**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

------------------------------------

MYUN-UK CHOI, JIN-HO JUNG, SUNG-
HUN JUNG, SUNG-HEE LEE, and KYUNG-
SUB LEE, Individually and on Behalf of All
Others Similarly Situated,

                        Plaintiff,

      vs.

TOWER RESEARCH CAPITAL LLC and
MARK GORTON,

                      Defendants.

------------------------------------

Case No.: 14-cv-9912 (KMW)

**Oral Argument Requested**

**MEMORANDUM OF LAW IN SUPPORT OF**
**TOWER RESEARCH CAPITAL LLC'S AND MARK GORTON'S**
**<u>MOTION TO DISMISS THE COMPLAINT</u>**

## **TABLE OF CONTENTS**

Page

PRELIMINARY STATEMENT ............................................................................................1

ALLEGED FACTS.............................................................................................................2

    A.    Parties.............................................................................................................3

    B.    The Korean Stock Exchange and KOSPI 200 Futures ...........................3

    C.    The Complaint ................................................................................................4

ARGUMENT ....................................................................................................................5

I.    *Morrison* Bars the Korean Traders' CEA Claims.................................................5

II.    The Complaint Fails to State any Claim against Tower ....................................10

    A.    The Complaint Fails to State a CEA Claim against Tower ...................10

    B.    The Complaint Fails to State an Unjust Enrichment Claim against Tower...........15

III.    The Complaint Fails to State a Claim against Mr. Gorton ...............................16

CONCLUSION .................................................................................................................18

# TABLE OF AUTHORITIES

**Page(s)**

**FEDERAL CASES**

*ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*,
   493 F.3d 87 (2d Cir. 2007).................................................................................10, 11, 17

*Bell Atlantic Corp. v. Twombly*,
   550 U.S. 544 (2007)...............................................................................................15

*Bryant v. N.Y. State Educ. Dep't*,
   692 F. 3d 202 (2d Cir. 2012)..................................................................................11

*CFTC v. Garofalo*,
   No. 10-CV-2417, 2010 U.S. Dist. LEXIS 145379 (N.D. Ill. Dec. 21, 2010)...........................6

*CFTC v. Parnon Energy Inc.*,
   875 F. Supp. 2d 233 (S.D.N.Y. 2012).......................................................................11, 12, 13

*Chambers v. Time Warner, Inc.*,
   282 F.3d 147 (2d Cir. 2002)....................................................................................8

*City of Pontiac Policemen's & Firemen's Ret. Sys. v. UBS AG*,
   752 F.3d 173 (2d Cir. 2014)....................................................................................8

*Cornwell v. Credit Suisse Grp.*,
   729 F. Supp. 2d 620 (S.D.N.Y. 2010).......................................................................8

*Hinds County v. Wachovia Bank N.A.*,
   620 F. Supp. 2d 499 (S.D.N.Y. 2009).......................................................................15

*In re Amaranth Natural Gas Commodities Litig.*,
   587 F. Supp. 2d 513 (S.D.N.Y. 2008)....................................................................8, 10, 13, 16

*In re Amaranth Natural Gas Commodities Litig.*,
   612 F. Supp. 2d 376 (S.D.N.Y. 2009).......................................................................16

*In re Amaranth Natural Gas Commodities Litig.*,
   269 F.R.D. 366 (S.D.N.Y. 2010) .............................................................................14

*In re Amaranth Natural Gas Commodities Litig.*,
   730 F.3d 170 (2d Cir. 2013).....................................................................................11

*In re Commodity Exchange Inc., Silver Futures & Options Trading Litig.*,
   No. 11 Md. 2213, 2012 WL 6700236 (S.D.N.Y. Dec. 21, 2012).....................................12, 13

i

*In re Commodity Exchange Inc., Silver Futures & Options Trading Litig.*,
    560 F. App'x 84 (2d Cir. Mar. 27, 2014)......................................................................11, 13

*In re Crude Oil Commodity Litig.*,
    No. 06-cv-6677, 2007 WL 1946553 (S.D.N.Y. June 28, 2013) ................................10, 12, 13

*In re Foreign Exch. Benchmark Rates Antitrust Litig.*,
    Nos. 13-civ-7789, -7953, 14-civ-1364, 2015 WL 363894 (S.D.N.Y. Jan. 28, 2015)..............14

*In re Fosamax Prods. Liab. Litig.*,
    No. 09-civ-1412, 2010 WL 1654156 (S.D.N.Y. Apr. 9, 2010) ..............................................15

*In re LIBOR-Based Fin. Instruments Antitrust Litig.*,
    935 F. Supp. 2d 666 (S.D.N.Y. 2013)......................................................................6, 8, 14, 16

*In re LIBOR-Based Fin. Instruments Antitrust Litig.*,
    962 F. Supp. 2d 606 (S.D.N.Y. 2013)...................................................................................14

*In re Manulife Fin. Corp. Sec. Litig.*,
    276 F.R.D. 87 (S.D.N.Y. 2011) ...........................................................................................14

*In re Motel 6 Sec. Litig.*,
    Nos. 93-cv-2183, 92-cv-2866, 1997 WL 154011 (S.D.N.Y. Apr. 2, 1997) ..........................15

*In re Natural Gas Commodity Litig.*,
    358 F. Supp. 2d 336 (S.D.N.Y. 2005)...................................................................................10

*In re Platinum & Palladium Commodities Litig.*,
    828 F. Supp. 2d 588 (S.D.N.Y. 2011)..............................................................................17, 18

*In re Rough Rice Commodity Litig.*,
    No. 11 C 618, 2012 WL 473091 (N.D. Ill. Feb. 9, 2012).....................................................12

*In re Term Commodities Cotton Futures Litig.*,
    No. 12 Civ. 5126, 2013 U.S. Dist. LEXIS 184374 (S.D.N.Y. Dec. 20, 2013).................13, 17

*Krause v. Forex Exch. Mkt., Inc.*,
    356 F. Supp. 2d 332 (S.D.N.Y. 2005)...................................................................................17

*Loginovskaya v. Batratchenko*,
    936 F. Supp. 2d 357 (S.D.N.Y. 2013), *aff'd*, 764 F.3d 266 (2d Cir. 2014)............................6

*Morrison v. National Australia Bank Ltd.*,
    561 U.S. 247 (2010)................................................................................................... passim

