# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

MYUN-UK CHOI, JIN-HO JUNG, SUNG-
HUN JUNG, SUNG-HEE LEE, and KYUNG-
SUB LEE, Individually and on Behalf of All
Others Similarly Situated,

                Plaintiff,

     vs.

TOWER RESEARCH CAPITAL LLC and
MARK GORTON,

                Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

Case No.: 14-cv-9912 (KMW)

**ORAL ARGUMENT REQUESTED**

# MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS THE COMPLAINT

# **TABLE OF CONTENTS**

I.    INTRODUCTION AND BACKGROUND FACTS ......................................................... 1

II.   ARGUMENT ................................................................................................................. 2

    A.    Defendants' Motion to Dismiss Plaintiffs' CEA Claim Should Be Denied .......... 2

        1.    The Legal Standard For Pleading a CEA Claim ....................................... 2

        2.    The CEA Covers the Commodity Transactions at Issue Because
             They Took Place on the CME Globex Exchange in Aurora, Illinois ......... 4

             a.    The CEA Covers the Transactions at Issue Because the
                    KOSPI 200 Contracts Were Listed on an American
                    Exchange – CME Globex .............................................................. 5

             b.    The CEA Also Covers the Transactions at Issue Because
                      Irrevocable Liability For These KOSPI 200 Purchases Was
                    Incurred In America .................................................................... 6

             c.    Defendants' Arguments Should Be Disregarded Because
                      They Fly in the Face of the Alleged Facts and Applicable
                      Law ............................................................................................. 9

        3.    The Complaint Adequately Pleads All Elements of a CEA Claim ........... 13

             a.    The Complaint Adequately Pleads That Defendants
                      Possessed the Ability to Influence Market Prices ....................... 14

              b.    The Complaint Adequately Pleads That Defendants
                      Specifically Intended to Influence Market Prices ....................... 16

              c.    The Complaint Adequately Pleads That Artificial Prices
                      Existed ........................................................................................ 17

              d.    The Complaint Adequately Pleads That Defendants Caused
                      the Artificial Prices ................................................................... 18

              e.    The Complaint Adequately Alleges Losses Suffered by
                      Plaintiffs .................................................................................... 19

    B.    Defendants' Arguments Against Gorton's Liability Should be Rejected ............. 22

    C.    The Court Should Deny Defendants' Motion to Dismiss Plaintiffs' Unjust
        Enrichment Claim ................................................................................................ 23

III.  CONCLUSION ............................................................................................................ 24

## Table of Authorities

**Page(s)**

CASES

*Absolute Activist Value Master Fund Ltd. v. Ficeto*,
   677 F.3d 60 (2d Cir. 2012)...................................................................................7, 8, 9

*In re Amaranth Natural Gas Commodities Litig.*,
   269 F.R.D. 366 (S.D.N.Y. 2010) ................................................................................22

*In re Amaranth Natural Gas Commodities Litig.*,
   587 F. Supp. 2d 513 (S.D.N.Y. 2008).......................................................................24

*Arco Capital Corps. Ltd. v. Deutsche Bank AG*,
   949 F. Supp. 2d 532 (S.D.N.Y. 2013)...................................................................9, 13

*Atlantica Holdings, Inc. v. Sovereign Wealth Fund Samruk-Kazyna JSC*,
   2 F. Supp. 3d 550, 559-560 (S.D.N.Y. 2014) ....................................................8, 9, 13

*ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*,
   493 F.3d 87 (2d Cir. 2007)...........................................................................................4

*Coexist Found., Inc. v. Fehrenbacher*,
   No. 11 cv 6279, 2014 U.S. Dist. LEXIS 43026 (N.D. Ill. Mar. 28, 2014) ..............24

*Chiaramonte v. Animal Med. Ctr.*,
   No. 13 Civ. 5117, 2014 U.S. Dist. LEXIS 99930 (S.D.N.Y. July 22, 2014)...........12

*City of Pontiac Policemen's & Firemen's Retirement Sytem. v. UBS AG*,
   752 F.3d 173 (2d Cir. 2014)......................................................................................11

*In re Commodity Exch., Inc., Silver Futures & Options Trading Litig.*,
   No. 11 Md. 2213, 2012 U.S. Dist. LEXIS 181487 (S.D.N.Y. Dec. 21, 2012) ...................3, 15

*Cornwell v. Credit Suisse Group*,
   729 F. Supp. 2d 620 (S.D.N.Y. 2010) ......................................................................11

*Corsello v. Verizon N.Y., Inc.*,
   18 N.Y.3d 777 (N.Y. Ct. App. 2012)........................................................................24

*De David v. Alaron Trading Corp.*,
   814 F. Supp. 2d 822 (N.D. Ill. 2011) ..................................................................23, 24

*DiPlacido v. Commodity Futures Trading Comm'n*,
   364 F. App'x 657 (2d Cir. 2009)...............................................................................14

*Liberty Media Corp. v. Vivendi Universal, S.A.*,
   861 F. Supp. 2d 262 (S.D.N.Y. 2012).......................................................................13

*In re LIBOR-Based Fin. Instruments Antitrust Litig.*,
   935 F. Supp. 2d 666 (S.D.N.Y. 2013) ("*Libor I*") ........................................................ *passim*

*In re LIBOR-Based Fin. Instruments Antitrust Litig.*,
   962 F. Supp. 2d 606 (S.D.N.Y. 2013) ("*Libor II*")....................................................20, 21, 22

*Loginovskaya v. Batratchenko*,
   764 F.3d 266 (2d Cir. 2014)................................................................................. *passim*

*Morrison v. National Australia Bank Ltd.*,
   561 U.S. 247 (2010)............................................................................................ *passim*

*In re Natural Gas Commodity Litig.*,
   358 F. Supp. 2d 336 (S.D.N.Y. 2005)....................................................................18, 19

*Parkcentral Global HUB Ltd. v. Porsche Auto. Holdings SE*,
   763 F.3d 198 (2d Cir. 2014)........................................................................................13

*In re Rough Rice Commodity Litig.*,
   No. 11 C 618, 2012 U.S. Dist. LEXIS 140658 (N.D. Ill. Sept. 26, 2012)........................15, 16

*SEC v. Amerindo Inv. Advisors, Inc.*,
   No. 05 Civ. 5231, 2014 U.S. Dist. LEXIS 15696 (S.D.N.Y. Jan. 31, 2014)...........................9

*Telectronics Proprietary, Ltd. v. Medtronic, Inc.*,
   687 F. Supp. 832 (S.D.N.Y. 1988)...............................................................................16

*In re Term Commodities Cotton Futures Litig.*,
   No. 12 Civ. 5126, 2013 U.S. Dist. LEXIS 184374 (S.D.N.Y. Dec. 20, 2013).........................2

*U.S. Commodity Futures Trading Com'n v. Amaranth Advisors, L.L.C.*,
   554 F. Supp. 2d 523 (S.D.N.Y. 2008)............................................................................2

*U.S. Commodity Futures Trading Com'n v. Parnon Energy Inc.*,
   875 F. Supp. 2d 233 (S.D.N.Y. 2012).............................................................3, 14, 16, 18

*U.S. Commodity Futures Trading Com'n v. Wilson*,
   27 F. Supp. 3d 517, 532 (S.D.N.Y. 2014)............................................................3, 14, 18

*United States v. Coffman*,
   574 Fed. App'x. 541 (6th Cir. 2014) .............................................................................7

