**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

| | |
|---|---|
| MYUN-UK CHOI, JIN-HO JUNG, SUNG-HUN JUNG, SUNG-HEE LEE, and KYUNG-SUB LEE, Individually and on Behalf of All Others Similarly Situated, | Case No.: 14-cv-9912 (KMW) **Oral Argument Requested** |
| Plaintiff, | |
| vs. | |
| TOWER RESEARCH CAPITAL LLC and MARK GORTON, | |
| Defendants. | |

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

**REPLY MEMORANDUM OF LAW IN SUPPORT OF**
**TOWER RESEARCH CAPITAL LLC'S AND MARK GORTON'S**
**MOTION TO DISMISS THE COMPLAINT**

**TABLE OF CONTENTS**

Page

PRELIMINARY STATEMENT ...................................................................................................1

ARGUMENT ...................................................................................................................................1

I.     *Morrison* Bars the Korean Traders' CEA Claims..................................................................1

      A.     KOSPI 200 Overnight Futures Trade on a Foreign Futures Exchange ....................2

      B.     Off-Exchange Cases Applying *Morrison* Are Irrelevant Here ................................5

II.    The Complaint Fails to State a Claim ..................................................................................6

CONCLUSION ................................................................................................................................10

# TABLE OF AUTHORITIES

Page(s)

## CASES

*Absolute Activist Value Master Fund Ltd. v. Ficeto*, 677 F.3d 60 (2d Cir. 2012) ........................5, 6

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009) ..........................................................................................4

*ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87 (2d Cir. 2007) ..........................................7

*Caiafa v. Sea Containers Ltd.*, 525 F. Supp. 2d 398 (S.D.N.Y. 2007) ...........................................7

*CFTC v. Wilson*, 27 F. Supp. 3d 517 (S.D.N.Y. 2014) ...................................................................6

*City of Pontiac Policemen's & Firemen's Ret. Sys. v. UBS AG*, 752 F.3d 173 (2d
    Cir. 2014) ...........................................................................................................................1, 3, 6

*Cleary v. Philip Morris Inc.*, 656 F.3d 511 (7th Cir. 2011) ..........................................................10

*Ganino v. Citizens Utils. Co.*, 228 F.3d 154 (2d Cir. 2000) ...........................................................8

*Glaser v. The9, Ltd.*, 772 F. Supp. 2d 573 (S.D.N.Y. 2011) ..........................................................8

*Golden Pac. Bancorp v. FDIC*, 273 F.3d 509 (2d Cir. 2001) .......................................................10

*In re Connetics Corp. Sec. Litig.*, 542 F. Supp. 2d 996 (N.D. Cal. 2008) ......................................7

*In re Libor-Based Fin. Instruments Antitrust Litig.*, 935 F. Supp. 2d 666
    (S.D.N.Y. 2013) ......................................................................................................................8, 9

*In re UBS AG Sec. Litig.*, 07 Civ. 11225, 2012 WL 4471265 (S.D.N.Y. Sept. 28,
    2012) ..........................................................................................................................................7

*Morrison v. National Australia Bank Ltd.*, 561 U.S. 247 (2010) .......................................... passim

*Novak v. Kasaks*, 216 F.3d 300 (2d Cir. 2000) ..............................................................................8

*Wall v. CSX Transp., Inc.*, 471 F.3d 410 (2d Cir. 2006) ..............................................................10

## STATUTES, REGULATIONS, and RULES

7 U.S.C. § 6(a) ................................................................................................................................3

7 U.S.C. § 7a-2(c) ...........................................................................................................................3

17 C.F.R. § 38.4 ..............................................................................................................................3

i

17 C.F.R. § 38.150 .................................................................................................................3

Fed. R. Civ. P. 8 .....................................................................................................................6

Fed. R. Civ. P. 9(b) .............................................................................................................6, 7

