UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------X

MYUN-UK CHOI, JIN-HO JUNG, SUNG-HUN
JUNG, SUNG-HEE LEE, and KYUNG SUB LEE,
Individually and on Behalf of All Others Similarly
Situated,

                    Plaintiffs,                              14-CV-9912 (KMW)

                                                    **OPINION AND ORDER**

        v.

TOWER RESEARCH CAPITAL LLC and
MARK GORTON,

                    Defendants.
------------------------------------------------------------------X

KIMBA M. WOOD, District Judge:

      Plaintiffs are members of a putative class comprised of parties who transacted in certain

futures contracts during 2012. Plaintiffs allege that Tower Research Capital LLC ("Tower") and

its CEO, Mark Gorton (collectively, "Defendants"), used fictitious trades and other deceptive

techniques to manipulate the prices at which these futures contracts traded on the Chicago

Mercantile Exchange Globex platform ("CME Globex"). Plaintiffs assert that this conduct

violates the Commodity Exchange Act ("CEA"), 7 U.S.C. §§ 1, et seq., as well as state law.

      Defendants have moved to dismiss the Complaint pursuant to Federal Rule of Civil

Procedure 12(b)(6). For the reasons stated below, the Court GRANTS Defendants' Motion to

Dismiss, but with leave for Plaintiffs to amend.

## I.       BACKGROUND

      The following facts are taken from Plaintiffs' Complaint and are assumed to be true for

purposes of Defendants' Motion to Dismiss. *See Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,

551 U.S. 308, 322 (2007); *see also Shipping Fin. Servs. Corp. v. Drakos*, 140 F.3d 129, 131 (2d

Cir. 1998) ("When considering a motion to dismiss . . . for failure to state a cause of action, a court must accept as true all material factual allegations in the complaint.").

The KOSPI 200 is an index for Korean stocks, similar to the Dow Jones Industrial Average or the S&P 500. (Compl. ¶ 15 [Doc. No. 1]). Since 2007, KOSPI 200 futures contracts have been listed and traded on the CME Globex—an electronic trading platform located in Aurora, Illinois—during the night market, which runs from 5:00 p.m. to 6:00 a.m. Seoul time (2:00 a.m. to 3:00 p.m. Chicago time). *Id.* ¶ 18. Parties who wish to trade in KOSPI 200 futures contracts do so by submitting orders either to buy or to sell through the KRX, a Korean exchange. *Id.* ¶ 21. During the KRX night market, those orders are matched on the CME Globex, at which point the parties enter into a binding agreement to trade a KOSPI 200 futures contract. *Id.*

Plaintiffs Myun-Uk Choi, Jin-Ho Jung, Sung-Hun Jung, Sung-Hee Lee, and Kyung-Sub Lee (collectively, "Plaintiffs") are individuals who bought and sold KOSPI 200 futures contracts on the CME Globex during 2012. *Id.* ¶¶ 8-12. Plaintiffs assert claims on behalf of all persons and entities who bought and sold KOSPI 200 futures contracts on the CME Globex between January 1, 2012, and December 31, 2012. *Id.* ¶ 1. Defendant Tower Research Capital is a high frequency trading firm founded in 1998 by Defendant Mark Gorton, and located in New York, New York. *Id.* ¶¶ 13-14, 24.

Plaintiffs allege that, during the relevant period, Defendants "manipulate[d] the price of KOSPI 200 futures contracts traded on the CME [Globex] for their own profit" by misleading other traders about the prevailing price and number of contracts available. *Id.* ¶ 2. Defendants allegedly did so by entering hundreds of large-volume orders either to buy or to sell KOSPI 200 futures contracts without intending these orders to be matched by others users. *Id.* ¶¶ 2, 29.