*Police & Fire Ret. Sys. v. SafeNet, Inc.*,
    645 F. Supp. 2d 210 (S.D.N.Y. 2009)...................................................................................15

*Rombach v. Chang,*
    355 F.3d 164 (2d Cir. 2004)........................................................................10

*SEC v. Tourre,*
    No. 10 CIV. 3229 KBF, 2012 WL 5838794 (S.D.N.Y. Nov. 19, 2012) ...................8

*Starshinova v. Batratchenko,*
    931 F. Supp. 2d 478 (S.D.N.Y. 2013) (Wood, J.)..............................................6

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.,*
    551 U.S. 308 (2007).......................................................................................8

**STATE CASES**

*Corsello v. Verizon N.Y., Inc.,*
    18 N.Y.3d 777 (2012) ...................................................................................16

*Sperry v. Crompton Corp.,*
    8 N.Y.3d 204 (2007) .....................................................................................16

**FEDERAL STATUTES**

7 U.S.C. § 1a .....................................................................................................7

7 U.S.C. § 2 .......................................................................................................5

7 U.S.C. § 6 .......................................................................................................7

7 U.S.C. § 9 ................................................................................................5, 6, 7

7 U.S.C. § 13 ...................................................................................................5, 7

7 U.S.C. § 13b ....................................................................................................5

7 U.S.C. § 13c ....................................................................................................5

7 U.S.C. § 25 .............................................................................................5, 7, 17

15 U.S.C. § 78j(b) ...........................................................................................5, 6

U.S. Commodity Exchange Act (CEA) .......................................................... passim

**RULES**

Federal Rule of Civil Procedure 8 .....................................................2, 11, 12, 13

Federal Rule of Civil Procedure 9(b).............................................................. passim

**OTHER AUTHORITIES**

A New Regulatory Framework for Trading Facilities, Intermediaries and Clearing
   Organizations, 66 Fed. Reg. 42,256 (August 10, 2001) ...........................................7

CFTC No Action Letter 99-69 (Nov. 12, 2009) ..................................................................7

CFTC No Action Letter 02-96 (July 26, 2002) ...................................................................7

CFTC No Action Letter 03-08 (Feb. 24, 2003) ..................................................................7

CFTC No Action Letter 03-12 (Mar. 10, 2003) .................................................................7

CFTC No Action Letter 03-17 (Apr. 14, 2003) ..................................................................7

CFTC No Action Letter 08-20 (Nov. 26, 2008) ...........................................................3, 4, 10

CME Regulatory Notice No. 20091009 (Nov. 9, 2009) ......................................................9

Korea Exchange Derivatives Market Business Regulation ..................................................9

Korea Exchange Enforcement Rules of the Derivatives Market
   Business Regulation ........................................................................................................9

Korea Exchange Market Oversight Regulation ...................................................................9

*In re Louis Abrams*,
   No. 88-10, 1994 WL 506250 (C.F.T.C. Sept. 15, 1994) ........................................15

iv

## PRELIMINARY STATEMENT

In this putative class action, foreign traders of foreign futures contracts assert U.S. Commodity Exchange Act (CEA) claims for alleged manipulation of a foreign market. U.S. law, however, does not apply here. Even if it did, the Complaint comes nowhere close to pleading a proper claim. It is far too general and unsupported. This case should be dismissed.

Plaintiffs are Korean traders of "KOSPI 200" index futures, contracts that track the value of 200 underlying stocks on the Korean Stock Exchange. Like their underlying securities, KOSPI 200 futures trade on the Korean Stock Exchange subject to Korean regulation. These instruments accordingly have been deemed non-U.S. futures by the Commodity Futures Trading Commission (CFTC).

Nonetheless, the Korean trader plaintiffs seek to apply U.S. law to regulate the conduct here, arguing that the Korean Stock Exchange's use of computers in the United States to "match" KOSPI 200 contracts at certain times of day supposedly justifies imposing United States trading rules abroad. The Korean traders then maintain that a Korean financial regulator's reported public statements—not even formal allegations—support a CEA claim against Tower Research Capital LLC and its owner Mark Gorton.

The Korean traders are wrong for at least three reasons.

*First*, U.S. law does not apply. Under *Morrison v. National Australia Bank Ltd.*, 561 U.S. 247 (2010), U.S. law applies only to transactions on U.S. exchanges. KOSPI 200 futures are traded on a Korean exchange. Nothing in *Morrison* supports extending U.S. law to trades on a foreign exchange merely because some exchange-related computers are in the U.S. Nor would that result make sense. It would create the exact conflict of law risk *Morrison* prohibits.

*Second*, even if U.S. law applied, the Complaint is fatally deficient. The Korean traders allege only in general terms that Tower engaged in "spoofing," in which orders are submitted

without intending to execute them, and "wash trading," in which a trader simultaneously buys and sells the same commodity at the same price.  But the Korean traders never identify even one allegedly bad trade or any market effect, much less an effect on themselves.  They instead rely on a Korean regulator's reported statements about Tower, and on paragraphs cut-and-pasted from charges against a trader in a Chicago firm unrelated to Tower or Mr. Gorton.  Neither source satisfies Federal Rule of Civil Procedure 9(b), or even Rule 8's more lenient standards.  The Complaint thus pleads none of the elements of a CEA manipulation claim:  the ability to affect market prices, an artificial price, defendants' connection to such a price, defendants' intent to create an artificial price, or any injury to the Korean traders.

*Third*, the claims against Mr. Gorton individually are especially threadbare.  The Complaint never alleges that Mr. Gorton had anything to do with any unlawful trading, either directly or as a supervisor.  Plaintiffs instead cite Mr. Gorton's ownership of Tower to sweep him into this case and along the way try to smear his character by referencing an unrelated copyright lawsuit about music file-sharing.  Merely owning a company, however, has never sufficed to plead a trading case like this.  And the Complaint's reference to a file-sharing lawsuit is blatantly improper.  It has no bearing here.

For these reasons and those that follow, this Court should dismiss the Complaint.

## ALLEGED FACTS

The facts here are from the Complaint and documents it incorporates by reference or that are otherwise subject to judicial notice.  Relevant documents are attached to the March 4, 2015 Declaration of Robert W. Trenchard (Tren. Dec.).

### A.    Parties

Plaintiffs are Myun Uk-Choi, Jin-Ho Jung, Sung-Hung Jung, Sung-Hee Lee, and Kyung-Sub Lee, Korean citizens all living in Korea.  (Compl. ¶¶ 8-12.)  They purport to represent a class of KOSPI 200 overnight traders in 2012.  (*Id.* ¶ 1.)