*United States v. Martoma*,
   No. S1 12 Cr. 973, 2013 U.S. Dist. LEXIS 176998 (S.D.N.Y. Dec. 16, 2013) ........................6

## I.      INTRODUCTION AND BACKGROUND FACTS

The Commodity Exchange Act ("CEA") is a "remedial statute that serves the crucial purpose of protecting the innocent individual investor—who may know little about the intricacies and complexities of the commodities market—from being misled or deceived." *Loginovskaya v. Batratchenko*, 764 F.3d 266, 270 (2d Cir. 2014) (citations omitted). Defendants' scheme in this case – manipulation of the market for KOSPI 200 future contracts traded on the CME Globex market in Illinois – is exactly the kind of misbehavior the CEA is designed to punish.  As described in the Complaint, Defendants – a New York based high frequency trading firm and its leader – used their sophisticated algorithmic flash trading technology and techniques to artificially manipulate the price of KOSPI 200 futures contracts traded on the CME Globex.  Specifically, Defendants engaged in illegal "spoofing" activities by entering into large volume KOSPI 200 buy or sell orders that they had no intention of filling – and then – using their computers, either withdrew those large volume orders or filled them themselves.  This allowed Defendants to create a false impression regarding supply and demand for KOSPI 200 contracts and, by immediately repeating the strategy in the opposite direction, allowed Defendants to reap an illegal, riskless profit by buying futures contracts at a lower price than it just paid for them or by selling futures contracts at a higher price than it had just paid for them.  These manipulations distorted the prices paid or received by other investors trading in these contracts.  During the 2012 Class Period, Defendants manipulated the market hundreds of times while trading 3,828,127 futures contracts – approximately 53% of all KOSPI 200 trading on the CME Globex for 2012, netting them illegal profits of $14.1 million.[1]

---

[1] Defendants' state that the complaint relies on "boilerplate descriptions of alleged 'spoofing' and 'wash trading' lifted from" charges from an indictment in an unrelated spoofing and wash trading case. Def. Br. at 5. Apart from being completely irrelevant as a matter of law, the gravamen of Defendants' assertion is hard to explain.

Significantly, Defendants' manipulation of the market for KOSPI 200 futures contracts was restricted to after-hours trading on the "night market" – trading which only took place in the U.S. on the CME Globex market in Aurora, Illinois.  That the futures product involved was a Korean security does not change the fact that the key aspect of the transactions at issue – the commitment to buy or sell the KOSPI 200 Futures Contracts at issue – occurred in the US on a US exchange, thus bringing the transactions within the purview of the CEA.

Defendants' motion attacks Plaintiffs' claims on a number of grounds, but, as explained below, Defendants' arguments are spurious and should be rejected.

## II.    ARGUMENT

### A.    Defendants' Motion to Dismiss Plaintiffs' CEA Claim Should Be Denied

#### 1.    The Legal Standard For Pleading a CEA Claim

At the motion to dismiss stage, the Court considers "the legal sufficiency of the complaint, taking its factual allegations to be true and drawing all reasonable inferences in the plaintiff's favor." *Loginovskaya*, 764 F.3d at 269-270 (citations omitted).  "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face."  *Id.* at 270 (citations omitted).

"[W]here a plaintiff has alleged a manipulative trading strategy, courts have found Rule 8(a) is more appropriate." *In re Term Commodities Cotton Futures Litig*., No. 12 Civ. 5126, 2013 U.S. Dist. LEXIS 184374, at *35 (S.D.N.Y. Dec. 20, 2013); *U.S. Commodity Futures Trading Com'n v. Amaranth Advisors, L.L.C.*, 554 F. Supp. 2d 523, 534 (S.D.N.Y. 2008)

---

It is no surprise and completely appropriate for similar language to be used to describe a similar scheme. For instance, all indictments for burglary probably use similar language to describe a defendant breaking and entering into a dwelling and all indictments for premeditated murder presumably use the phrase, "with malice aforethought" or something along those lines.  Defendants' manipulation here, while illegal, was not original – so it is no surprise that the description of this scheme in the Complaint may echo descriptions of other, similar, illegal schemes elsewhere.  *See* Complaint ¶ 32 (noting that Tower's scheme was example of "longstanding illegal practice" known as "spoofing") (citations to Complaint at ¶__ are to paragraphs in the Complaint in this matter).

(applying Rule 8(a) where the allegations of manipulation were based on a particular trading strategy); *U.S. Commodity Futures Trading Com'n v. Parnon Energy Inc.*, 875 F. Supp. 2d 233, 244 (S.D.N.Y. 2012) (analyzing a manipulation claim under Rule 8(a) where the alleged scheme was accomplished through use of market power).[2]  Fraud is "not a necessary element of a market manipulation claim."  *U.S. Commodity Futures Trading Com'n v. Wilson*, 27 F. Supp. 3d 517, 532 (S.D.N.Y. 2014).

Here, Defendants' market manipulation scheme is most factually akin to that alleged in *Wilson*, where the Court decided to "apply the flexible pleading standards of Rule 8(a)."  *Id.* at 532.  In *Wilson*, the defendant deliberately made above-market bids (which were subsequently withdrawn), not "with the intent to consummate an exchange but rather" to manipulate prices – a strategy the CFTC described as akin to a "banging the close" scheme in "which a trader uses bids or offers to influence a settlement price in his [or her] favor."  *Id.* at 526 (citations and internal quotation marks omitted).  This is almost identical to the scheme in this case where "Tower entered large-volume KOSPI 200 buy or sell orders on CME Globex that it had no intention of filling" – a strategy which allowed Tower to "manipulate the price of KOSPI 200 futures on the CME."  Complaint ¶ 29.  See also Complaint ¶¶ 28-32 (describing Tower's manipulative trading strategy).  Thus, the Complaint at issue should also be judged under Rule 8(a).

Even if, however, this Court determines that the Complaint does sound in fraud, a relaxed Rule 9(b) standard applies to this kind of manipulation case.  Specifically, courts "relax Rule

---

[2] Whether a CEA complaint is governed by Rule 8(a) or Rule 9(b) is a "case-specific" approach which depends on whether the Complaint sounds in fraud.  *See In re Commodity Exch., Inc., Silver Futures & Options Trading Litig.*, No. 11 Md. 2213, 2012 U.S. Dist. LEXIS 181487, at *43-45 (S.D.N.Y. Dec. 21, 2012) (citations omitted).  While the Complaint does not sound in fraud for the reasons discussed herein, the allegations in the Complaint are detailed and specific enough to satisfy Rule 9(b) as well as Rule 8(a).

,

9(b)'s requirements in the context of manipulation claims, as such claims often 'involve facts solely within the defendant's knowledge.'" *In re LIBOR-Based Fin. Instruments Antitrust Litig.*, 935 F. Supp. 2d 666, 714 (S.D.N.Y. 2013) ("*Libor I*") (quoting *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 102 (2d Cir. 2007)).  This is certainly true in this case as brokers have a fiduciary obligation to keep individual trade information confidential, so there is no way, outside of governmental action or a subpoena, to access information about Defendants' trading activities or proprietary trading algorithms.