## OTHER AUTHORITIES

A New Regulatory Framework for Trading Facilities, Intermediaries and Clearing
    Organizations, 66 Fed. Reg. 42,256 (Aug. 10, 2001) ...........................................................4

Notice of Additional Conditions on the No-Action Relief When Foreign Boards
    of Trade That Have Received Staff No-Action Relief To Permit Direct
    Access to Their Automated Trading Systems From Locations in the
    United States List for Trading From the U.S. Linked Futures and Option
    Contracts and a Revision of Commission Policy Regarding the Listing of
    Certain New Option Contracts, 74 Fed. Reg. 3570 (Jan. 21, 2009) ....................................5

CFTC No-Action Letter 02-96 (July 26, 2002) .........................................................................5

CFTC No-Action Letter 03-08 (Feb. 24, 2003) .........................................................................5

CFTC No-Action Letter 03-12 (Mar. 10, 2003) ........................................................................5

CFTC No-Action Letter 03-17 (Apr. 14, 2003) .........................................................................5

CFTC No-Action Letter 07-06 (May 24, 2007) .........................................................................4

CFTC No-Action Letter 08-18 (Sept. 26, 2008) ........................................................................4

CFTC No-Action Letter 08-20 (Nov. 26, 2008) ........................................................................3

PRELIMINARY STATEMENT

The Korean traders' opposition brief admits that *Morrison v. National Australia Bank Ltd.*, 561 U.S. 247 (2010), controls the extraterritorial reach of the Commodity Exchange Act (CEA). (Op. Br. at 4-5.) The Korean traders further do not dispute that, under *Morrison*, transactions on a foreign futures exchange are beyond the CEA's reach. And, finally, the Korean traders do not dispute that the U.S. Commodity Futures Trading Commission (CFTC) has deemed the instruments at issue here—KOSPI 200 futures—foreign futures contracts traded on a foreign futures exchange. Nothing more is needed to dismiss the Complaint under *Morrison*.

Rather than dispute these points, the Korean traders repeatedly assert that KOSPI 200 futures are in fact listed on a U.S. "exchange," CME Globex. But while the "CME"—the Chicago Mercantile Exchange—is a CEA-registered exchange, "CME Globex" is not. It is merely a computer system that the CME uses and also offers to other exchanges for their trading. For that reason, the CFTC has declined to subject foreign futures exchanges to the CEA merely because they use Globex or other U.S.-based computers. These facts are dispositive.

In any event, even if U.S. law applied, the Korean traders fail to show that the Complaint properly pleads a CEA or state law unjust enrichment claim. The Complaint contains only vague generalities on the required elements. It should be dismissed for that reason too.

ARGUMENT

I.      *Morrison* Bars the Korean Traders' CEA Claims

As Tower showed in its moving brief, *Morrison* prohibits applying the CEA to futures transactions outside the U.S. Trading on a foreign exchange thus generally is not subject to the CEA. (Mov. Br. at 5.) The Korean traders do not dispute this point. To the contrary, they acknowledge that instruments purchased on a "foreign exchange" are off-limits to U.S. law. (Op. Br. at 11 (distinguishing *City of Pontiac Policemen's & Firemen's Ret. Sys. v. UBS AG*, 752 F.3d

1

173, 181 (2d Cir. 2014).)  The Korean traders instead argue that, because overnight KOSPI 200 contracts are "matched" on Globex, they should be deemed to occur on a domestic exchange. (*See* Op. Br. at 11.)  In addition, the Korean traders argue that using a matching engine in the U.S. means that "irrevocable liability" attaches to trades in the U.S., which they say is a further basis for applying U.S. law.  Both arguments are without merit.

### A.     KOSPI 200 Overnight Futures Trade on a Foreign Futures Exchange

As Tower showed in its moving brief, the KRX regulates KOSPI 200 futures the same way whether traded during the day or at night: as on-exchange futures.  (Mov. Br. at 8.)  The Korean traders do not dispute this.  They do try to dismiss the Korean rules in a footnote as not properly considered for their "truth" (Op. Br. at 12 n.12), but offer no response to the many cases that have considered similar materials at the motion to dismiss stage (Mov. Br. at 8 n.5).