Instead, Defendants took advantage of flash-trading technology to respond to their own orders within a fraction of a second by either (1) cancelling the orders before they could be matched, or (2) fulfilling the orders themselves. *Id.* ¶¶ 2, 29. The purpose of this trading strategy—sometimes known as "spoofing"—was to create a "false impression regarding the number of contracts available in the market, along with illusory price and volume information" and thereby manipulate the price of KOSPI 200 futures contracts in Tower's favor. *Id.* ¶¶ 2, 29, 31. This false information was intended to trick other traders into believing that the prevailing price was either higher or lower than it actually was. *Id.* ¶ 31. Tower was then able to "purchase [KOSPI 200 futures] contracts at prices lower, or sell contracts at prices higher, than were available in the market before Tower entered its fictitious large-volume buy or sell orders." *Id.* ¶ 29.

The Complaint alleges that Defendants created "hundreds and hundreds" of these fictitious buy and sell orders, and, over the course of the year, earned approximately $14.1 million through the use of these "spoofing" tactics. *Id.* ¶¶ 4, 29.

Plaintiffs filed their class action complaint on December 16, 2014, asserting violations of the CEA §§ 6(c), 6(d), 9(a), and 22(a), 7 U.S.C. §§ 9, 13b, 13(a), and 25(a), as well as state law. (Compl.). Defendants subsequently moved to dismiss the complaint with prejudice on March 4, 2015. (Defs.' Mem. of Law in Supp. Mot. to Dismiss ("Mot. to Dismiss") [Doc. No. 19]).

**II.     LEGAL STANDARD**

To survive a Rule 12(b)(6) motion to dismiss, a plaintiff must plead facts sufficient "to state a claim to relief that is plausible on its face." *Bell Atl. Corp v. Twombly*, 550 U.S. 544, 570 (2007). A claim is facially plausible when the supporting factual allegations "allow[] the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Where a plaintiff has failed to "nudge" a claim "across the line

from conceivable to plausible," a district court must dismiss the complaint. *Twombly*, 550 U.S. at 570.

The Court must accept as true all well-pleaded factual allegations in a complaint and "draw[] all inferences in the plaintiff's favor." *Allaire Corp. v. Okumus*, 433 F.3d 248, 249-50 (2d Cir. 2006) (internal quotations omitted). But a court is "not bound to accept as true a legal conclusion couched as a factual allegation." *Twombly*, 550 U.S. at 555.

## III.   DISCUSSION

### A.   *Pleading Standard – Rule 8(a) vs. Rule 9(b)*

As an initial matter, the parties disagree as to whether the heightened pleading standard of Federal Rule of Civil Procedure 9(b) or the more relaxed standard of Rule 8(a) applies in this case. *See* (Mot. to Dismiss, 10); (Pls.' Mem. of Law in Opp'n ("Pls.' Opp'n"), 2-3 [Doc. No. 30]).[1]

Following the majority of courts in this Circuit, this Court adopts the case-by-case approach to determining whether Rule 9(b) applies, namely "[i]f a particular manipulation claim sounds in fraud, it must comply with Rule 9(b); if it does not sound in fraud, it need not comply with Rule 9(b)." *U.S. Commodity Futures Trading Comm'n v. Amaranth Advisors, L.L.C.*, 554 F. Supp. 2d 523, 531 (S.D.N.Y. 2008) (Chin, J.). In general, if the theory of manipulation alleged in the complaint is based on false or misleading statements or omissions, it sounds in fraud and Rule 9(b) applies. *See In re Crude Oil Commodity Litig.*, No. 06-CV-6677, 2007 WL 1946553,