Defendant Tower is a New York financial services firm.  (*Id.* ¶ 13.)  Tower's trading teams and affiliates trade in global markets using primarily algorithmic trading strategies.  (*See id.* ¶ 24.)  Mr. Gorton is Tower's majority owner and Managing Director.  (*Id.* ¶ 14.)

### B.    The Korean Stock Exchange and KOSPI 200 Futures

The Korean Stock Exchange (also called "KRX") is "the derivatives and securities exchange of the Republic of Korea."  It is "headquartered in Busan" and is self-regulated by a "Market Oversight Commission" that "conducts market surveillance . . . to prevent unfair trading practices such as manipulation."  The Korean Government's Financial Services Commission, which "monitor[s] and supervis[es] the Korean securities and futures markets," oversees the KRX.  (Tren. Dec. Ex. A (CFTC No-Action Letter 08-20, at 1-2 (Nov. 26, 2008)).)

The KRX sponsors the KOSPI 200, an index of 200 major stocks traded on the KRX similar to the Dow Jones or S&P 500 index.  (Compl. ¶¶ 15, 17.)  The KRX began offering KOSPI 200 futures contracts to track the index in May 1996.  (*Id.* ¶ 17.)  Those contracts trade and settle on the KRX.  (*Id.* ¶ 21.)

While U.S. investors can buy and sell KOSPI 200 futures, the CFTC has excluded these instruments from regulation as U.S. futures contracts.  In November 2008, the CFTC issued a "no-action" letter to permit U.S. investors to buy and sell KOSPI 200 futures.  (*Id.* ¶ 19.)  That letter identifies the KRX as a "foreign board of trade" subject to extensive Korean regulation. Based on the extensive Korean regulatory scheme, the CFTC concluded that KOSPI 200 futures

should not be regulated as U.S. futures contracts.  (Tren. Dec. Ex. A (CFTC No-Action Letter 08-20, at 6-7 (Nov. 26, 2008)).)

  **C.**  **The Complaint**

  Despite the CFTC's conclusion, the Korean trader plaintiffs maintain that the CEA should apply to the KOSPI 200 "overnight" market.  According to the Korean traders, the KRX began in 2009 to use Chicago Mercantile Exchange (CME) computers for overnight trading. CME "Globex" computers in Chicago allegedly "match" KOSPI 200 contracts when the Korean exchange is otherwise closed.  (Compl. ¶¶ 18, 21.)

  Having alleged this jurisdictional hook, the Korean traders assert CEA manipulation claims for allegedly "fictitious" and "spoof" trades.  (*Id.* ¶¶ 2, 3, 28-37.)  They say that Tower entered "large-volume buy or sell orders that it had no intention of fulfilling" and then either cancelled the orders or closed them by trading with itself.  (*Id.* ¶ 2.)  This conduct allegedly distorted prices up and down.  (*Id.*)

  However, the Complaint never identifies a single such order or trade.  Nor does it say when in the one-year class period prices supposedly moved, in which direction, or by how much. (*See id.* ¶¶ 29-32.)  The Complaint does not even allege that any of the supposed misconduct occurred in the overnight market when CME Globex computers allegedly were in use.

  Rather than provide any details, the Complaint relies on press releases and boilerplate lifted from other cases.  The Complaint cites a May 2014 press release by a Korean regulator asserting that Tower engaged in spoof and self-trades sometime in 2012, which supposedly prompted the regulator to refer Tower to a Korean prosecutor.  (*Id.* ¶ 33.)  The Complaint then cites other articles picking up on the same story.  (*Id.* ¶¶ 34-37.)  Tellingly, the Complaint nowhere claims that any actual charges resulted from the Korean regulators' statements.  Tower knows of none.

The Complaint then relies on boilerplate descriptions of alleged "spoofing" and "wash trading" lifted from charges against Michael Coscia in Chicago.  Mr. Coscia, however, is entirely unaffiliated with Tower—he was a trader with Panther Energy Trading LLC.  Nonetheless, paragraphs 2, 3, 29, and 31 of the Korean traders' complaint appear to copy language straight from the Coscia indictment, as shown in Appendix 1 to this brief and Exhibit B to the Trenchard Declaration.

Based on these boilerplate descriptions, the Korean traders allege violations of CEA (i) market manipulation prohibitions, 7 U.S.C. §§ 9, 13(a), 13b and 25(a); (ii) aiding and abetting liability provisions, 7 U.S.C. § 2; and (iii) control person liability provisions, 7 U.S.C. § 13c.  In addition, plaintiffs assert common law unjust enrichment claims.  (Compl. ¶¶ 57-60.)

Tower and Mr. Gorton now move to dismiss these claims.

## ARGUMENT

### I.   *Morrison* **Bars the Korean Traders' CEA Claims**

The Korean traders' CEA claims fail because U.S. law does not apply.  Federal law presumptively applies only to domestic conduct.  This presumption is fatal here, where the Korean traders complain solely of conduct on a foreign futures exchange.

In *Morrison v. National Australia Bank Ltd.*, 561 U.S. 247 (2010), the Supreme Court applied this principle to the federal securities laws.  The *Morrison* plaintiffs asserted federal securities claims based on trading losses incurred on an Australian exchange.  The Supreme Court rejected these claims as beyond the reach of U.S. law.  The Court started from the rule that "legislation of Congress, unless a contrary intent appears, is meant to apply only within the territorial jurisdiction of the United States[.]"  *Id.* at 255.  In other words, "[w]hen a statute gives no clear indication of an extraterritorial application, it has none."  *Id.*  Applying this rule, the Court examined Section 10(b) of the Securities Exchange Act and concluded that Congress never

intended to extend that provision abroad.  *Id.* at 267-268.  Section 10(b) instead applies only to domestic securities transactions because "purchase-and-sale transactions are the objects of the statute's solicitude."  *Id.* at 267.

The Court further held that domestic transactions are "transactions in securities listed on domestic exchanges," or off-exchange "domestic purchases and sales."  *Id.* at 267-68.  By drawing this bright-line rule, the Court sought to reduce "the probability of incompatibility" between U.S. law and "the applicable laws of other countries."  *Id.* at 269.  Because the trades in *Morrison* had occurred on an Australian exchange, the complaint failed to state a claim under Section 10(b).