For a manipulation complaint, the Second Circuit has held that Rule 9(b) will be satisfied in the securities context if the "complaint sets forth, to **the extent possible**, 'what manipulative acts were performed, which defendants performed them, when the manipulative acts were performed, and what effect the scheme had on the market for the securities at issue'" and this standard has "also been applied in the context of commodities manipulation." *Id.* (emphasis added).  Scienter may be "alleged generally" "either (a) by alleging facts to show that defendants had both motive and opportunity to commit fraud, or (b) by alleging facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness." *Libor I*, 935 F. Supp. 2d at 714 (citations omitted).  As discussed below, the allegations in the Complaint easily meet this standard as well.

2.      The CEA Covers the Commodity Transactions at Issue Because They Took Place on the CME Globex Exchange in Aurora, Illinois

Defendants' argument that, under *Morrison v. National Australia Bank Ltd.*, 561 U.S. 247 (2010) and its progeny, this Court should dismiss Plaintiffs' CEA claims because the commodity transactions at issue do not qualify as domestic conduct, *see* Def. Br. at 5 – 10, fails because it both misstates the applicable law and mischaracterizes the facts as alleged in the

complaint.  Under the *Morrison* test[3], a transaction counts as a domestic transaction if it involved "a security listed on an American stock exchange" or if it involved "the purchase or sale of any other security in the United States." *Morrison*, 561 U.S. at 273.[4]  As discussed at length below, the commodity transactions at issue in this case qualify under either or both of the *Morrison* prongs because the KOSPI 200 futures contracts at issue in this case were listed on the CME Globex, an American exchange, and/or because the trades at issue took place in the U.S. – specifically, Aurora, Illinois.

      a.     *The CEA Covers the Transactions at Issue Because the KOSPI 200 Contracts Were Listed on an American Exchange – CME Globex*

It is undisputed that a transaction in a security listed on an American Exchange qualifies as a domestic transaction under *Morrison*.  *See Morrison*, 561 U.S. at 273 (Section 10(b) applies "in connection with the purchase or sale of a security listed on an American stock exchange").  Defendants do not and cannot dispute that the CME Globex is an American exchange.[5]  It is also undisputed that the Complaint, whose allegations must be taken as true at this stage in the litigation, alleges that the KOSPI 200 futures contracts at issue in this case were "listed and traded on CME Globex."  Complaint ¶ 18.[6]  Finally, and perhaps most importantly, it is also undisputed that the Complaint alleges that all the trades themselves – the exchange of money for

---

[3] *Morrison's* test applies to the CEA.  *See Loginovskaya*, 764 F.3d at 272 ("*Morrison's* domestic transaction test in effect decides the territorial reach of CEA § 22.").

[4] "Section 10(b) reaches the use of a manipulative or deceptive device or contrivance only in connection with the purchase or sale of a security listed on an American stock exchange, and the purchase or sale of any other security in the United States." *Id.*

[5] CME is a national exchange registered with the SEC through a notice filing under Section 6(g) of the Exchange Act.  SEC, *Exchanges*, http://www.sec.gov/divisions/marketreg/mrexchanges.shtml (last visited May 4, 2015).

[6] *See also* CME Group, *KRX on CME Globex, Frequently Asked Questions*, *available at* http://www.cmegroup.com/international/files/FAQ_about_Kospi200_on_Globex_USG_phase1.pdf ("Two KRX products are **currently listed** on CME Globex.  These are KOSPI 200 Futures and USD/KRW Futures") (emphasis added).

futures contracts, the "meeting of minds" to agree on a price and the binding agreement to pay

that price, occurred on the CME Globex in Illinois "using the 'multiple price action method'

through which 'successful bidders are *required* to pay for the allotted quantity of securities at the

respective price/yield at which they have bid."  Complaint ¶ 21 (emphasis added).  This applies

to all the trades at issue in this case because the trades by which Tower manipulated the market

in KOSPI 200 futures contracts, the trades by which Tower benefited from that manipulation,

and the transactions of class members who suffered harm because they purchased KOSPI 200

Futures contracts at artificially high prices or sold them at artificially low prices all occurred in

Aurora, Illinois on the Overnight Futures Market via the CME Globex.  Complaint ¶¶ 18, 21, 28-

32, 38.

     For all these reasons, the transactions at issue fall within the purview of the Commodity

Exchange Act under the "listed on an American exchange" prong of the *Morrison* test.  *See e.g.,*

*Libor I*, 935 F. Supp. 2d at 697 (transactions on the CME in Eurodollar futures contracts are

"within the scope of the CEA's manipulation provision" under *Morrison* because they are traded

on an American exchange).  *See also United States v. Martoma*, No. S1 12 Cr. 973, 2013 U.S.

Dist. LEXIS 176998, at *14-17 (S.D.N.Y. Dec. 16, 2013) (American Deposit Receipts of an Irish

company listed on the New York Stock Exchange qualify under both prongs of *Morrison*).

        b.    *The CEA Also Covers the Transactions at Issue Because*
            *Irrevocable Liability For These KOSPI 200 Purchases Was*
            *Incurred In America*

     Under the *Morrison* test, even if a transaction did not involve "a security listed on an

American stock exchange," it would still qualify as domestic transaction if it involved "the

purchase or sale of any other security in the United States."  *Morrison*, 561 U.S. at 273.  In

addition to qualifying under the first "American exchange" prong of *Morrison*, as discussed

above, the transactions in KOSPI 200 futures at issue in this case also independently qualify

under this second "domestic purchases and sales" prong.  As the Second Circuit recently

observed while "*Morrison* holds that § 10(b) can be applied to domestic purchases or sales, it

provides little guidance as to what constitutes a domestic purchase or sale." *Absolute Activist*

*Value Master Fund Ltd. v. Ficeto,* 677 F.3d 60, 67 (2d Cir. 2012).

In *Absolute Activist,*[7] the Second Circuit provided that missing guidance and held that "to

sufficiently allege a domestic securities transaction in securities not listed on a domestic

exchange," "a plaintiff must allege facts suggesting that irrevocable liability was incurred or title

was transferred within the United States." *Id*. at 68.[8]   "Thus, in order to adequately allege the

existence of a domestic transaction, it is sufficient for a plaintiff to allege facts leading to the

plausible inference that the parties incurred irrevocable liability within the United States: that is,

that the purchaser incurred irrevocable liability within the United States to take and pay for a

security, or that the seller incurred irrevocable liability within the United States to deliver a

security."  *Id*.  In *Loginovskaya*, the Second Circuit elaborated on this requirement in the specific

context of the CEA, holding that the location of a given transaction is where the parties to a

transaction "reached a '***meeting of the minds***.'"  764 F.3d at 274 (emphasis added) (citing

*Absolute Activist*, 677 F.3d at 68).

The futures transactions at issue in this case qualify as domestic transactions under the

Second Circuit test established by *Absolute Activist* and *Loginovskaya* because the "meeting of

minds" necessary for the generation of irrevocable liability for the commodities transactions at

---

[7] A case which Defendants seemingly forgot to cite, despite the fact that it establishes the governing standard within the Second Circuit for determining whether a transaction is domestic or extraterritorial under *Morrison* for securities (or commodities) not listed on an American exchange.

[8] Other circuits have adopted an even more expansive definition.  *See, e.g., United States v. Coffman*, 574 Fed. App'x. 541, 557 (6th Cir. 2014) ("Because portions of the transactions involved in this case occurred in the United States, it is fair to characterize them as 'domestic.'" (citation omitted)).

issue occurred in Aurora, Illinois.  As stated in the Complaint, irrevocable liability for ***all*** the transactions at issue in this case – both the Tower transactions that manipulated the market in KOSPI 200 Futures contracts and the Tower transactions that benefited from that manipulation as well as the transactions of all class members who suffered harm because they purchased KOSPI 200 Futures contracts at artificially high prices or sold them at artificially low prices – occurred in Aurora, Illinois on the Overnight Futures Market via the CME Globex.  Complaint ¶¶ 18, 21, 28-32, 38.