Unable to contest this point, the Korean traders argue that both Korean and U.S. law should apply to overnight KOSPI 200 trading.  (Op. Br. at 13.)  This argument elides the key issue.  The KRX treats overnight KOSPI 200 contracts as on-exchange transactions, just like day-traded KOSPI 200 contracts.  The Korean rules thus show that overnight KOSPI 200 futures should be treated as exactly the sort of on-exchange foreign trading deemed beyond the reach of U.S. law under *Morrison*.  (Mov. Br. at 9-10.)

Nonetheless, the Korean traders repeatedly label Globex a domestic "exchange," and based on that premise argue that the CEA should apply.  (*See*, *e.g.*, Op. Br. at 5.)  There is no basis for the Korean traders' assertion.  The CFTC maintains a registry of all domestic exchanges. While the CME is listed, "CME Globex" is not.[1]  Consistent with that list, the CFTC has deemed KRX a "foreign board of trade," and has specifically found that KOSPI 200 futures contracts—

---

[1]     *Trading Organizations – Designated Contract Markets (DCM)*, U.S. COMMODITY FUTURES TRADING COMMISSION, http://sirt.cftc.gov/SIRT/SIRT. aspx?Topic=TradingOrganizations&implicit=true&type=]DCM& CustomColumnDisplay=TTTTTTTT (last visited June 9, 2015).

traded overnight or during the day—are not subject to regulation as U.S. futures contracts. (Mov. Br. at 3-4 (citing Tren. Dec. Ex. A (CFTC No-Action Letter 08-20, at 6-7 (Nov. 26, 2008))).)

The Korean Traders do not dispute this either. They instead argue that the CFTC's no-action letter supports their position because it concludes that KOSPI 200 futures may be "offered and sold in the United States." (Op. Br. at 11.) True, but irrelevant—the securities at issue in *City of Pontiac* were also offered and sold in the United States. But as the Korean traders admit (Op. Br. at 11), those securities were beyond the reach of U.S. law under *Morrison* because they were traded on a foreign exchange, *see City of Pontiac*, 752 F.3d at 176, 181 (rejecting a theory that *Morrison* did not apply to "claims arising out of foreign-issued securities purchased on foreign exchanges," but offered to U.S. buyers through U.S. brokers).

The Korean traders also argue that the CFTC no-action letter should be disregarded because it predates the KRX's use of Globex for overnight KOSPI 200 trades. (Op. Br. at 11-12.) This misses the point. The CFTC deemed KRX a foreign exchange and KOSPI 200 futures as foreign contracts because comprehensive Korean regulation takes KOSPI 200 trading outside the CEA's scope. And the CFTC has never revisited its view despite KRX's use of Globex. In other words, the location of Globex is not relevant to the CFTC's conclusion.

If the Korean traders were correct, then all overnight KOSPI 200 trading would be illegal; under CEA Section 4(a), all futures transactions except those "located outside the United States" *must* be conducted on a board of trade designated or registered as a contract market. 7 U.S.C. § 6(a). In addition, KOSPI 200 contract trading provisions would have to be specifically approved by the CFTC and then adopted by the CME. 7 U.S.C. § 7a-2(c); *see also* 17 C.F.R. § 38.4 (requiring all products to be submitted for CFTC approval); *id.* § 38.150 (requiring boards of trade to adopt rules for each listing). But the CME has never requested the CFTC's

3

permission to trade KOSPI 200 contracts, indisputably lacks any KOSPI 200 trading rules, and requires that KOSPI 200 trades be routed through KRX computers in Korea. (Mov. Br. at 9.)