---

[1] Courts in this Circuit are divided as to whether Rule 9(b) always applies in the context of market manipulation claims under the CEA. *See In re Amaranth Natural Gas Commodities Litig.*, 730 F.3d 170, 181 (2d Cir. 2013). However, the majority of courts have embraced a "case-by-case" approach in determining whether Rule 9(b) applies to a particular complaint. *See, e.g.*, *U.S. Commodity Futures Trading Comm'n v. Parnon Energy Inc.*, 875 F. Supp. 2d 233, 244 (S.D.N.Y. 2012) (Pauley, J.) ("[T]he weight of authority rejects [a] bright line rule in favor of a case-by-case examination into whether the allegations do, in fact, sound in fraud."); *In re LIBOR-Based Fin. Instruments Antitrust Litig.* 935 F. Supp. 2d 666, 713 (S.D.N.Y. 2013) (Buchwald, J.). *But see In re Amaranth Natural Gas Commodities Litig.*, 587 F. Supp. 2d 513, 535 (S.D.N.Y. 2008) (Scheindlin, J.) (holding that a complaint alleging manipulation of commodities prices must always satisfy the heightened standard of Rule 9(b) because "market manipulation is inherently deceptive").

at *5 (S.D.N.Y. June 28, 2007) (Buchwald, J.). If, however, the complaint merely alleges a scheme based on a manipulative trading strategy or abuse of market power, "courts have found Rule 8(a) is more appropriate." *In re Term Commodities Cotton Futures Litig.*, No. 12-CV-5126, 2013 WL 9815198, at *10 (S.D.N.Y. Dec. 20, 2013) (Carter, J.); *U.S. Commodity Futures Trading Comm'n v. Wilson*, 27 F. Supp. 3d 517, 532 (S.D.N.Y. 2014) (Torres, J.).[2] Whether or not the word "fraud" appears in the complaint is not dispositive in determining whether Rule 9(b) applies. *In re Crude Oil Commodity Litig.*, 2007 WL 1946553, at *5.

The Complaint in this action alleges that Tower created a "false impression" and "illusory price and volume information" through the use of "fictitious large-volume buy or sell orders" that moved the price of KOSPI 200 futures contracts in a direction favorable to the Defendants. (Compl. ¶¶ 2, 29). The Complaint also describes these orders as "fraudulent and misleading." *Id.* ¶¶ 3, 31. Although Plaintiffs have used language that is indicative of fraud ("fictitious", "fraudulent", "misleading", "illusory"), the gravamen of the allegations is that Tower employed a strategy of submitting high-volume above- or below-market bids in order to manipulate market prices. (Compl. ¶¶ 2-3, 29, 31).

This closely resembles the scheme alleged in *Wilson*, where the defendants repeatedly submitted above-market bids and then withdrew them "without the intent to consummate an exchange" in order to manipulate the prevailing price in their favor. 27 F. Supp. 3d at 526. The *Wilson* court decided that, because the attempted manipulation was effectuated through "a particular trading strategy" and did not involve "misleading statements or omissions," the

---

[2] *Compare In re Natural Gas*, 358 F. Supp. 2d 336, 341-43 (S.D.N.Y. 2005) (Marrero, J.) (applying Rule 9(b) to CEA claims when defendants gave "false information," disseminated "inaccurate, misleading, and false trading information," and participated in "fraudulent trade reporting strategies") *with Amaranth Advisors*, 554 F. Supp. 2d at 531 (applying Rule 8(a) when the alleged manipulation was "not based on false statements of fact intended to deceive a buyer or seller, but on the timing of trades intended to change the closing price") *and Parnon Energy*, 875 F. Supp. 2d at 245 (applying Rule 8(a) because "this scheme was not the product of misstatements or material omissions").

complaint did not sound in fraud and therefore should be evaluated under the "flexible pleading standard[] of Rule 8(a)" rather than the more stringent standard of Rule 9(b). *Id.* at 532. The Court finds *Wilson*'s reasoning persuasive.

Here, despite Plaintiffs' description of Tower's conduct as "fraudulent," the Complaint does not allege that Tower made any false or misleading statements of fact or material omissions as part of its alleged manipulation. The submission of an above- or below-market bid—even if the party intends to withdraw the bid before it can ever be matched—does not constitute a false or misleading statement that would trigger the application of Rule 9(b). *See* 27 F. Supp. 3d at 532.