So it is here.  The Korean traders complain about trading on a Korean exchange.  Their effort to extend CEA Section 6(c) to that exchange is flatly inconsistent with *Morrison*.  True, *Morrison* dealt specifically with the securities laws, not the CEA.  But the Second Circuit and this Court have both concluded that *Morrison*'s transactional test applies to the CEA.  *Loginovskaya v. Batratchenko*, 936 F. Supp. 2d 357, 372-374 (S.D.N.Y. 2013) ("The CEA is silent as to its extraterritorial reach; accordingly, the *Morrison* presumption against extraterritoriality applies in full force."), *aff'd*, 764 F.3d 266 (2d Cir. 2014); *Starshinova v. Batratchenko*, 931 F. Supp. 2d 478, 485-487 (S.D.N.Y. 2013) (Wood, J.) (dismissing case on pleadings after applying *Morrison*'s "transactional test" and finding "no clear indication of extraterritoriality" in the CEA's statutory language).  Other cases are the same.[1]

Moreover, like the securities laws in *Morrison*, the CEA provisions here lack any explicit extraterritorial application.  *Compare*  7 U.S.C. § 9(1), *with* 15 U.S.C. § 78j(b).  To the contrary,

---

[1]      *See In re LIBOR-Based Fin. Instruments Antitrust Litig.* (*LIBOR I*), 935 F. Supp. 2d 666, 696 (S.D.N.Y. 2013) ("Because section 9(a) of the CEA 'gives no clear indication of an extraterritorial application, it has none.'") (quoting *Morrison*, 561 U.S. at 255); *see also CFTC v. Garofalo*, No. 10-CV-2417, 2010 U.S. Dist. LEXIS 145379, at *17 (N.D. Ill. Dec. 21, 2010) (citing *Tamari v. Bache & Co*, 730 F.2d 1103, 1107 (7th Cir. 1984)) ("[N]either the CEA nor its legislative history specifically authorizes extraterritorial application of the statute.").

the CEA sections here expressly apply only to trading on "registered" contract markets.  *See* 7 U.S.C. § 9(a)(1) (prohibiting manipulation "in connection with any swap, or a contract of sale of any commodity" on "registered entit[ies]"); § 13(a)(2) (same); § 25(a)(1)(D)(i) (same).[2]  A "registered" entity is a domestic U.S. market registered with the Commission under Section 5 of the CEA.  *Id*. § 1a(40).  It is distinct from a "foreign board of trade" like the KRX, which is not subject to the CEA's general requirements for U.S. exchanges.  *See id.* § 6(b)(1).

The KRX's use of CME Globex computers in Chicago is beside the point.  Wherever those computers are situated, the KRX remains a Korean market subject to Korean regulatory oversight, as the CFTC has found.  Outsourcing certain functions to computers in the U.S. does not alter that fact.  In fact, the CFTC routinely exempts foreign markets from U.S. regulation even when those markets have computers in the U.S.[3]

That result makes sense.  Under *Morrison*, what matters is the *exchange's* location, not where the *technology* is located.  561 U.S. at 268; *cf.* A New Regulatory Framework for Trading Facilities, Intermediaries and Clearing Organizations, 66 Fed. Reg. 42,256, 42,266 & n.58 (August 10, 2001) (observing that exchanges may outsource "various services related to their operations," including the operation of a matching engine, without triggering CEA registration).  Any other result would create exactly the conflict of laws risk *Morrison* forbids.  Here, for

---

[2]     The other CEA claims in the complaint are derivative of these sections.  Plaintiffs' Second and Third Claims for Relief raise vicarious liability, aiding and abetting, and control person theories of liability.  These claims expressly depend on alleged primary violations of the CEA provisions discussed above.

[3]     Through a series of no-action letters, the CFTC has exempted foreign boards of trade from the CEA's registration requirements even when they provide U.S. persons direct access to "electronic trading and order matching systems" in the U.S.  CFTC No-Action Letter 99-69 (Nov. 12, 2009) (granting International Petroleum Exchange (IPE) relief from registration requirements if it provided U.S. customers direct access to its systems); CFTC No-Action Letter 02-96 (July 26, 2002) (extending IPE relief to make certain contracts available on the IntercontinentalExchange's (ICE) trading platform); CFTC No-Action Letter 03-08 (Feb. 24, 2003) (extending IPE relief to make additional contracts available on ICE and/or existing contracts available during extended hours trading); CFTC No-Action Letter 03-12 (Mar. 10, 2003) (same); CFTC No-Action Letter 03-17 (Apr. 14, 2003) (allowing IPE to make all contracts directly available to U.S. customers during the entire trading day).  Here, KRX does not even provide U.S. persons with such direct access.  Orders must be routed through a KRX member, which under Korean law must be a Korean firm or maintain an office in Korea.

instance, the CEA could end up in conflict with Korea's comprehensive regulatory scheme. *Morrison* does not permit that result.

The Korean traders here suggest that KRX's use of CME Globex computers is significant because "transactions" supposedly occur on those computers.  (Compl. ¶¶ 18, 21.)  In this way, the Korean traders try to fit within *Morrison*'s rule that U.S. law applies to U.S. "transactions." That theory is wrong.  *Morrison* makes clear that, for on-exchange trades, the trade occurs where the exchange is located.  561 U.S. at 268 (finding that the Exchange Act was not "intended to regulate *foreign* securities exchange" (internal quotations omitted)); *see also City of Pontiac Policemen's & Firemen's Ret. Sys. v. UBS AG*, 752 F.3d 173, 181 (2d Cir. 2014) (dismissing claims based on "purchase of foreign securities on a foreign exchange," where orders were submitted directly from the U.S.).[4]  The KRX is indisputably in Korea, not the U.S.

In that regard, the KRX's rules draw no meaningful distinction between regular and after-hours trading—*all* KOSPI 200 trading is deemed on-exchange.  This is a "guiding principle" for the KRX:  KOSPI 200 futures traded overnight still "are products listed on Korea Exchange . . . subject to the rules and regulations of Korea Exchange (including the market oversight regulations)."  (Tren. Dec. Ex. C (KOREA EXCHANGE, GUIDE TO TRADING OF KOSPI 200 FUTURES TRADED ON CME GLOBEX & DAILY FUTURES ON KOSPI 200 OPTIONS ON EUREX (2012-07) [KOSPI 200 FUTURES GUIDE]).)[5]

---

[4]      *See also Cornwell v. Credit Suisse Grp.*, 729 F. Supp. 2d 620, 625-626 (S.D.N.Y. 2010) (dismissing claims based on purchase of foreign shares that settled on Swiss Stock Exchange, even though shares were purchased from the U.S.).