As alleged in the Complaint and mentioned above, when traders place limit orders for KOSPI 200 Futures Contracts during the Overnight Futures Market (the market Defendants traded in and manipulated), the "orders are matched on CME Globex [in Aurora, Illinois] using the 'multiple price action method' through which 'successful bidders are ***required*** to pay for the allotted quantity of securities at the respective price/yield at which they have bid."  Complaint ¶ 21 (emphasis added).  As further explained in the complaint, "parties negotiate through CME Globex by putting in limit orders and, once those orders match, parties enter into a ***binding agreement*** to buy or sell a futures contract" and the "***meeting of minds required*** for the trade takes place on the CME Globex in ***Illinois***."  *Id*.  (Emphasis added).

There should be no question that these allegations – specifying that a binding agreement and meeting of minds took place in the United States and describing the process by which such liability incurred – fulfills the Second Circuit's requirement – as laid out in *Absolute Activist* and *Loginovskaya* – for the existence of a domestic transaction based upon incurring irrevocable liability within the United States.  Additional confirmation that the Second Circuit and *Morrison*'s requirements are fulfilled by these allegations can be found in *Atlantica Holdings,*

*Inc. v. Sovereign Wealth Fund Samruk-Kazyna JSC*, 2 F. Supp. 3d 550, 559-560 (S.D.N.Y. 2014) – a recent decision by Judge Furman.

In *Atlantica Holdings*, Judge Furman found allegations in the complaint that irrevocable liability for the transactions occurred in the United States sufficient to survive a *Morrison* based motion to dismiss where plaintiffs alleged that irrevocable liability to pay for securities was incurred in the United States and described in broad terms the "process by which such liability was incurred" – specifically, the placement of an order with a broker in UBS's office in Miami, who transmitted the order to its broker-dealer in New York, where funds were transferred internally to UBS's back office – sufficient to survive a motion to dismiss. *Id*. at 560. *See also SEC v. Amerindo Inv. Advisors, Inc*., No. 05 Civ. 5231, 2014 U.S. Dist. LEXIS 15696, at *14-22 (S.D.N.Y. Jan. 31, 2014) (evidence that individual was in United States when he or she agreed to purchase securities at issue sufficient to satisfy *Morrison* requirement); *Arco Capital Corps. Ltd. v. Deutsche Bank AG*, 949 F. Supp. 2d 532, 542-543 (S.D.N.Y. 2013) (fact that performance on the closing date, consisting of delivery of funds and assigning interest in the trust, occurred in New York sufficient for *Morrison* purposes).

c. *Defendants' Arguments Should Be Disregarded Because They Fly in the Face of the Alleged Facts and Applicable Law*

Defendants' arguments to the contrary either ignore or misconstrue both the alleged facts and the law. Defendants begin their argument by stating that it is "Korean traders complain[ing] about trading on Korean exchange" and "to extend CEA Section 6(c) to that exchange is flatly inconsistent with *Morrison*." Def. Br. at 6. This argument, however, is directly refuted by Second Circuit precedent and the alleged facts. First, as the Second Circuit held in *Absolute Activist* and reaffirmed in *Loginovskaya*, "a party's residency or citizenship is irrelevant to the location of a given transaction." *Loginovskaya*, 764 F.3d at 274  (quoting *Absolute Activist*, 677

F.3d at 70, n.9).  Defendants' insinuation that, because the named plaintiffs are Korean, they deserve less protection under the CEA than Americans is both disturbing and contrary to the law. Second, the Korean traders are not complaining about trading on a Korean exchange – they are complaining about trading that took place in America (specifically, in Aurora, Illinois) on an American exchange – the CME Globex. Complaint ¶¶ 18, 21, 28-32, 38.   Indeed, Plaintiffs are complaining about a U.S. based trader (Tower) engaging in trading misconduct (spoofing and manipulation) in the U.S., on a U.S. exchange based in the U.S. (CME Globex).

Next, Defendants attempt to minimize the role of the CME Globex by saying that their only role in the transactions was permitting the Korean Exchange "[o]utsourcing certain functions to computers in the U.S."  Def. Br. at 7.  This is highly misleading – the whole function of an exchange (whether commodities or securities) is to **match** buyers and sellers so that they can **exchange** money for futures contracts or securities.  As alleged in the Complaint, this activity – the core function of what an exchange does[9] – took place on the CME Globex in Illinois.  Complaint ¶ 21.  Defendants say that what matters under *Morrison* is the "exchange's location, not where the technology is located," Def. Br. at 7, but what they refuse to acknowledge is that the relevant exchange is not the KRX, it is the CME Globex and that exchange is located in Illinois.[10]

---

[9] An exchange means "any organization ... which constitutes, maintains, or provides a market place or facilities for bringing together purchasers and sellers of securities ... and includes the market place and the market facilities maintained by such exchange."  15 U.S.C.A. § 78c(1).

[10] It is worth noting that the CME offers "Co-Location Services," permitting, for a fee, customers to put their computer equipment right next to the CME Globex's physical servers in Aurora, Illinois which allows "the lowest latency connectivity possible for all products traded on the CME Globex platform."  CME Co-Location Services, *available at* https://www.cmegroup.com/globex/files/CME-Co-Location-Services-Overview.pdf.  The advantage of being physically next to the CME Globex's servers in Aurora is, of course, that it permits trades to be made by "flash" or algorithmic traders milliseconds faster than others – a trading "edge" that can provide significant profits. *See, e.g.,* Charles Duhigg, *Stock Traders Find Speed Pays, in Milliseconds*, N.Y. Times, Jul. 23, 2009, http://www.nytimes.com/2009/07/24/business/24trading.html ("Powerful computers, some housed right next to the machines that drive marketplaces like the New York Stock Exchange, enable high-frequency traders to transmit

Defendants' case-law citations are similarly beside the point. *City of Pontiac Policemen's & Firemen's Retirement Sytem. v. UBS AG,* 752 F.3d 173, 181 (2d Cir. 2014) – as Defendants helpfully point out, ruled on the "purchase of foreign securities on a ***foreign exchange***" – here, the contracts were purchased  or sold on a ***domestic*** exchange – the CME Globex.  *Id*., Def. Br. at 8.  In *Cornwell v. Credit Suisse Group*, 729 F. Supp. 2d 620, 622 (S.D.N.Y. 2010) there were two classes of plaintiffs – those who bought shares on a foreign exchange and those who bought shares on an American exchange.  As in *City of Pontiac*, the court dismissed the claims of those who purchased shares on the foreign exchange, but the defendants in *Cornwell* did not even bother to challenge the class of plaintiffs who purchased stock on a domestic exchange as the Plaintiffs did in this case with the CME Globex.   *Id*. at 621-22.