Thus, the Korean traders' assertion that overnight KOSPI 200 futures trade on a domestic exchange is based on the theory that CME and the CFTC have simply failed to comply with the CEA—an inherently implausible hypothesis that, in any event, is never pleaded. Such implausible assertions cannot survive a motion to dismiss. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) ("A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.").

In that regard, the CFTC has found that other foreign exchanges' use of U.S.-based computers—including Globex—does not trigger the CEA's domestic exchange provisions. (Mov. Br. at 7 n.3.) For instance, the CFTC found in 2008 that a Brazilian exchange's use of Globex did not trigger U.S. regulation, because the exchange was subject to foreign regulation and trades were cleared through foreign firms. CFTC No Action Letter 08-18 (Sept. 26, 2008). Likewise, in 2007, the CFTC found that a Dubai exchange's use of NYMEX matching and clearing systems did not turn the exchange into a domestic exchange under the CEA. CFTC No Action Letter 07-06 (May 24, 2007). As these no-action letters explain, simply using computers in the U.S. to perform certain functions does not establish an exchange in the U.S.[2]

In a footnote, the Korean traders argue that the CFTC's no-action letters cited in Tower's moving brief did not involve an "order matching" system in the U.S. (Op. Br. at 12 n.11.) Not true—the CFTC found in one letter that the presence of a foreign exchange's order matching system in Atlanta would not trigger regulation of the market under the CEA and found in four subsequent letters that the matching engine's continued presence in Atlanta did not impact the

---

[2]    *Cf.* A New Regulatory Framework for Trading Facilities, Intermediaries and Clearing Organizations, 66 Fed. Reg. 42,256, 42,266 & n.58 (Aug. 10, 2001) (CFTC release noting that, unlike core functions like rulemaking and surveillance, exchanges may outsource the operation of a matching engine to unregistered technology providers).

CFTC's analysis.³  Further, the CFTC's Dubai no-action letter above likewise involved a U.S. matching system.

More importantly, these letters show that if there is a comprehensive foreign regulatory scheme for an exchange, the CFTC will not regulate it as a domestic exchange, regardless of the computers used by the foreign exchange.  That is exactly the case here: the KRX is a Korean exchange subject to extensive Korean regulation.  Under these circumstances, *Morrison* requires that U.S. law give way to foreign regulation to avoid the risk of conflict of laws.

> **B.**     **Off-Exchange Cases Applying *Morrison* Are Irrelevant Here**

The Korean traders also point to off-exchange trading cases applying *Morrison* to argue that the CEA should apply here.  They cite *Absolute Activist Value Master Fund Ltd. v. Ficeto*, 677 F.3d 60 (2d Cir. 2012), for the rule that "'to sufficiently allege a domestic securities transaction in securities not listed on a domestic exchange . . . a plaintiff must allege facts suggesting that irrevocable liability was incurred or title was transferred within the United States.'"  (Op. Br. at 7 (citing *Ficeto*, 677 F.3d at 68).)

But *Ficeto* dealt solely with *off-exchange* transactions, as the *Ficeto* Court itself explained.  677 F.3d at 64 ("the Trading Defendants allegedly caused the Funds to purchase the U.S. Penny Stocks directly from those companies in subscriptions pursuant to private offerings known as private investment in public equity ('PIPE') transactions.").  In other words, the trades at issue were on neither a foreign nor a domestic exchange.  This case, however, exclusively involves *on-exchange* trades.  And as the Second Circuit explained, for on-exchange trades, U.S.