Accordingly, the Court concludes that Plaintiffs' allegations against Tower and Mr. Gorton do not sound in fraud, and therefore the more relaxed Rule 8(a) pleading standard applies.[3]

### B.   Whether the CEA Applies to the Defendants' Conduct

Defendants argue that United States law does not apply to the alleged misconduct. *See* (Mot. to Dismiss, 5-10). In *Morrison v. National Australia Bank Ltd.*, 561 U.S. 247 (2010), the United States Supreme Court held that the Securities Exchange Act (SEA) does not apply to conduct that occurs abroad, but rather applies only to the purchase or sale of a security that (1) is made in the United States, or (2) is listed on a domestic exchange. *Id.* at 269-70.[4] Both the Second Circuit and this Court have held that *Morrison*'s transactional test applies to the CEA as well. *See Loginovskaya v. Batratchenko*, 936 F. Supp. 2d 357, 372 (S.D.N.Y. 2013) (Oetken, J.)

---

[3] Even if the allegations were required to meet the Rule 9(b) standard, that standard is typically relaxed in market manipulation cases. *See In re LIBOR*, 935 F. Supp. 2d at 714 ("[C]ourts generally relax Rule 9(b)'s requirements in the context of manipulation claims.") (citing *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 102 (2d Cir. 2007)).

[4] *Morrison* rejected the Second Circuit's "conduct and effects" tests for determining whether or not the SEA applied to extraterritorial conduct. *Morrison*, 561 U.S. at 265-69. That test would have allowed the SEA to apply whenever "the wrongful conduct occurred in the United States" or "the wrongful conduct had a substantial effect in the United States or upon the United States citizens." *Id.* at 257.

*aff'd*, 764 F.3d 266 (2d Cir. 2014); *Starshinova v. Batratchenko*, 931 F. Supp. 2d 478, 487 (S.D.N.Y. 2013) (Wood, J.).

Although the parties agree that *Morrison*'s transactional test governs the analysis under the CEA, they dispute (1) whether the alleged transactions took place in the United States or in South Korea, and (2) whether they took place on a U.S. exchange or a Korean exchange. *See* (Mot. to Dismiss, 6); (Pls.' Opp'n, 5). Plaintiffs contend that the CME Globex trading platform itself qualifies as a domestic exchange, (Pls.' Opp'n, 5), and that, for all transactions taking place on the CME Globex, the "meeting of the minds required for the trade takes place on the CME Globex in Illinois." (Compl. ¶ 21). By contrast, Defendants contend that all transactions in KOSPI 200 futures contracts occur on the KRX, a South Korean exchange, and that the "use of CME Globex computers in Chicago" to effectuate these transactions during the night market "does not alter that fact." (Mot. to Dismiss, 7). Defendants contend that "[u]nder *Morrison*, what matters is the *exchange's* location, not where the *technology* is located." *Id.*

For the reasons discussed below, the Court concludes that the alleged transactions fail to qualify as domestic under either prong of *Morrison*'s test.

1.  Purchase or Sale Made in the United States

First, Plaintiffs assert that the "meeting of the minds required for the trade takes place on the CME Globex in Illinois," (Compl. ¶ 21), and therefore these transactions qualify under the first prong of the *Morrison* test. But Plaintiffs have alleged no facts to support that conclusion.

"To sufficiently allege the existence of a 'domestic transaction . . .' plaintiffs must allege facts indicating that irrevocable liability was incurred, or that title was transferred, within the United States." *Absolute Activist Value Master Fund Ltd. v. Ficeto*, 677 F.3d 60, 62 (2d Cir. 2012); *see also Starshinova*, 931 F. Supp.2d at 487 (applying this standard to a claim brought

under the CEA). In *Absolute Activist*, the Second Circuit stated that factual allegations supporting the conclusion that irrevocable liability was incurred within the United States might include, "facts concerning the formation of the contracts, the placement of purchase orders, the passing of title, or the exchange of money." 677 F.3d at 70. However the "mere assertion that transactions 'took place in the United States' is insufficient to adequately plead the existence of domestic transactions." *Id.*