[5]      This Court may consider the KRX's and CME's rules and publications on this motion.  *Tellabs, Inc. v. Makor Issues & Rights, Ltd.,* 551 U.S. 308, 322 (2007) ("[C]ourts must consider the complaint in its entirety, as well as other sources . . ., in particular, documents incorporated into the complaint by reference, and matters of which a court may take judicial notice."); *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 152-153 (2d Cir. 2002) (same); *see also, e.g., LIBOR I*, 935 F. Supp. 2d at 721 (taking judicial notice of various CME rules, statements, and filings in the context of plaintiffs' CEA claims); *SEC v. Tourre*, No. 10 CIV. 3229 KBF, 2012 WL 5838794, at *2 (S.D.N.Y. Nov. 19, 2012) (taking judicial notice of documents relating to the location where "irrevocable liability" attached); *In re Amaranth Natural Gas Commodities Litig.* (*Amaranth I*), 587 F. Supp. 2d 513, 522-523, n.26, 32, & 35

At any time of day, trades can only be made through KRX clearing member firms, which implement the required margin, position, and risk controls.  (Tren. Dec. Ex. D (Korea Exchange Derivatives Market Business Regulation (Korea Exchange Derivatives Rules) §§ 65, 82-3, 110, 124, 126-139, & 154; *see also id.* Ex. E (Korea Exchange Enforcement Rules of the Derivatives Market Business Regulation (Korea Exchange Derivatives Enforcement Rules) § 119).) Approved orders are then transmitted to the exchange's derivatives systems.  (*Id.* Ex. D (Korea Exchange Derivatives Rules § 8, 8-2, 65, 82-3, 118); Ex. E (Korea Exchange Derivatives Enforcement Rules §§ 117-18).)  After-hours trades clear and settle the next business day, alongside activity from the next day's regular session.  (Compl. ¶ 21; Tren. Dec. Ex. D (Korea Exchange Derivatives Rules §§ 96(1), 140).)

Consistent with this approach, the CME has no KOSPI 200 trading rules.  CME members may not trade KOSPI 200 futures unless they open KRX member accounts and route orders through KRX's computers.  (Tren. Dec. Ex. F (CME Regulatory Notice No. 20091009).)  After-hours orders cannot be entered into the CME's computers directly, but must instead be routed through the KRX's computers in Korea.  (*Id.*; Ex. G (KOREA EXCHANGE FAQS); Ex. H (Korea Exchange (CME Website)).)

All of this activity occurs under Korean regulators' supervision and control.  After-hours trading is subject to the Korea Exchange's Market Oversight Regulation, enforced by the exchange's Market Oversight Commission.  (*Id.* Ex. I (Korea Exchange Market Oversight Regulation); Ex. C (KOSPI 200 FUTURES GUIDE).)  The KRX can suspend trading in the after-hours session.  (*Id.* Ex. D (Korea Exchange Derivatives Rules § 4-2).)  Korean Regulators may investigate and act against firms that violate the Financial Investment Services and Capital

---

(S.D.N.Y. 2008) (citing to the NYMEX website for factual propositions relating to the structure and market for futures trading (the NYMEX website links through to the CME homepage)).

Market Act, or other applicable regulations.  (*Id.* Ex. A (CFTC No-Action Letter 08-20, at 1-2 (Nov. 26, 2008)).)

This is exactly the context in which *Morrison* precludes the extraterritorial application of U.S. law.  KOSPI 200 futures trade on a foreign exchange subject to foreign regulation. Layering U.S. law on top of that scheme would create exactly the risk of conflict of laws that *Morrison* forbids.  The Korean traders' CEA claims accordingly should be dismissed.

## II.    The Complaint Fails to State any Claim against Tower

Even if the Korean traders could escape *Morrison* (which they cannot), the Complaint would still fail.  The Complaint comes nowhere close pleading proper claims.

### A.    The Complaint Fails to State a CEA Claim against Tower

The Korean traders claim that Tower created false impressions in the market, either by submitting illusory orders or by trading with itself to create the appearance of trading activity. (*See* Compl. ¶¶ 28, 37.)  Such allegations of "disseminating false or misleading information in the market" are deemed to "sound in fraud," and thus must comply with Federal Rule of Civil Procedure 9(b)'s particularity requirements.  *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 99, 101-102 (2d Cir. 2007) (market manipulation that sounds in fraud must be pled with particularity under Rule 9(b)); *Rombach v. Chang*, 355 F.3d 164, 172 (2d Cir. 2004) (same). Rule 9(b) is thus routinely applied in commodity market manipulation cases.  *See, e.g., Amaranth I*, 587 F. Supp. 2d at 535; *In re Crude Oil Commodity Litig.* (*In re Crude Oil*), No. 06-cv-6677, 2007 WL 1946553, at *5-7 (S.D.N.Y. June 28, 2013) (applying Rule 9(b) where the defendant allegedly "misled the market," created a "*false impression*" and "conceal[ed]" information (emphasis in original)); *In re Natural Gas Commodity Litig.*, 358 F. Supp. 2d 336, 343 (S.D.N.Y. 2005) (applying Rule 9(b) because the complaint "allege[d] a scheme that is

10

'classically associated with fraud,': the dissemination of inaccurate, misleading and false trading information.").

To comply with Rule 9(b), a complaint must "plead with particularity the nature, purpose, and effect of the fraudulent conduct and the roles of the defendants." *ATSI Commc'ns, Inc.*, 493 F.3d at 102. A manipulation complaint thus must state "what manipulative acts were performed, which defendants performed them, when the manipulative acts were performed, and what effect the scheme had on the market for the securities at issue." *Id.*

The Complaint here fails under any view of Rule 9(b). Even if 9(b) did not apply, the Complaint would also fail under Rule 8, which still requires that a complaint provide "'enough facts' to 'raise a right to relief above the speculative level' and 'state a claim to relief that is plausible.'" *Bryant v. N.Y. State Educ. Dep't*, 692 F. 3d 202, 210 (2d Cir. 2012) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555, 570 (2007)).