Defendants' only other citations in support of their argument are No-Action letters from the CFTC and a description of how KOSPI 200 trading purportedly works derived from Korean Exchange Rules and a regulatory notice from the CME.  None of these sources provide any support for Defendants' position.  First, the November 26, 2008 CFTC No-Action letter concerning KOSPI 200 trading in the United States cited by Defendants, *see* Def. Br. at 3-4. actually supports Plaintiffs' argument as it "allows KRX's futures contract on the KOSPI 200 to be ***offered and sold in the United States***."  Def. Ex. A at p. 7 (emphasis added).  That is Plaintiffs' point – the transactions at issue occurred ***here*** – in the United States – and are thus subject to the CEA under *Morrison*.  Second, the CFTC, in its ***November 26, 2008***, No-Action letter, did not address – in any way – the key fact in this case and the *Morrison* analysis – that KOSPI 200 buy and sell orders were "matched" on the CME Globex in Illinois during night

---

millions of orders at lightning speed and, their detractors contend, reap billions at everyone else's expense.").  As one of the most prominent and successful flash trading firms, Tower's assertion that, Aurora, Illinois, the location where the trades are matched, is irrelevant, is absurd given the impact of location on speed of trading.

market trading, nor could it, because that practice began in *2009 – after* the issuance of the

November 2008 CFTC No-Action letter.  *See* Def. Br. at 4, Complaint ¶¶ 18, 21.   Finally, and

perhaps most importantly, *all* of the No-Action letters cited by Defendants – including the cluster

cited in a footnote, *see* Def. Br. at 7 n.3, are irrelevant to this analysis as they were issued *prior*

to *Morrison*, which completely shifted the law on the scope of CEA coverage.[11]

As to the citations describing certain mechanics of interaction between the CME Globex,

the KRX, and the role of Korean regulators, they also provide no support for Defendants'

argument.[12]  First, none of them contradict the central and most important point for purposes of

determining the location where "irrevocable liability" made in the Complaint – that the matching

of offer and acceptance, the meeting of minds, and the creation of a binding agreement all

occurred in Illinois. Complaint ¶ 21.[13]  The fact that the ministerial act of settling the trades

occurred the next day on the KRX, *see* Complaint ¶ 21, does not change the place where

irrevocable liability occurred.  *See Loginovskaya* 764 F.3d at 275 (location of wire transfer

enabling transaction irrelevant as location of meeting of minds determines location of irrevocable

---

[11] Reviewing the No-Action letters cited on page 7, n.3 of Defendants' brief reveals that they are factually inapposite to the instant case.  All six letters cited by Defendants are for the same organization, the International Petroleum Exchange, and all depend on the representations made by the International Petroleum Exchange in their original application – granted in No-Action Letter 99-69 (Nov. 12, 1999) (Defendants' date citation of 2009 is off by a decade).  In the Conclusion of CFTC-Letter 99-69, the CFTC stated that it granted the International Petroleum Exchange's request based on the information it submitted in support, which included a representation that the International Petroleum Exchange "does not maintain *order matching* or clearing facilities in the United States." (Emphasis added).  Of course, the whole issue here is that the order matching occurred *within* the United States.

[12] As these documents are not referenced in the Complaint, the Court should not consider them for the truth of their content. *See Chiaramonte v. Animal Med. Ctr.*, No. 13 Civ. 5117, 2014 U.S. Dist. LEXIS 99930, at *12 (S.D.N.Y. July 22, 2014) ("Judicial notice may be taken of documents outside the pleadings to establish the fact of their existence and the scope, but not the truth, of their content.")

[13] *See also* SEC, 17 CFR Part 241, Release No. 34-39829, *Confirmation and Affirmation of Securities Trades; Matching*, Apr. 6, 1998, *available at* http://www.sec.gov/rules/interp/34-39829.htm#foot2 ("A matching service conducted by an intermediary clearly provides a facility in which the terms of transactions between broker-dealers and their institutional customers are compared to each other to assure that both parties agree to the terms of the trades before they are submitted for settlement.").

liability); *Atlantica Holdings*, 2 F. Supp. 3d at 561 ("[T]he existence of conditions precedent to the closing of a deal do not render the transaction non-domestic."); *Arco*, 949 F. Supp. 2d at 542-43 (holding that liability was irrevocable when party "no longer had the discretion to revoke acceptance," notwithstanding that the transaction was not completed until other conditions were met); *Liberty Media Corp. v. Vivendi Universal, S.A.*, 861 F. Supp. 2d 262, 269 (S.D.N.Y. 2012) ("Although there were conditions to be satisfied before closing and the eventual performance of the Merger Agreement was effectuated by the transfer of a different security than originally intended, this is insufficient to establish that irrevocable liability occurred later.").

Second, the fact that the Korean authorities and regulators are also interested in Defendants' misconduct certainly does not mean that the CEA also doesn't cover the conduct. *See Parkcentral Global HUB Ltd. v. Porsche Auto. Holdings SE*, 763 F.3d 198, 216-217 (2d Cir. 2014) ("Section 10(b) would indeed be a craven watchdog against securities fraud if it retreated to its kennel whenever a fraud involved some foreign activity. … It is neither a safe harbor nor the only relevant consideration in the extraterritoriality analysis.").  The CME and the KRX chose to set up a unique system in which transactions in Korean securities were made in the US on an American exchange – it is not a surprise that two sets of laws might apply.[14]  Moreover, Defendants have identified no incompatibility between Korean and U.S. law on the subject – in fact, under both sets of laws it seems that Defendants' manipulation of the market was illegal.

3.    The Complaint Adequately Pleads All Elements of a CEA Claim

---

[14] This is becoming more and more common in the modern world of finance which spans national borders and laws.  For instance, the Libor manipulation scandal is being dealt with by a number of jurisdictions (including the U.S.) simultaneously.  *See* Wall Street Journal, *The Libor Investigation*, http://stream.wsj.com/story/the-libor-investigation/SS-2-32262/ ("Investigators in the U.S., Europe and Asia have been probing alleged wrongdoing in the interest-rate setting process for about two years.").

Defendants claim that the "Complaint here alleges not even a single required element" of a CEA claim. Def. Br. at 11. They are completely wrong as Plaintiffs adequately allege every required element of a CEA claim. "To establish price manipulation in violation of the CEA, a Plaintiff must demonstrate that: '(i) the accused had the ability to influence market prices; (ii) [he] specifically intended to do so; (iii) artificial prices existed; and (iv) the accused caused the artificial prices.'" *Laydon v. Mizuho Bank*, Ltd., No. 12-cv-3419, 2014 U.S. Dist. LEXIS 46368, at *16 (S.D.N.Y. Mar. 28, 2014) (alteration in original) (quoting *DiPlacido v. Commodity Futures Trading Comm'n*, 364 F. App'x 657, 661 (2d Cir. 2009)).

a. *The Complaint Adequately Pleads That Defendants Possessed the Ability to Influence Market Prices*

"Whether Defendants exercised market power is fact-intense, and courts reserve dismissal on this issue for pleadings containing only bare and conclusory allegations." *Parnon Energy*, 875 F. Supp. 2d at 245. The Complaint makes two allegations of which each, independently, suffices to move past a motion to dismiss on the requirement that a complaint plead that Defendants possessed the ability to influence market prices. First, the Complaint alleges that Defendants possessed the ability to influence market prices by using a large volume of trading in conjunction with its algorithms and flash trading process. Complaint ¶¶ 28-32, 49. Specifically, the Complaint alleges that Tower's flash algorithms and flash trading prowess allowed it to issue large buy and sell orders at above or below market prices and then use its flash trading programs to withdraw those orders or fulfill them itself before the ordinary traders on the market could accept – thus moving the price of the contracts up or down by creating the illusion of large amounts of supply or demand. *Id*. This exact type of allegation – that artificial bids caused artificial prices – has been found sufficient to withstand a motion to dismiss a CEA claim. *See Wilson*, 27 F. Supp. 3d at 533-535 (denying motion to dismiss where CFTC alleged

that "Defendants' bids were artificial—and produced artificial prices—because[,] [*inter alia,*] the bids (1) were placed and quickly withdrawn … (2) were not intended to consummate actual trades …"). *See also In re Rough Rice Commodity Litig.*, No. 11 C 618, 2012 U.S. Dist. LEXIS 140658, at *12 (N.D. Ill. Sept. 26, 2012) (allegations "that by purchasing physical rice while also holding long positions in rice futures contracts, Defendants caused those holding short positions to pay higher prices" sufficient to "plausibly allege[] that Defendants' positions, coupled with their cash purchase, had the ability to inflate CBOT rice futures contract prices from October 2007 forward.").