---

³        CFTC No-Action Letter 02-96 (July 26, 2002); CFTC No-Action Letter 03-08 (Feb. 24, 2003); CFTC No-Action Letter 03-12 (Mar. 10, 2003); CFTC No-Action Letter 03-17 (Apr. 14, 2003); *see also* Notice of Additional Conditions on the No-Action Relief When Foreign Boards of Trade That Have Received Staff No-Action Relief To Permit Direct Access to Their Automated Trading Systems From Locations in the United States List for Trading From the U.S. Linked Futures and Option Contracts and a Revision of Commission Policy Regarding the Listing of Certain New Option Contracts, 74 Fed. Reg. 3570, 3571 n.9 (Jan. 21, 2009) (noting that cited no-action letters allowed the relevant exchange to transition its matching engine to the ICE Platform in Atlanta, Georgia).

law applies only to trades on a domestic exchange; it does not apply to trades on a foreign exchange. *See City of Pontiac*, 752 F.3d at 181.

Any other result would undermine *Morrison*. By drawing a bright line between trades on foreign versus domestic exchanges, the Supreme Court sought to reduce the "probability of incompatibility" between U.S. laws and "the applicable laws of other countries." *Morrison*, 561 U.S. at 269. The Korean traders admit, as they must, that Korean law governs trading of KOSPI futures. (Op. Br. at 13.) Thus, there is a high risk of conflicting laws, putting this case squarely in the center of what *Morrison* said was off-limits to U.S. law.

In any event, even under *Ficeto*, the Complaint fails to adequately plead that "irrevocable liability" attaches in the U.S. Korean law applies to KOSPI 200 contracts, as shown throughout Tower's moving brief.[4] Neither the Complaint nor the opposition brief purports to conduct any analysis under Korean law of when "irrevocable liability" attaches to a KOSPI 200 contract. Thus, even if *Ficeto* applied—which it does not—the Complaint would still fail to state a claim.

## II.   The Complaint Fails to State a Claim

As shown in Tower's moving brief, Rule 9(b) applies here and requires particularized pleading because the Korean traders' claims "sound in fraud." The Complaint repeatedly states its allegations in terms of fraud and deceit. (*See* Mov. Br. at 10.) And, in any event, even if Rule 8 applied, the Complaint still fails to state a claim.

The Korean traders argue that Rule 8 should apply based mainly on *CFTC v. Wilson*, 27 F. Supp. 3d 517 (S.D.N.Y. 2014). (Op. Br. at 3.) *Wilson* is inapposite. In that case, "the complaint contain[ed] no allegation that the Defendants engaged in fraud." *Wilson*, 27 F. Supp. 3d at 532. Here, the Complaint alleges that Defendants "intended to trick other traders into

---

[4] *See, e.g.*, Mov. Br. at 8; Tren. Dec. Ex. C (KOREA EXCHANGE, GUIDE TO TRADING OF KOSPI 200 FUTURES TRADED ON CME GLOBEX & DAILY FUTURES ON KOSPI 200 OPTIONS ON EUREX (2012-07)).

6

reacting to [] false price[s], and volume information it created with its fraudulent and misleading quote orders." (Compl. ¶ 3; *see also id*. ¶ 31 (same).)  Likewise, in Paragraph 36, the Korean traders rely on a Korean news article that allegedly details "Tower's fraudulent transactions."  Rule 9(b) thus applies.

The Korean traders argue in the alternative that Rule 9(b) should be applied less rigorously here than normally.  (Op. Br. at 3-4.)  But the cases they cite require that "a manipulation complaint must plead with particularity the nature, purpose, and effect of the fraudulent conduct and the roles of the Defendants," and that "[g]eneral allegations not tied to the Defendants or resting upon speculation are insufficient."  *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 102 (2d Cir. 2007).  In addition, they also require pleading with particularity "to the extent possible."  The Korean traders have met none of these standards, and thus fail to properly plead any element of a CEA claim.

As shown in Tower's moving brief (at 5, Appendix 1), much of the Complaint consists of nothing more than verbatim language copied from an indictment in a completely unrelated case.  The Korean traders say that is standard practice (Op. Br. at 5 n.1), but that is wrong.  Numerous courts have rejected pleadings that have copied language from *related* complaints.[5]  Here, the allegations are copied from an indictment in another jurisdiction against an individual employed by another company who traded different products.