The allegations in the Complaint state no facts to support the conclusion that the transactions took place in the United States, beyond a bare assertion that the requisite meeting of the minds occurred in Aurora, Illinois. *See* (Compl. ¶ 21). In fact, several allegations in the Complaint regarding the process by which KOSPI 200 futures contracts are traded support the conclusion that the meeting of the minds took place in South Korea. For instance, the Complaint states that all orders for KOSPI 200 futures contracts that are matched and fulfilled on the CME Globex must first be placed through the KRX trading system. *Id.* It also states that settlement of any trade matched on the CME Globex does not occur immediately, but instead takes place on the KRX on the following day once the KRX has opened for regular trading. *Id.*

2. <u>Security Listed on a Domestic Exchange</u>

Second, Plaintiffs allege that "the CME Globex is an American exchange" and therefore transactions in KOSPI 200 futures contracts fall within the second prong of the *Morrison* test, because the contracts are "listed on a domestic exchange." (Pls.' Opp'n, 5). In support of this assertion, Plaintiffs note merely that the CME *itself* is a national exchange registered with the SEC. *Id.* at n. 5. However, the CME and the CME Globex are not the same thing. The CME is a financial exchange located in Chicago, Illinois and registered with the SEC. The CME Globex is an electronic trading platform owned by the CME Group that runs on servers located in Aurora,

Illinois. (Compl. ¶¶ 16, 45). The CME Globex platform is used by the CME and by other exchanges, both domestic and foreign, to facilitate trading in securities listed on those exchanges. *See id.* ¶¶ 16, 18.

Even if the CME is a domestic exchange, it does not necessarily follow that the CME Globex platform *also* qualifies as a domestic "exchange" for the purpose of the CEA. Instead, if the CME Globex system merely provides a technological platform for trading securities that are listed on exchanges located elsewhere (such as the CME, the NYMEX, or the KRX), then it would not itself qualify as an exchange.[5] Plaintiffs' Complaint fails to allege any facts in support of a finding that the CME Globex—as distinct from the CME—is a domestic exchange, rather than simply a technological platform utilized by other exchangesto effectuate trading.[6]

In sum, Plaintiffs have failed to plead facts adequate to support their claim that the alleged transactions either (1) took place in the United States, or (2) occurred on a domestic exchange. Accordingly, the Court concludes that the CEA does not apply to the alleged conduct under *Morrison* and *Loginovskaya*, and that the Complaint fails to state a claim.[7]

---

[5] In *U.S. Commodity Futures Trading Comm'n v. Garofalo*, No. 10-CV-2417, 2011 WL 4954082 (N.D. Ill. May 5, 2011), the court held that the CEA did apply to options traded through CME Globex, but those options were *also* listed on and traded through the CME itself. *Id.* at *1. The court held that the transactions took place in Chicago (the location of the CME, not of the Globex computers), and therefore that the defendant's conduct fell within the scope of the CEA under *Morrison*. *Id.* at *6 (trades at issue were executed "on the CME in Chicago").

[6] In their Reply, Defendants assert, without support, that "the CFTC has declined to subject foreign futures exchanges to the CEA merely because they use CME Globex or other U.S.-based computers." (Defs.' Reply, 1). Although such decisions might be persuasive, in the absence of citation to any relevant authority, the Court cannot rely on that statement.

[7] Because the Complaint fails to adequately state a claim for relief under the CEA, the claims against Mr. Gorton predicated upon aiding and abetting and control person liability necessarily fail as well.

### C.  State Law Claims

In addition to their claim under the CEA, Plaintiffs also assert a claim for unjust enrichment under state law.[8] As a threshold matter, the parties dispute whether Illinois or New York law governs the Plaintiffs' unjust enrichment claim.