The Complaint here alleges not even a single required element. CEA manipulation claims require that (i) the defendant could influence prices; (ii) artificial prices existed; (iii) the defendant caused the artificial prices; (iv) the defendant specifically intended to cause the artificial prices; and (v) injury to plaintiffs. *In re Commodity Exchange Inc., Silver Futures & Options Trading Litig.* (*Silver II*), 560 F. App'x 84, 86 (2d Cir. Mar. 27, 2014); *In re Amaranth Natural Gas Commodities Litig.* (*Amaranth IV*), 730 F.3d 170, 183 (2d Cir. 2013). None of these elements are pleaded here.

**First**, the Complaint fails to allege artificial prices, *i.e.*, prices that do not reflect natural supply and demand. *CFTC v. Parnon Energy Inc.*, 875 F. Supp. 2d 233, 246 (S.D.N.Y. 2012). The Complaint identifies not a single artificial price in all of 2012. This alone defeats the plaintiffs' claims.

11

**Second**, the Complaint fails to allege that Tower could create an artificial price. *See id.* at 245 ("bare and conclusory" assertions of market power are insufficient) (citing *Crosswood Magazine Inc. v. Times Books*, No. 96 Civ. 4550 (SJ), 1997 WL 227998, at *2 (E.D.N.Y. May 5, 1997) ("Plaintiffs . . . have pleaded no facts indicating that [defendant] has the power to fix prices or exclude competition in the alleged relevant market."); *Telectronics Proprietary, Ltd. v. Medtronic, Inc.*, 687 F. Supp. 832, 838 (S.D.N.Y. 1988) (dismissing complaint which baldly averred that defendants had "monopolized and continue to monopolize the relevant markets")). At most, the Korean traders allege that Tower traded "a total of 3,828,127 KOSPI 200 Futures contracts between January and December 2012[.]" (Compl. ¶ 37.) Such "bare and conclusory" assertions of market power, without more, are insufficient under Rules 8(a) or 9(b).

Merely trading large volumes has never sufficed to allege the ability to create an artificial price. In any event, the Complaint fails to identify the size of Tower's positions at particular points in time, or the portion of the overall market represented by its activity. *See, e.g.*, *In re Rough Rice Commodity Litig.*, No. 11 C 618, 2012 WL 473091, at *6 (N.D. Ill. Feb. 9, 2012) (bare allegations that defendants held a dominant position in various contracts insufficient to create an inference that defendants had ability to cause an artificial price).

**Third**, the Complaint fails to plead that Tower caused artificial prices. "The causation element requires that a defendant be the proximate cause of the price artificiality." *In re Commodities Exchange Inc., Silver Futures & Options Trading Litig.* (*Silver I*), No. 11 Md. 2213, 2012 WL 6700236, at *16 (S.D.N.Y. Dec. 21, 2012). The Complaint here never matches Tower's trades to any particular price movement. Nowhere do Plaintiffs specifically state "what effect the scheme had on the market for the [contracts] at issue." *In re Crude Oil*, 2007 WL 1946553, at *6 (citing *In re Natural Gas Commodity Litig.*, 358 F. Supp. 2d at 344).

**Fourth**, the Complaint fails to allege facts giving rise to an inference of manipulative intent, never mind the "strong" inference required under Rule 9(b).  Market manipulation under the CEA requires proof of a specific intent.  *Silver I*, 2012 WL 6700236, at *10.  And Rule 9(b) requires the factual allegations to give rise to a "strong inference that manipulation was the dominant purpose of the [subject] transaction."  *Amaranth I*, 587 F. Supp. 2d at 535-536.

To plead a "strong inference of scienter," plaintiffs must allege "facts showing that defendants had both motive and opportunity to commit fraud" or "by alleging facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness."  *In re Crude Oil*, 2007 WL 1946553, at *8 (citing *Lerner v. Fleet Bank, N.A.*, 459 F. 3d 273, 290-291 (2nd Cir. 2006)).  Even under Rule 8(a), Plaintiffs must allege that causing an artificial price was "the purpose or conscious object" of the act.  *In re Term Commodities Cotton Futures Litig.* (*In re Cotton Futures*), No. 12 Civ. 5126, 2013 U.S. Dist. LEXIS 184374, at *54 (S.D.N.Y. Dec. 20, 2013) (quoting *In re Ind. Farm Bureau Coop. Ass'n, Comm. Fut. L. Rep.* (CCH), ¶ 21,796, 1982 WL 30249, at *7 (CFTC Dec. 17, 1982)), *modified on reconsideration by* 2014 U.S. Dist. LEXIS 145955 (Sept. 30, 2014).[6]

Far from meeting that standard, the Complaint has only a conclusory assertion that Tower intended to "move[] the KOSPI 200 price on the CME in a direction favorable to Tower." (Compl. ¶ 29.)  There are no facts—none—supporting that conclusory assertion.

**Fifth**, the Complaint fails to allege an injury causally connected to any conduct of the defendants.  The CEA provides a private right of action only to individuals who have suffered actual damages from a violation of its provisions.  7 U.S.C. § 25(a) (remedies are available only to a "person who sustains loss as a result of any alleged violation" of the CEA).  Where, as here,

---

[6]       *See also Silver II*, 560 F. App'x, at 86-87 (holding that plaintiffs must go beyond vague allegations of improper conduct); *Parnon Energy Inc.*, 875 F. Supp. 2d at 249 (requiring allegations that the purpose of a defendant's action was to create an artificial price).

plaintiffs allege "day-to-day" manipulation that is "episodic and varying in direction," plaintiffs must allege (i) "that they engaged in a transaction at a time during which prices were artificial as a result of defendants' alleged trader-based manipulative conduct"; and (ii) "that the artificiality was adverse to their position[.]"   *In re LIBOR-Based Fin. Instruments Antitrust Litig.*, 962 F. Supp. 2d 606, 620, 622 (S.D.N.Y. 2013).   The Korean traders allege no date on which they traded, or any losses they suffered.   They thus cannot satisfy the most basic principle of pleading actual damages: alleging a "net loss."   *In re Amaranth Natural Gas Commodities Litig.* (*Amaranth III*), 269 F.R.D. 366, 379 (S.D.N.Y. 2010); *see LIBOR I*, 935 F. Supp. 2d at 714.

To rescue their facially deficient claims, the Korean traders litter their complaint with irrelevant allegations regarding a supposed investigation by Korean regulators.   As an initial matter, the purported existence of an investigation by *Korean* authorities only sharpens the point made by *Morrison*, namely that these claims are based on foreign conduct and permitting U.S. jurisdiction creates the risk of conflict with foreign regulatory authority.