Second, the Complaint also specified – to a high degree of precision – the extraordinary volume of Defendants' actual trading during the Class period – 3,828,127 futures contracts. Complaint ¶ 28.   This means that Tower's trading alone was responsible for approximately ***53% of all KOSPI 200 trading on the CME for 2012***.   Complaint ¶¶ 20, 28.[15]   An allegation of a huge market position has also been found, by itself, sufficient to allege the ability to influence market prices. *See Commodity Exch.*, 2012 U.S. Dist. LEXIS 181487, at *46 (allegation that JP Morgan held 20-30% of total short open interest in all COMEX contracts and 32-40% of the entire short open interest sufficient to make it "plausible that JPMorgan had the ability to influence prices in the silver futures market."). [16]

---

[15] Average trading on the CME Globex of KOSPI 200 futures was 28,233 contracts a day in 2012. Complaint ¶ 20.  There are approximately 252 trading days in a year, *see* Jaewook Jung, Analysis on the KOSPI200 Option from the Time-Series and Cross-Sectional Perspectives (June 2013) (Unpublished M.S. thesis, Massachusetts Institute of Technology) (on file with MIT Library), at 21 (https://dspace.mit.edu/bitstream/handle/1721.1/81085/858010354.pdf?sequence=1, last visited Apr. 16, 2015) (Plaintiffs' Counsel will provide a copy of the article upon request), which means that approximately 7,112,196 KOSPI 200 contracts traded in 2012.   3,288,127 (the number of Tower trades in 2012 – Complaint ¶ 28), divided by 7,112,196 is 0.538 or 53.8%.

[16] Defendants citation to *Rough Rice* for the proposition that "allegations that defendants held a dominant position in various contracts insufficient to create an inference that defendants had ability to cause an artificial price," Def. Br. at 12, is both inaccurate and misleading.  In *Rough Rice*, the court only discounted an allegation that "Defendants[] obtain[ed] a dominant position in the July 2008 rough rice futures market" because "Plaintiffs'

As each of these allegations, alone, is sufficient to allege the ability of Defendants to manipulate market prices, together they more than satisfy this requirement.[17]

          b.    *The Complaint Adequately Pleads That Defendants Specifically Intended to Influence Market Prices*

"Plaintiffs may demonstrate scienter either (a) by alleging facts to show that Defendants had both motive and opportunity to commit fraud, or (b) by alleging facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness." *Laydon*, 2014 U.S. Dist. LEXIS 46368, at \*20 (citations and internal quotation marks omitted). Even under a Rule 9(b) standard, which as described above, does not apply, "[t]he scienter element "may be alleged generally," though plaintiffs must still allege facts that "give rise to a strong inference of scienter." *Libor I*, 935 F. Supp. 2d at 714 (internal citations omitted).  Defendants make the absurd assertion, again, without any citing to any supporting case-law, that Plaintiffs fail to meet this requirement because the "Complaint has only a conclusory assertion that Tower intended to 'move[] the KOSPI 200 price on the CME in a direction favorable to Tower.'" Def. Br. at 13 (citing Complaint at ¶ 29).  Once again, Defendants' argument has no basis in fact or law.

The Complaint alleges facts showing that Defendants had both motive and opportunity to manipulate the price of KOSPI 200 futures contracts on the CME Globex.  As to motive, the Complaint is clear – Defendants manipulated the KOSPI 200 market to make riskless trading

---

allegations indicated they did not trade July 2008 contracts." *Id.* at \*11.  That obviously does not apply here where Plaintiffs transacted in KOSPI 200 during the time period that Defendants manipulated and dominated the market. As a matter of fact, as discussed previously, see previous paragraph above, *Rough Rice* supports Plaintiffs' position here.

[17]  Defendants cite no cases to the contrary. *Parnon Energy*, 875 F. Supp. 2d at 245, which Defendants' cite, actually supports Plaintiffs' position as it held that "the Commission sufficiently pleads Defendants' ability to affect price." *Telectronics Proprietary, Ltd. v. Medtronic, Inc.*, 687 F. Supp. 832 (S.D.N.Y. 1988) – another highly misleading citation by Defendants – is not even a CEA case and is therefore completely irrelevant to this matter.

profits.  Specifically, the Complaint alleges that Tower's "strategy … moved the KOSPI price on the CME in a direction favorable to Tower which allowed it to either purchase contracts at prices lower, or sell contracts at prices higher, than were available in the market before Tower entered its fictitious large-volume buy or sell orders."  Complaint ¶ 2.   "Tower then immediately repeatedly this strategy in the opposite direction – allowing it to immediately obtain a riskless profit by buying futures contracts at a lower price than it just paid for them or by selling futures contracts at a higher price than it had just paid for them."  Complaint ¶ 3.  Moreover, the Complaint specified the profit made by Defendants from their illegal manipulation scheme – $14.1 million.  Complaint ¶ 4.

As to opportunity, as discussed above, *see supra* at II.A.3.a, Defendants' flash and algorithmic trading prowess and the fact that they made more than *50%* of the trades in the KOSPI 200 futures market made on the CME in 2012 gave them the opportunity to manipulate KOSPI 200 futures trading on the CME Globex in 2012.  These motive and opportunity allegations are sufficient to meet the pleading requirements of Rule 9(b).   *See Libor I*, 935 F. Supp. 2d at 715 ("plaintiffs have adequately pleaded motive by alleging that defendants stood to gain concrete benefits from manipulating the price of Eurodollar futures contracts. *See Amaranth II*, 612 F. Supp. 2d 376, 383 (S.D.N.Y. 2009).  Additionally, defendants undeniably had the opportunity to manipulate Eurodollar contract prices by submitting artificial LIBOR quotes. Therefore, plaintiffs' allegations give rise to a strong inference of scienter.").