In addition, Tower showed that the Korean traders' other allegations are based entirely on unconfirmed public statements by a Korean regulator and Korean press articles about the same statements, which are manifestly insufficient bases on which to bring a Complaint.  (Mov. Br. at

---

[5]  *See*, *e.g.*, *In re UBS AG Sec. Litig.*, 07 Civ. 11225, 2012 WL 4471265, at *17 n.17 (S.D.N.Y. Sept. 28, 2012) ("[B]ecause such allegations are taken directly from uncorroborated allegations embedded in a complaint in another action, the Court will not consider them."); *In re Connetics Corp. Sec. Litig.*, 542 F. Supp. 2d 996, 1005 (N.D. Cal. 2008) (striking allegations sourced solely to an SEC complaint); *Caiafa v. Sea Containers Ltd.*, 525 F. Supp. 2d 398, 411 (S.D.N.Y. 2007) (rejecting allegations copied from another complaint).

14-15.)  The Korean traders essentially concede the point and do not even mention these allegations in their opposition.  But these parts of the Complaint are the only bases Plaintiffs identify for bringing this case.

Stripped of these allegations, the Complaint contains nothing more than vague generalities that come nowhere close to stating a claim.  Tower's moving brief walks through how the Complaint fails to plead any element of a CEA claim against defendants Tower or Mark Gorton, or an unjust enrichment claim.  The Korean traders fail to rebut that showing.  For purposes of this reply, we focus only on the following, while respectfully resting on our moving brief for the remaining elements:

*First*, as Tower's moving brief shows (at 13), the Complaint fails to plead *scienter*.  The Korean traders do not dispute that the Complaint fails to plead "facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness."  (Op. Br. at 16.)  Instead, they argue "motive and opportunity."  (Op. Br. at 16.)  But the "motive" they posit is merely the desire for trading profit, and the "opportunity" simply the ability to make such trades.  Such prosaic business motives and transactions cannot support an inference of *scienter*.  *See*, *e.g.*, *Ganino v. Citizens Utils. Co.,* 228 F.3d 154, 170 (2d Cir. 2000) ("[G]eneral allegations that the defendants acted in their economic self-interest are not enough."); *Novak v. Kasaks*, 216 F.3d 300, 307 (2d Cir. 2000) (general profit motive insufficient to support *scienter* allegation); *Glaser v. The9, Ltd.*, 772 F. Supp. 2d 573, 592 (S.D.N.Y. 2011) (listing cases for same).

*Second*, Tower showed that the Complaint fails to demonstrate that artificial prices existed, or that Tower caused them.  (Mov. Br. at 11-12.)  The Korean traders argue that their general assertions of artificiality and causation suffice.  (Op. Br. at 17-19.)  In support, they cite cases, such as *In re Libor-Based Fin. Instruments Antitrust Litig. (Libor I)*, 935 F. Supp. 2d 666

8

(S.D.N.Y. 2013), in which plaintiffs claimed price artificiality and causation over a period of time.  But in *Libor I*, plaintiffs identified evidence of multiple specific dates when prices were artificial, and connected those prices to defendants' conduct.  *Id.* at 716-717 (plaintiffs presented "a series of data points that correspond to individual L[ibor] quotes and corresponding benchmarks on each day during the Class Period.").  Here, the Korean traders fail to identify a single such instance.

   ***Third***, Tower showed that the Korean traders fail to allege harm from any price artificiality.  (Mov. Br. at 13-14.)  The Korean traders argue that one of the *Libor* cases supports their generalized allegations.  (Op. Br. at 20.)  But, again, the *Libor* cases involved at least some specific dates of alleged manipulation that affected specific plaintiffs in specific ways.  *Libor I*, 935 F. Supp. 2d at 716-717 (noting plaintiffs alleged manipulative acts performed on "all or a substantial number of the business days during the Class Period" and showed how Libor quotes diverged from benchmarks).  Only after having passed that threshold did the *Libor I* court allow some claims to proceed with respect to all of a plaintiff's trading.  *Id.*  Here, however, the plaintiffs have not met that threshold.  The Korean traders do not identify one penny of losses on any trade in their lengthy class period.  That failure is fatal to their claims.