In diversity cases, federal courts must look to the laws of the forum state in deciding issues with respect to conflicts of law. *Krock v. Lipsay*, 97 F.3d 640, 645 (2d Cir. 1996) (citing *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487 (1941)). New York's conflict of laws rules provide that "'[t]he first step in any case presenting a potential choice of law issue is to determine whether there is an actual conflict between the laws of the jurisdictions involved.'" *Wall v. CSX Transp., Inc.*, 471 F.3d 410, 415 (2d Cir. 2006) (quoting *Matter of Allstate Ins. Co. (Stolarz)*, 81 N.Y.2d 219, 223 (1993)). The elements of an unjust enrichment claim are in essence the same under both New York and Illinois law. *Compare Golden Pac. Bancorp v. FDIC*, 273 F.3d 509, 519 (2d Cir. 2001) (citing *Universal City Studios, Inc. v. Nintendo Co.*, 797 F.2d 70, 79 (2d Cir. 1986) (applying New York law)) (elements of unjust enrichment under New York law are: (1) "that the defendant was enriched"; (2) "that the enrichment was at the plaintiff's expense"; and (3) "circumstances are such that in equity and good conscience, the defendant should return the money or property to the plaintiff") *with Cleary v. Philip Morris, Inc.*, 656 F.3d 511, 516 (7th Cir. 2011) (applying Illinois law) (quoting *HPI Health Care Servs., Inc. v. Mt. Vernon Hosp., Inc.*, 131 Ill. 2d 145, 160 (1989) (elements of unjust enrichment under Illinois law are: (1) "the defendant has unjustly retained a benefit to the plaintiff's detriment"; and (2) "th[e] defendant's retention of the benefit violates the fundamental principles of justice, equity, and good conscience"). Accordingly, the Court finds no actual conflict.

---

[8] Even if Plaintiffs' claim under the CEA is dismissed, the Court has an independent ground for jurisdiction over Plaintiffs' state law claim under 28 U.S.C. § 1332(d)(2), as Plaintiffs allege that there are members of the class who are diverse from Defendants, and the alleged amount in controversy exceeds $5 million. (Compl. ¶ 6).

Under New York law, a claim for unjust enrichment must allege some sort of direct relationship between plaintiff(s) and defendant(s). *In re Motel 6 Sec. Litig.*, Nos. 93-CV-2183, 92-CV-2866, 1997 WL 154011, at *7 (S.D.N.Y. Apr. 2, 1997) (Keenan, J.). Courts in this Circuit have previously rejected unjust enrichment claims based on market manipulation when the "alleged relationship between plaintiffs and defendants [was] excessively attenuated." *In re Amaranth Nat'l Gas Commodities Litig.*, 587 F. Supp. 2d 513, 535 (S.D.N.Y. 2008) (Scheindlin, J.) (dismissing an unjust enrichment claim based on market manipulation where the "alleged link" between plaintiffs' trades and defendants' manipulations "is too attenuated"); *In re Term Commodities Cotton Futures Litig.*, 2013 WL 9815198, at *28 (dismissing an unjust enrichment claim upon finding merely a "strained connection" between purchasers of cotton futures contracts and alleged manipulations by defendants).

Here, Plaintiffs have failed to allege any direct dealing or actual, substantive relationship with the Defendants. The purchase or sale of securities at prices that might have been artificially elevated or lowered because of Defendants' alleged manipulation is not a direct, substantive relationship. And although Plaintiffs argue in a footnote that there is a high likelihood that some members of the purported class engaged in direct dealing with the Defendants during the class period, (Pls.' Opp'n, 24 n.25), a "mathematical probability" that some Plaintiffs transacted with Defendants is not sufficient to show the direct relationship necessary to support a claim for unjust enrichment. Accordingly, this claim also is dismissed.

## IV.   CONCLUSION

For the foregoing reasons, Defendants' Motion to Dismiss is GRANTED. Plaintiffs are given thirty days to file an amended complaint, should they choose to do so. This Opinion and Order resolves Docket Entry 18.

SO ORDERED.

DATED:      New York, New York
            February 24, 2016

                                    _____
                                              /s/
                                    KIMBA M. WOOD
                                    United States District Judge