In any event, the statements the Complaint quotes simply mention a "referr[al]" of a matter to prosecutors.   (Compl. ¶ 33.)   In this district, such allegations—which show nothing more than the existence of an investigation as of May 2014—cannot support a civil complaint. *See In re Foreign Exch. Benchmark Rates Antitrust Litig.*, Nos. 13-civ-7789, -7953, 14-civ-1364, 2015 WL 363894, at *6-7 (S.D.N.Y. Jan. 28, 2015) ("Certainly, the mere fact of pending investigations without more only raises, but does not respond to, the question of whether . . . wrongdoing occurred because the outcome and scope of such investigations are 'pure speculation.'") (quoting *Hinds County v. Wachovia Bank N.A.*, 620 F. Supp. 2d 499, 514 (S.D.N.Y. 2009)); *In re Manulife Fin. Corp. Sec. Litig.*, 276 F.R.D. 87, 102 (S.D.N.Y. 2011) ("Securities regulators are obligated to examine the behavior of public corporations, and the fact

that a regulator is fulfilling this role cannot be sufficient to allege scienter."); *Police & Fire Ret. Sys. v. SafeNet, Inc.*, 645 F. Supp. 2d 210, 230 (S.D.N.Y. 2009) ("the mere existence of an investigation cannot support any inferences of wrongdoing or fraudulent scienter on the part of a company or its senior management"); *Hinds County*, 620 F. Supp. 2d at 514 (S.D.N.Y. 2009) (existence of investigations does not support civil claim of wrongdoing). Investigations are launched for many reasons, such as political gain, that support no inference of actual wrongdoing. The Korean traders' reliance on public reports of an investigation that has yielded no charges shows the weakness of their claims.

Other than reports of the Korean regulators' statements, the Complaint consists primarily of passages cribbed from the Coscia indictment. Such boilerplate allegations from a charging instrument against entirely unrelated parties cannot satisfy the Korean traders' pleading obligations. At most, such boilerplate describes a general category of wrongdoing, and provides no "facts" that would render the Korean traders' claims "plausible." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007); *see also In re Fosamax Prods. Liab. Litig.*, No. 09-civ-1412, 2010 WL 1654156, at *2 (S.D.N.Y. Apr. 9, 2010) (finding conclusory allegations apparently copied from other complaints in multi-district litigation insufficient to state a claim).

Most "[m]anipulation cases have not fared well." *In re Louis Abrams*, No. 88-10, 1994 WL 506250, at *12 (C.F.T.C. Sept. 15, 1994). So it is here. The Korean traders' CEA claims should be dismissed.

### B. The Complaint Fails to State an Unjust Enrichment Claim against Tower

The Complaint's unjust enrichment claim is equally defective. Unjust enrichment requires showing "some type of direct dealing, or actual, substantive relationship" between the plaintiff and defendant. *In re Motel 6 Sec. Litig.*, Nos. 93-cv-2183, 92-cv-2866, 1997 WL

154011, at *7 (S.D.N.Y. Apr. 2, 1997).  The relationship between the parties cannot be "too attenuated."  *Sperry v. Crompton Corp.*, 8 N.Y.3d 204, 215-216 (2007).

The Korean traders allege no contractual, business, or any other relationship with Tower or Mr. Gorton.  This claim accordingly must be dismissed too.  *See LIBOR I*, 935 F. Supp. 2d at 737-738 (dismissing unjust enrichment claim because plaintiffs did not purchase contracts from the defendants, nor did they have any other relationship with the defendants); *Amaranth I*, 587 F. Supp. 2d at 547 (dismissing unjust enrichment claim predicated on the alleged manipulation of NYMEX natural gas contracts).  In addition, because Plaintiffs' unjust enrichment claim duplicates their CEA claims, the unjust enrichment claim cannot stand in any event.  *See Corsello v. Verizon N.Y., Inc.*, 18 N.Y.3d 777, 791 (2012) ("[I]f plaintiffs' [statutory] claims 'are defective, an unjust enrichment claim cannot remedy the defects.'").

## III.    The Complaint Fails to State a Claim against Mr. Gorton

The Korean traders' claims against Mr. Gorton are even more lacking than those against Tower.  The Complaint barely mentions Mr. Gorton and never alleges that he was involved with the trading at issue.  The claims against Mr. Gorton should thus also be dismissed.

*First*, the substantive CEA claims against Mr. Gorton fail for the same reasons they fail as against Tower.  Having failed to state a claim against Tower, the Complaint necessarily also fails to state a claim against Mr. Gorton.  But even if a claim were stated against Tower, the Complaint would still fail against Mr. Gorton, who is not alleged to have any connection to the trading at issue.

*Second*, the aiding and abetting claim against Mr. Gorton similarly fails.  CEA aiding and abetting requires that defendant "(1) had knowledge of a principal's intent to manipulate the market and intended to assist to further that manipulation; and (2) performed an act in furtherance of that manipulation."  *In re Amaranth Natural Gas Commodities Litig. (Amaranth*

*II*), 612 F. Supp. 2d 376, 389 (S.D.N.Y. 2009).  These elements must be pled with particularity under Rule 9(b), *Krause v. Forex Exch. Mkt., Inc.*, 356 F. Supp. 2d 332, 338 (S.D.N.Y. 2005), though Plaintiffs' claims fail under any standard.

Having failed to adequately plead the underlying claims, an aiding and abetting claim fails.  *In re Platinum & Palladium Commodities Litig.*, 828 F. Supp. 2d 588, 599 (S.D.N.Y. 2011) (where complaint "fails to allege the requisite intent of any primary actor, there can be no aiding and abetting liability as a matter of law").  Pleading aiding and abetting requires individual, particularized allegations that a defendant knew of the manipulative trading strategy of another defendant it allegedly assisted and that each defendant intended to assist that manipulation.  *In re Cotton Futures*, 2013 U.S. Dist. LEXIS 184374, at *65 (quoting *Amaranth IV*, 730 F.3d at 183) ("'[A]iding and abetting requires knowledge of the primary violation and an intent to assist it.'").