> c. *The Complaint Adequately Pleads That Artificial Prices Existed*

Defendants' entire argument on this point consists of two conclusory sentences – neither of which is supported by any legal citation – that the "Complaint identifies not a single price in all of 2012" and this "alone defeats plaintiffs' claims."  Def. Br. at 11.  Defendants are, of course, wrong.  Plaintiffs alleged that Tower artificially manipulated the KOSPI 200 futures

price "*hundreds*" of times during the 2012 Class Period.  *See, e.g.*, Complaint ¶¶ 29-32, 47

(emphasis added).  While Plaintiffs have not alleged precisely on which dates and times prices

were manipulated, even under Rule 9(b)[18] that is not required at this stage of the litigation where

data regarding Defendants' trading activity is solely within its own control.  *See, e.g., Libor I*,

935 F. Supp. 2d at 716 ("Although plaintiffs have not identified precisely how each LIBOR

quote from each defendant on each day during the Class Period was or was not artificial, they

could not reasonably be expected to do so at this stage of the litigation [as if] anyone currently

possesses this information for each day during the Class Period, it is defendants, and in such a

situation, Rule 9(b)'s requirements are relaxed."); *id*. at 717 ("Moreover, even to the extent that

plaintiffs have affirmatively alleged LIBOR manipulation not for each day, but only over a 34-

month-long period, this does not necessarily mean that the allegations are insufficiently

specific"); *In re Natural Gas Commodity Litig.*, 358 F. Supp. 2d 336, 344-45 (S.D.N.Y. 2005)

(plaintiffs adequately plead a commodities manipulation claim where they had alleged that

defendants engaged in manipulative acts "from June 1999 to February 2001" and "between

March 2001 and December 2002").

> d.      *The Complaint Adequately Pleads That Defendants Caused the
>         Artificial Prices*

"[I]t is enough, for purposes of a finding of manipulation in violation of sections 6[c] and

9(a)(2) of the CEA that respondents' action contributed to the price movement."  *Wilson*, 27 F.

Supp. 3d at 535 (quoting *Parnon Energy*, 875 F. Supp. 2d at 248 (internal citations omitted)).

Defendants claim that Plaintiffs do not fulfill this element because "[n]owhere do Plaintiffs

---

[18] Which, as discussed above, does not apply.

specifically state what effect the scheme had on the market for the [contracts] at issue." Def. Br. at 12.[19]

Defendants must have missed paragraphs 2-4, 28-32, and 48 of the Complaint which explain the scheme's effect on the market. Specifically, Tower placed enormous orders for KOSPI 200 futures contracts on the CME (which it either immediately cancelled or fulfilled itself using its algorithmic trading technology) either to buy contracts at a price higher than the prevailing offer or to sell contracts at a price lower than the prevailing to bid, thereby moving the price of the KOSPI 200 contracts either up or down based on the illusory information on supply and demand that Tower itself generated. *See* Complaint ¶¶ 2-4, 28-32, 48. These allegations suffice to fulfill this requirement and move past the motion to dismiss stage and on to discovery. *See Libor I*, 935 F. Supp. 2d at 716 (plaintiffs "adequately alleged that defendants caused the prices of Eurodollar futures contracts to be artificial" by alleging that prices were artificial and how defendants' scheme altered prices); *Natural Gas*, 358 F. Supp. 2d at 344 ("Plaintiffs have alleged the effect the scheme had on the market for the securities at issue" by describing the mechanism by which the scheme worked, "alleging that the false trade reports skewed published price indices, which 'are widely used and relied on by NYMEX natural gas futures traders to determine the price at which they will buy or sell NYMEX natural gas futures'") (internal citations omitted).

> e.   *The Complaint Adequately Alleges Losses Suffered by Plaintiffs*

---

[19] Defendants also complain, again, that the "Complaint here never matches Tower's trades to any particular price movement." Def. Br. at 12. As described above, *see infra* at II.A.3.c. – citing to *Libor* and *Natural Gas*, that is not required at this stage of the litigation where data regarding Defendants' trading activity is solely within its own control. *See also Libor I*, 935 F. Supp. 2d at 719 ("[I]n contrast to a situation in which the defendant disseminated false information and the plaintiff can allege precisely when the false statements were made and what was false about them, here plaintiffs cannot reasonably be expected to know the spread between LIBOR's 'true' value and its actual level on any given day, let alone how this spread changed over time.").

Finally, in their last effort to derail Plaintiffs' CEA claims, Defendants argue that the Plaintiffs lack standing because the Complaint fails to allege that they sustained a loss as a result of Defendants' violation of the CEA.  Def. Br. at 13-14.  Reviewing Defendants' main case citation, however, reveals that, once again, Defendants' argument runs counter to the facts and applicable law.  Specifically, *In re LIBOR-Based Fin. Instruments Antitrust Litig.*, 962 F. Supp. 2d 606 (S.D.N.Y. 2013) ("*Libor II*"), the case cited by Defendants, actually reveals why the complaint in this case satisfies the "actual damages" standing requirement described by Defendants.  In *Libor II*, where Judge Buchwald found the "actual damages" standing argument unsatisfied, she compared that finding to her decision in *Libor I*, where she found the "actual damages" standing requirement – for a different set of allegations – satisfied.  The problem for Defendants is that, under the criteria described by Judge Buchwald, the allegations and facts in the Complaint here are analogous to those in *Libor I*, not those in *Libor II* – leading to the conclusion that, as Judge Buchwald found in *Libor I*, the "actual damages" standing requirement has been satisfied.

In *Libor I*, the allegations concerned a persistent manipulation over time of Libor by the Libor-setting banks where the data concerning on which days Libor was manipulated, by whom, and by how much were in the exclusive control of Defendants.  *See Libor I*, 935 F. Supp. 2d at 716 ("Although plaintiffs have not identified precisely how each LIBOR quote from each defendant on each day during the Class Period was or was not artificial, they could not reasonably be expected to do so at this stage of the litigation [as if] anyone currently possesses this information for each day during the Class Period, it is defendants, and in such a situation, Rule 9(b)'s requirements are relaxed.").  In *Libor II*, the allegations concerned additional, isolated instances of manipulation of Libor by the same Libor-setting banks to benefit their trading arm.

*Libor II*, 962 F. Supp. 2d at 622 ("[T]he trader-based conduct described in the Barclays settlement documents falls squarely in the category of isolated (though repeated) manipulative activity.").  Importantly, in *Libor II* a governmental investigation had isolated and identified certain dates on which these isolated manipulation took place, which Plaintiffs incorporated in their proposed complaint in *Libor II*.  *See, e.g.*, [Proposed] Second Amended Class Action Complaint, ¶¶ 181-208, *In re LIBOR-Based Fin. Instruments Antitrust Litig.*, 1:11-MD-02262-NRB (S.D.N.Y. May 17, 2013) Dkt. No. 332-3, .  In fact, Judge Buchwald quantified the days on which the isolated manipulation occurred and calculated that, during the relevant time period, "LIBOR was artificial, at most, roughly 10% of the time." *Libor II*, 962 F. Supp. 2d at 623.

In other words, the two differences between *Libor I* and *Libor II* were: (1) frequency  of manipulation and (2) availability of information to plaintiffs.  In *Libor I* the frequency of the manipulation was very high as the allegation was that the manipulation was persistent, while in *Libor II* the court concluded that the manipulation had occurred infrequently – at most, 10% of the time.  In *Libor I*, the Plaintiffs did not have access to the dates on which manipulation occurred, so a relaxed 9(b) standard applied.  In *Libor II*, thanks to a governmental investigation which published email correspondence between the banks' traders, the Plaintiffs did have access to dates on which manipulation occurred.