   ***Fourth***, Tower showed that the Complaint is especially threadbare as against Mr. Gorton. (Mov. Br. at 16-17.)  The Korean traders argue that Mr. Gorton's unspecified role in Tower's "trading operations" suffices to tie him to the alleged wrongdoing.  (Op. Br. at 22-23.)  As shown in Tower's moving brief (at 17), that is incorrect.  The Complaint never alleges that Mr. Gorton played any role in the alleged spoofing and wash trading the complaint purports to describe.  The absence of such allegations is fatal.

***Fifth***, and finally, Tower showed that the Korean traders' unjust enrichment claim fails under the law applied in this District. (Mov. Br. at 15-16.) The Korean traders argue that Illinois, not New York, law governs. But for choice of law purposes, the Court applies the law of its own jurisdiction absent a showing of an actual conflict of laws. *Wall v. CSX Transp., Inc.*, 471 F.3d 410, 415 (2d Cir. 2006) ("The first step in any case presenting a potential choice of law issue is to determine whether there is an actual conflict between the laws of the jurisdictions involved."). The Korean traders make no such showing. Nor is there any reason to think that Illinois law is different. Illinois unjust enrichment cases set out the same basic elements as New York cases. *Compare Golden Pac. Bancorp v. FDIC*, 273 F.3d 509, 519 (2d Cir. 2001) ("Under New York law, for a plaintiff to prevail on a claim of unjust enrichment, he must establish (1) that the defendant was enriched; (2) that the enrichment was at the plaintiff's expense; and (3) that the circumstances are such that in equity and good conscience the defendant should return the money or property to the plaintiff.") *with Cleary v. Philip Morris Inc.*, 656 F.3d 511, 516 (7th Cir. 2011) ("In Illinois, '[t]o state a cause of action based on a theory of unjust enrichment, a plaintiff must allege that the defendant has unjustly retained a benefit to the plaintiff's detriment, and that defendant's retention of the benefit violates the fundamental principles of justice, equity, and good conscience.'")

Accordingly, New York law governs, and while the Korean traders say in a footnote that there is some "mathematical probability" of a connection between plaintiffs and defendants (Op. Br. at 24 n.25), they plead no such connection here. Under the cases cited in Tower's moving brief, that pleading failure is fatal.

## CONCLUSION

For the foregoing reasons, this Court should dismiss the Complaint, with prejudice.

Dated:  June 9, 2015.

        Respectfully submitted,

        **WILMER CUTLER PICKERING**
        **HALE AND DORR LLP**
        By: /s Robert W. Trenchard
            Robert W. Trenchard
            Jason D. Hirsch
            7 World Trade Center
            250 Greenwich Street
            New York, NY 10007
            Telephone: (212) 230-8867
            Facsimile: (212) 230-8800
            robert.trenchard@wilmerhale.com
            jason.hirsch@wilmerhale.com

        Matthew T. Martens
        Matthew L. Beville
        1875 Pennsylvania Avenue
        Washington, DC 20006
        Telephone: (202) 663-6921
        Facsimile: (202) 663-6363
        matthew.martens@wilmerhale.com
        matthew.beville@wilmerhale.com

        ***Attorneys for Defendants Tower Research***
        ***Capital LLC and Mark Gorton***

## CERTIFICATE OF SERVICE

I certify that on June 9, 2015, I filed the foregoing Defendants' Memorandum of Law in Support of Their Motion to Dismiss the Complaint via the Court's CM/ECF system, which shall transmit notice to all counsel of record.

/s/ Robert W. Trenchard
*Attorney for Tower Research Capital LLC and Mark Gorton*