No such allegations are pleaded as to Mr. Gorton.  There is only a single conclusory allegation that Mr. Gorton supposedly "possessed knowledge of Tower's intent to violate the CEA by manipulating [sic], intended to further that violation; and acted in furtherance of Tower's intention through his control of Tower [and] his direction of Tower's traders and . . . algorithmic trading."  (Compl. ¶ 55.)  The Complaint fails to allege facts, much less particularized ones, of Tower's purported manipulative intent or of Mr. Gorton's alleged awareness of such intent or assistance in the purported scheme.

***Third***, the Complaint's "control person liability" claim fails for similar reasons: the Complaint fails to allege (1) any primary violation, *see ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 108 (2d Cir. 2007), and (2) that Mr. Gorton was involved with any such violation. Moreover, there is no private right of action for control person liability under the CEA.  *See* 7

U.S.C. § 25.  Only CEA Section 13 concerns control person liability, and it provides that only the CFTC may sanction principals who control agents engaging in prohibited activities.  *Cf. In re Platinum & Palladium Commodities Litig.*, 828 F. Supp. 2d at 600 (discussing lack of a private right of action for control person liability in the context of 13(b)).

## CONCLUSION

For the foregoing reasons, this Court should dismiss the Complaint, with prejudice.


Dated:  March 4, 2015.

Respectfully submitted,

**WILMER CUTLER PICKERING
HALE AND DORR LLP**
By: <u>/s Robert W. Trenchard</u>
    Robert W. Trenchard
    Jason D. Hirsch
    7 World Trade Center
    250 Greenwich Street
    New York, NY 10007
    Telephone: (212) 230-8867
    Facsimile: (212) 230-8800
    robert.trenchard@wilmerhale.com
    jason.hirsch@wilmerhale.com

    Matthew T. Martens
    Matthew L. Beville
    1875 Pennsylvania Avenue
    Washington, DC 20006
    Telephone: (202) 663-6921
    Facsimile: (202) 663-6363
    matthew.martens@wilmerhale.com
    matthew.beville@wilmerhale.com

***Attorneys for Defendants Tower Research
Capital LLC and Mark Gorton***

**APPENDIX 1**

| Signal | *Coscia* Indictment | *Choi* Complaint |
|--------|---------------------|-------------------|
| A | COSCIA devised this strategy to create a false impression regarding the number of contracts available in the market, […] (¶ 3.) | These strategies allowed Tower to create a false impression regarding the number of contracts available in the market, […] (¶ 2.)<br><br>These strategies allowed Tower to create a false impression regarding the number of contracts available in the market, […] (¶ 29.) |
| B | COSCIA's strategy moved the market in a direction favorable to him, enabling him to purchase contracts at prices lower than, or sell contracts at prices higher than, the prices available in the market before he entered and canceled his large-volume orders. (¶ 3.) | Tower's strategy – which it utilized hundreds of times – moved the KOSPI 200 price on the CME in a direction favorable to Tower which allowed it to either purchase contracts at prices lower, or sell contracts at prices higher, than were available in the market before Tower entered its fictitious large-volume buy or sell orders.  (¶ 2.)<br><br>Tower's strategy – which it utilized hundreds of times – moved the KOSPI 200 price on the CME in a direction favorable to Tower and allowed it to either purchase contracts at prices lower, or sell contracts at prices higher, than were available in the market before Tower entered its fictitious large-volume buy or sell orders. (¶ 29.) |

| C | COSCIA then repeated this strategy in the opposite direction to immediately obtain a profit by buying futures contracts at a lower price than he paid for them, or by selling contracts at a higher price than he paid for them. (¶ 3.) | Tower then immediately repeated this strategy in the opposite direction – allowing it to immediately obtain a riskless profit by buying futures contracts at a lower price than it just paid for them or by selling futures contracts at a higher price than it had just paid for them. (¶ 3.)<br><br>Tower then immediately repeated this strategy in the opposite direction – allowing it to immediately obtain a riskless profit by buying futures contracts at a lower price than it just paid for them or by selling futures contracts at a higher price than it had just paid for them. (¶ 30.) |
|---|---|---|
| D | It was further part of the scheme that COSCIA designed his programs to place several layers of "quote orders" on the other side of the market from his trade orders to create the illusion of market interest.   COSCIA's quote orders were either orders to buy contracts at a price higher than the prevailing offer, or orders to sell contracts at a price lower than the prevailing bid. (¶ 9.) | As part of its scheme, Tower designed its trading programs to place several layers of "quote orders" on the opposite side of the market from its trade orders to create a fictitious illusion of market interest. Tower's quote orders were eithers *[sic]* orders to buy contracts at a price higher than the prevailing offer, or orders to sell contracts at a price lower than the prevailing bid. (¶ 3.)<br><br>As part of its scheme to manipulate trading in KOSPI 200 contracts, Tower designed its trading programs to place several layers of "quote orders" on the opposite side of the market from its trade orders to create a fictitious illusion of market interest. Tower's quote orders were eithers *[sic]* orders to buy contracts at a price higher than the prevailing offer, or orders to sell contracts at a price lower than the prevailing bid. (¶ 31.) |

| | | |
|---|---|---|
| E | It was further part of the scheme that COSCIA designed his programs to cancel the quote orders within a fraction of a second automatically, without regard to market conditions, even if the market moved in a direction favorable to the quote orders.  COSCIA programmed the quote orders to cancel quickly and automatically because he did not intend for the quote orders to be filled when he entered them, but instead intended to trick other traders into reacting to the false price and volume information he created with his fraudulent and misleading quote orders.  (¶ 10.) | Tower engineered its algorithms so that these above or below market quote orders were automatically cancelled within a fraction of a second.   Tower did this because it did not intend for the quote orders to be filled when it entered them, but instead intended to trick other participating traders into reacting to the false price, and volume information it created with its fraudulent and misleading quote orders.  (¶ 3.)<br><br>Tower engineered its algorithms so that these above or below market quote orders were automatically cancelled within a fraction of a second.   Tower did this because it did not intend for the quote orders to be filled when it entered them, but instead intended to trick other participating traders into reacting to the false price, and volume information it created with its fraudulent and misleading quote orders.  (¶ 31.) |

## <u>CERTIFICATE OF SERVICE</u>

I certify that on March 4, 2015, I filed the foregoing Defendants' Memorandum of Law in Support of Their Motion to Dismiss the Complaint via the Court's CM/ECF system, which shall transmit notice to all counsel of record.


/s/ Robert W. Trenchard
*Attorney for Tower Research Capital LLC and Mark Gorton*