The situation in the instant case is far more akin to *Libor I* than *Libor II*.  First, here the allegation is that the manipulation occurred constantly – "hundreds" of times over a one year period where Defendants were responsible for more than half of all the trading in KOSPI 200 futures on the CME Globex.  *See* Complaint ¶¶ 2-4, *infra* at II.A.3.c.   As there are only 252

trading days in a year,[20] the allegation that the manipulation occurred "hundreds" of times in connection with the allegation that Defendants were responsible for more than half of all the trading at issue makes this frequent, essentially continuous manipulation as opposed to a series of isolated events.  Second, as in *Libor I*, Plaintiffs here do not have access to Defendants trading records – which contains the key information about the manipulation, while Defendants do – so Rule 9(b)'s requirements are relaxed as they were in *Libor I.  See Libor I*, 935 F. Supp. 2d at 716.[21]  Consequently, *Libor I* and *Libor II* both support rejection of Defendants' motion to dismiss.[22]

### B.    Defendants' Arguments Against Gorton's Liability Should be Rejected

Defendants assert that the CEA claims against Mr. Gorton, the "principal, founder, and managing director of Tower," who "ran Tower during the Class Period, including its trading operations," Complaint ¶ 14, should be dismissed.  They are incorrect.  Plaintiffs allege primary liability and aiding and abetting claims against Mr. Gorton in the CEA context.  *See* Complaint ¶¶ 44-56.[23]  For the primary liability claim, the only argument Defendants put forward in addition to adopting the arguments made by Tower (which fail for the reasons discussed above), is that "even if a claim were stated against Tower, the Complaint would still fail against Mr.

---

[20] *See supra* at n.15.

[21] Defendants' assertion that the "Korean traders allege no date on which they traded", Def. Br. at 14, is highly misleading.  All Plaintiffs state that that they "transacted in KOSPI 200 Futures Contracts on the Overnight Futures Market via CME Globex and w[ere] harmed as a consequence of Defendants' unlawful conduct," which places them squarely within the Class Definition which is restricted to those who bought or sold KOSPI 200 Futures Contracts on the Overnight Futures Market via CME Globex during the Class Period.  *See* Complaint ¶¶ 8-12, 38. Plaintiffs' trading records, of course, can be provided at the Court's request.

[22] Puzzlingly, Defendants also cite to *In re Amaranth Natural Gas Commodities Litig.*, 269 F.R.D. 366 (S.D.N.Y. 2010) – a class certification decision that is completely irrelevant to this motion to dismiss and provides no support to Defendants argument.

[23] Plaintiffs recognize that some district courts within this Circuit have held that there is no private right of action for control person liability under the CEA, *see* Def. Br. at 17-18, and assert a control person claim only to the extent necessary to preserve plaintiffs' rights should the Court reach a contrary conclusion.

Gorton, who is not alleged to have any connection to the trading at issue." Def. Br. at 16. Defendants' argument, which cites no case or law in support, is contradicted by the Complaint itself which asserts that Gorton "ran Tower during the Class period, including its trading operations." Complaint ¶ 14. As the person in charge of Tower and its trading operations, Gorton was certainly connected to the "trading at issue."

Similarly, for the aiding and abetting claim, in addition to claiming there is no primary violation (a meritless argument as discussed above), Defendants assert (again without citing to any case law in support) that the Complaint "fails to allege facts, much less particularized ones, of Tower's purported manipulative intent or of Mr. Gorton's awareness of such intent or assistance in the purported scheme." Def. Br. at 17. As described in detail above, *see supra* at II.A.3.b, the Complaint adequately alleged scienter. As the person in charge of Tower's trading, it is plausible that Gorton was aware of the trading in KOSPI 200 futures being done under his watch and, as the person responsible for approving and facilitating Tower's trading activity, it is more than plausible that Gorton performed numerous acts in furtherance of that manipulative trading.

C.    The Court Should Deny Defendants' Motion to Dismiss Plaintiffs' Unjust Enrichment Claim

 "[U]nder Illinois law [pleading unjust enrichment] requires that the defendant voluntarily accepted a benefit that would be inequitable for the defendant to retain without compensating the plaintiff." *De David v. Alaron Trading Corp.*, 814 F. Supp. 2d 822, 830 (N.D. Ill. 2011). Defendants do not challenge any of these elements. *See* Def. Br. at 15-16. Instead, Defendants argue that Plaintiffs claim must fail because it is duplicative of the CEA claim and because Plaintiffs do not allege a sufficiently close relationship with Defendants. Defendants are wrong on both counts. First, Plaintiffs' unjust enrichment claim is not duplicative – while CEA claims

seek redress for plaintiffs' injuries, unjust enrichment claims seek disgorgement of Defendants' ill-gotten gains and courts have permitted plaintiffs to simultaneously pursue CEA and unjust enrichment claims. *See, e.g., De David*, 814 F. Supp. 2d *at* 826, 830 (denying motion to dismiss CEA and unjust enrichment claims brought in same complaint). Defendants cite no case to the contrary.[24] As to the relationship requirement, Defendants cite no Illinois law in support of their proposition, instead relying entirely on cases interpreting New York law[25] regarding unjust enrichment, which do not apply here.[26]

## III. CONCLUSION

For all the above reasons, Defendants motion to dismiss should be denied.[27]

---

[24] *Corsello v. Verizon N.Y., Inc.*, 18 N.Y.3d 777 (N.Y. Ct. App. 2012), the only case Defendants cite, does not even involve a CEA claim.

[25] The New York cases Defendants cite are, in any event, inapposite as they do not involve "any direct relationship, trading or otherwise, between" plaintiffs and Defendants. *In re Amaranth Natural Gas Commodities Litig.*, 587 F. Supp. 2d 513, 547 (S.D.N.Y. 2008); *Libor I*, 935 F. Supp. 2d at 737 ("they have not alleged that they purchased Eurodollar contracts from defendants or that they had any other relationship with defendants"). Here, where Defendants allegedly made more than half of all trades during the Class period, *see* Complaint ¶¶ 20-28, *supra* at n.15, there is a mathematical probability that most plaintiffs did transact directly with Defendants.

[26] As the manipulative trading at issue occurred in Aurora, Illinois, Illinois state law applies to Plaintiffs' unjust enrichment claim. *C.f. Coexist Found., Inc. v. Fehrenbacher*, No. 11 cv 6279, 2014 U.S. Dist. LEXIS 43026 (N.D. Ill. Mar. 28, 2014) (finding that, since Illinois was situs of alleged misrepresentations, Illinois law applies).

[27] If the District Court does, however, grant the motion to dismiss, Plaintiffs respectfully request leave to replead and file an Amended Complaint.

Dated:  May 5, 2015                     Respectfully submitted,


                                        **COHEN MILSTEIN SELLERS & TOLL PLLC**


                                        _____/s/ Michael B. Eisenkraft_____
                                        J. Douglas Richards (JDR-6038)
                                        Michael Eisenkraft (ME-6974)
                                        Richard Speirs (RS-8872)
                                        88 Pine St., 14th Floor
                                        New York, NY  10005
                                        Telephone: (212) 838-7797
                                        Facsimile: (212) 838-7745

                                        Daniel S. Sommers
                                        1100 New York Avenue, N.W.
                                        West Tower, Suite 500
                                        Washington, DC  20005-3964
                                        Telephone: (202) 408-4600
                                        Facsimile: (202) 408-4699

                                        - and -

                                        YoungKi Rhee  (_pro hac vice_)
                                        **WE THE PEOPLE LAW GROUP**
                                        15F The Salvation Army Building
                                        476 Chungjeongro 3-Ka
                                        Seodaemun-Ku, Seoul 120-837, Korea
                                        Tel: (822) 2285-0062
                                        Fax: (822) 2285-0071
                                        Email: ykrhee@wethepeople.co.kr


                                        _Counsel for Plaintiffs and the Proposed Class_

25