# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

MYUN-UK CHOI, JIN-HO JUNG, SUNG-HUN JUNG, SUNG-HEE LEE, and KYUNG-SUB LEE, Individually and on Behalf of All Others Similarly Situated,

                   *Plaintiff,*

    vs.

TOWER RESEARCH CAPITAL LLC and MARK GORTON,

                   *Defendants.*

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

Case No.: 1:14-cv-09912

FIRST AMENDED CLASS ACTION COMPLAINT

JURY TRIAL DEMANDED

Plaintiffs Myun-Uk Choi, Jin-Ho Jung, Sung-Hun Jung, Sung-Hee Lee, and Kyung-Sub Lee ("collectively, Plaintiffs), by their undersigned attorneys, bring this action against Defendants Tower Research Capital LLC ("Tower") and Mark Gorton (collectively, "Defendants") pursuant to the Commodity Exchange Act, amended, 7 U.S.C. §§ 1, et seq. (the "CEA") and the common law on behalf of themselves and all others who transacted in KOSPI 200 Futures Contracts on the Overnight Futures Market via CME Globex between January 1, 2012 to December 31, 2012, inclusive (the "Class Period").  The allegations in this complaint are based upon information and belief, information provided by Plaintiffs, and the investigation of counsel, which included the review and translation of government reports and news articles, consultation with experts, and communications with government officials and reporters.

## SUMMARY OF ALLEGATIONS

1.      This is a class action on behalf of those who transacted in KOSPI 200 Futures Market on the Overnight Futures Market via CME Globex during the Class Period, seeking to pursue remedies under the Commodity Exchange Act and the common law.

2.      During the Class Period, Defendants used fictitious trades and other "spoofing" techniques to manipulate the price of KOSPI 200 Futures contracts traded on the CME Globex for their own profit.   Specifically, Defendant Tower – a flash trading firm founded and run by Defendant Gorton repeatedly entered large-volume buy or sell orders that it had no intention of fulfilling legitimately and then either immediately canceled these large-volume orders or traded those large volume contracts with itself using its algorithms and flash trading process to fill its own orders before those contracts could be matched by other traders.  These strategies allowed Tower to create a false impression regarding the number of contracts available in the market, along with illusory price and volume information, and thereby manipulate the price of KOSPI 200 futures on the CME Globex.  Tower's strategy – which it utilized hundreds of times – moved the KOSPI 200 price on the CME Globex in a direction favorable to Tower which allowed it to either purchase contracts at prices lower, or sell contracts at prices higher, than were available in the market before Tower entered its fictitious large-volume buy or sell orders.

3.      Tower then immediately repeated this strategy in the opposite direction – allowing it to immediately obtain a riskless profit by buying futures contracts at a lower price than it just paid for them or by selling futures contracts at a higher price than it had just paid for them.  As part of its scheme, Tower designed its trading programs to place several layers of "quote orders" on the opposite side of the market from its trade orders to create a fictitious illusion of market interest.   Tower's quote orders were eithers orders to buy contracts at a price higher than the

prevailing offer, or orders to sell contracts at a price lower than the prevailing bid.  Tower engineered its algorithms so that these above or below market quote orders were automatically cancelled within a fraction of a second.  Tower did this because it did not intend for the quote orders to be filled when it entered them, but instead intended to trick other participating traders into reacting to the false price, and volume information it created with its fraudulent and misleading quote orders.

4.       During the Class Period, Tower utilized these spoofing tactics hundreds of times, illegally earning approximately US $14.1 million (₩14.1 billion Korean Won) in profits.  The illegal scheme was exposed on May 28, 2014 when government regulators in Korea issued a press release revealing that they had referred Tower and a number of its traders to the prosecutor's office for engaging in this illegal scheme.

## JURISDICTION AND VENUE

5.       This action arises under Section 22 of the CEA, 7 U.S.C. § 25.

6.       This Court has jurisdiction over the subject matter of this action pursuant to Section 22 of the CEA, 7 U.S.C. § 25.  This Court also has jurisdiction over the state law claims under 28 U.S.C. § 1367 because those claims are so related to the federal claim that they form part of the same case or controversy, and under 28 U.S.C. § 1332, because the amount in controversy for the Class exceed $5,000,000 and there are members of the Class who are citizens of a different state than Defendants.

7.       Venue is proper in this District pursuant to Section 22 of the CEA, 7 U.S.C. § 25(c), and 28 U.S.C. § 139l, as, upon information and belief, Defendants reside in this District and made the trades at issue from their offices in Manhattan.

<u>PARTIES</u>

8.    Plaintiff **Myun-Uk Choi**, is a resident and citizen of the Republic of Korea ("Korea") who transacted in KOSPI 200 Futures Contracts on the Overnight Futures Market via CME Globex and was harmed as a consequence of Defendants' unlawful conduct.

9.    Plaintiff **Jin-Ho Jung**, is a resident and citizen of the Republic of Korea ("Korea") who transacted in KOSPI 200 Futures Contracts on the Overnight Futures Market via CME Globex and was harmed as a consequence of Defendants' unlawful conduct.

10.    Plaintiff **Sung-Hun Jung**, is a resident and citizen of the Republic of Korea ("Korea") who transacted in KOSPI 200 Futures Contracts on the Overnight Futures Market via CME Globex and was harmed as a consequence of Defendants' unlawful conduct.

11.    Plaintiff **Sung-Hee Lee**, is a resident and citizen of the Republic of Korea ("Korea") who transacted in KOSPI 200 Futures Contracts on the Overnight Futures Market via CME Globex and was harmed as a consequence of Defendants' unlawful conduct.

12.    Plaintiff **Kyung-Sub Lee**, is a resident and citizen of the Korea who transacted in KOSPI 200 Futures Contracts on the Overnight Futures Market via CME Globex and was harmed as a consequence of Defendants' unlawful conduct.

13.    Defendant **Tower Research Capital LLC** ("Tower"), is a financial services firm headquartered at 377 Broadway, New York, NY.

14.    Defendant **Mark H. Gorton,** ("Gorton"), a resident of New York City who lives at 108 West 76th Street, New York, NY, is the principal, founder, and managing director of Tower and ran Tower during the Class Period, including its trading operations.

<u>SUBSTANTIVE ALLEGATIONS</u>

A.    **Background Facts**

4

### a.  KOSPI 200 Futures Trade on The CME Globex After Hours

15.     The KOSPI 200 is a stock index for Korean stocks, akin to the S&P 500 or Dow Jones indexes in the United States.  The KOSPI 200 was created on January 3, 1990 with a base value of 100.   The two hundred Korean stocks in the KOSPI 200 comprise approximately 93% of the total value of the Korean Stock Exchange ("Korean Exchange").  Weighted by capitalization, the stocks in the KOSPI 200 index include global companies like Samsung Electronics and Hyundai Motor.  None of the component securities comprise more than 30 percent of the index's weighting.  The five highest weighted component securities together comprise less than 60% of the index's weighting.  The KOSPI 200 is updated every 2 seconds and published by the KRX publication of the Korean Exchange, the sole Exchange in South Korea.  It is the most liquid index for the Korean stock market.

16.     The CME Group was formed by the 2007 merger of the Chicago Mercantile Exchange and the Chicago Board of Trade.  The CME Group brings buyers and sellers together on the CME Globex electronic trading platform and on its trading floors. CME Group offers the widest range of benchmark products available across all major asset classes, including futures and options based on interest rates, equity indexes, foreign exchange, agricultural commodities, and alternative investment products such as weather and real estate. CME Group is traded on the New York Stock Exchange and NASDAQ under the symbol "CME."

17.     The Korean Exchange created the KOSPI 200 Futures Contract in May 1996 as its first derivative product.   One contract is the trading unit for a KOSPI 200 Futures derivative and the contract value is calculated by multiplying the KOSPI 200 Futures prices times 500,000 Korean won ("KRW"). The minimum price increment at which a futures

contract can trade is called a "tick", the value of 0.05 point (KRW 25,000) for each contract. As of 2012, the KOSPI 200 Futures contract ranks eighth in the world in terms of trading volume for stock market index futures.

18.     On October 23, 2007, the CME Group and the Korea Exchange signed an agreement at the Chicago Mercantile Exchange Building for the KOSPI 200 futures contract to be listed and traded on CME Globex, an electronic CME platform located in Aurora, Illinois.   The CME Globex falls within the CFTC's definition of "exchange": "A central marketplace with established rules and regulations where buyers and sellers meet to trade futures and options contracts or securities."[1] In particular, "[t]he CME Globex platform was the first—and remains among the fastest—global electronic trading system for futures and options. Through its advanced functionality, high-reliability and global connectivity, *it is now the world's premier marketplace for derivatives trading*."[2] (emphasis added) "The platform is an open access *marketplace that allows customers to participate directly in the trading process*, view the book of orders and prices for CME Group products and enter their own orders." (emphasis added). [3] The CME Globex permits trading of futures and options contracts or securities, between buyers and sellers, including trading other than on a principal-to-principal basis, and has adopted rules that govern the conduct of CME Globex users, which

---

[1] CFTC Glossary, "E," *available at* http://www.cftc.gov/consumerprotection/educationcenter/cftcglossary/glossary_e (last visited March 25, 2016).

[2] CME Globex Reference Guide, *available at* http://www.cmegroup.com/globex/files/GlobexRefGd.pdf at *4 (last visited March 25, 2016).

[3] *Id.*

include sanctions other than exclusion from trading.[4]  This is the same platform which CME utilizes to trade derivatives based on U.S. Treasury bonds, the S&P 500, the NASDAQ 100, the Dow Jones Industrial Average, grains, livestock, weather and real estate.[5]  The CME Globex also falls within the economic definition of an exchange, which a leading treatise describes as a "forum[] where traders meet to arrange trades" and includes electronic exchanges where "traders meet only via electronic communication networks."[6]  Similarly, Investopedia defines an exchange as a "marketplace in which securities, commodities, derivatives and other financial instruments are traded.  The core function of an exchange – such as a stock exchange – is to ensure fair and orderly trading, as well as efficient dissemination of price information for any securities trading on that exchange… An exchange may be a physical location where traders meet to conduct business or an electronic platform."[7]  Under the agreement between the CME Group and the Korea Exchange, KOSPI 200 Futures would be traded in Aurora, Illinois on CME Globex during the hours from 2 a.m. to 3 p.m. Chicago time, or 5:00 P.M. to 6:00 A.M. Seoul time (the "Night Market").

19.    On November 26, 2008, the Korean Exchange received a No-Action Letter for the KOSPI 200 Futures Contract from the U.S. Commodity Futures Trading Commission

---

[4] *See, e.g.*, CME Rule 402.B.11, *available at* https://www.cmegroup.com/rulebook/CME/I/4/4.pdf (last visited March 25, 2016) (providing for fines of up to $1M).

[5] CME offers "Co-Location Services," permitting, for a fee, customers to put their computer equipment right next to the CME Globex's physical servers in Aurora, Illinois which allows "the lowest latency connectivity possible for all products traded on the CME Globex platform." CME Co-Location Services, *available at* https://www.cmegroup.com/globex/files/CME-Co-Location-Services-Overview.pdf (last visited March 25, 2016).

[6] Trading and Exchanges, Market Microstructure for Practitioners, Larry Harris, Oxford University Press (2003) at 34.

[7] http://www.investopedia.com/terms/e/exchange.asp?layout=infini&v=4A&adtest=4A at *1. (last visited March 25, 2016)

("CFTC") stating that they would not recommend enforcement action if KOSPI Futures were offered and sold in the United States.   Consequently, U.S. registered futures commission merchants (FCMs) were permitted to, and did, accept orders for KOSPI 200 Futures from U.S. investors.

20.     When KOSPI 200 Futures began trading on the CME Globex in 2009, the average trading volume was 705 contracts.  Since then, trading volume of KOSPI 200 Futures on the CME Globex has skyrocketed, increasing to an average of 28,223 contracts a day in 2012, with a high point of 60,198 contracts traded on May 9, 2012.[8]  By 2012, over 10% of all KOSPI 200 Futures contracts were being traded in Illinois on the CME Globex.

21.     Irrevocable liability for KOSPI 200 Futures trades made on the CME Globex is incurred in Illinois when the trades are "matched."  Trading of KOSPI 200 Futures on the CME Globex works in the following manner.  When a trader places a limit order on KRX's Home or Global Trading Systems, the orders are matched on CME Globex using the "multiple price action method" through which "successful bidders are required to pay for the allotted quantity of securities at the respect price/yield at which they have bid."  In a public document on its website, the CME Group represents that, on the CME Globex, "matches are essentially binding contracts."[9]  Mr. Joonsoo Park, Director, Global Account Management – Asia, Global Market Solutions & Services at the CME, who is listed as a contact person for questions about the CME Group's strategic partnership with KRX and as being in charge of

---

[8] As there are approximately 252 trading days in a year for this product, this means that approximately 7,112,196 KOSPI 200 contracts traded in 2012.

[9] *See* https://www.cmegroup.com/trading/cme-direct/files/eos-trader-migration-faq.pdf at *3 (last visited March 25, 2016) ("CME Globex executions happen in the Central Limit Order Book (CLOB), where timing is critical and measured in seconds. CME Globex orders must be submitted accurately, as matches are essentially binding contracts and real-time order data is public").

"Order Routing and Connectivity" [10] confirmed orally on  Wednesday, March 2, 2016 (U.S. time), that this sentence is accurate.   A representative at CME Globex's Global Command Center further confirmed on March 3, 2016 that matched orders are binding.   This is in accordance with the Rule 522 of the CME, which states, under the heading "Acceptance of Bids and Offers," that:

> ***In … electronic trading***, while outstanding, ***all or any part of any bid or offer is subject to immediate acceptance by any trader.   Members are required to honor all bids or offers which have not been withdrawn from the market.   The price at which a trade is executed shall be binding***, unless such trade is cancelled by Exchange officials in accordance with Exchange rules. (Emphasis added). [11]

22.     In other words, parties negotiate through CME Globex by putting in limit orders and, once those orders match, parties enter into a ***binding*** agreement to buy or sell a futures contract when those orders match in Illinois.   This binding agreement constitutes irrevocable liability and the meeting of minds required for the trade takes place on the CME Globex in Illinois.   Only settlement of all trades occurs the day after on the KRX.

23.     Trading of KOSPI 200 Futures on the CME Globex is via a central limit order book and completely anonymous.   Traders are, as a matter of CME policy and practice, never told who their counterparty is on a trade.   In fact, the CME publicly touts the anonymity of trading on its platforms. [12]

---

[10] *See* https://www.cmegroup.com/international/partnership-resources/krx-resources.html (last visited March 25, 2016)

[11] www.cmegroup.com/rulebook/CBOT/I/5/5.pdf at *11 (last visited March 25, 2016).

[12] *See, e.g.*, http://www.cmegroup.com/globex/files/GlobexRefGd.pdf at *5 (last visited March 9, 2016) ("CME Group electronic markets provide fair and equal trading opportunity for all participants. Individual retail traders, small businesses and large institutions alike see and have access to the same prices. The anonymity of traders and firms is protected electronically in all bids, offers and trades."); http://www.cmegroup.com/education/request-for-quote.html (last visited March 25, 2016) ("Just like all trading activity on the CME Globex central limit order book, the RFQ market is completely anonymous.").

24.     While the CME itself possesses information about counterparties, it is nonpublic and the CME will not produce it absent a subpoena.  Collectively, Plaintiffs made well over one thousand (1,000) separate trades of KOSPI 200 Futures on the Overnight Futures Market via CME Globex during the Class Period.

### b.  Mark Gorton and Tower Research Capital

25.     Mark Gorton holds a bachelor's in electrical engineering from Yale, a master's degree in electrical engineering from Stanford, and an MBA from Harvard.  Mr. Gorton's first job in the finance industry was at the proprietary trading desk of First Boston where he utilized advanced math to derive new investment strategies.

26.     After leaving First Boston in 1998, Mr. Gorton founded two companies – Tower Research Capital and LimeWire.  LimeWire, an electronic peer-to-peer music service served as a successor to Napster in that it allowed people to trade files, including copyrighted material like albums, for free.  The Recording Industry Association of America sued Gorton and LimeWire in 2006 for copyright infringement and other legal violations.  In May of 2010, Judge Kimba Wood of the Southern District granted summary judgment against LimeWire, finding that LimeWire and its creator, Mark Gorton, committed copyright infringement, engaged in unfair competition and induced others to commit copyright infringement.  Mr. Gorton settled the case for $105 million.  According to the Recording Industry's CEO, Mr. Gorton was "thumbing his nose at the rule of law to profiteer enormously."  In an interview, Mr. Gorton explained that copyright laws were "preventing a lot of the natural market efficiencies from taking place."

27.     Tower Research Capital, which Mr. Gorton founded in 1998 the same year he left First Boston, is a high frequency trading firm.  High frequency trading firms use

computers to create and operate algorithms and, by using those algorithms and technology, execute trades faster than anyone else – making pennies on millions and millions of trades executed in milliseconds.  According to its website, "Tower develops proprietary trading algorithms by using rigorous statistical methodology to identify non-random patterns in the behavior of markets" and its "portfolio managers use these algorithms to earn exceptional returns while mitigating risk." According to a 2008 magazine interview with Mr. Gorton, Tower has never had a down investment year.  With a staff of 275 traders, Tower trades in 80 markets worldwide across equities, fixed income, futures and foreign exchange.

28.     Tower is no stranger to litigation or the authorities.  In September 2014, Latour Trading, at the time a wholly owned subsidiary of Tower, settled with the SEC for a record $16 million for violating a federal rule that requires all broker-dealers to maintain minimum levels of net liquid assets or net capital. According to the SEC, in 2011, Latour "often accounted for 4%, and at times as much as 9%, of the trading volume in equity securities for the entire U.S. market".  According to a description of the violation in Bloomberg, Latour was "looking for efficiency wherever it could find it" "[e]ven if that meant rewriting the rules…"

29.     Also in September 2013, CME Group announced that Tower agreed to settle two disciplinary actions over violations of CME and Chicago Board of Trade rules, including one regarding prohibited wash trades.

30.     Early in 2014, New York Attorney General Schneiderman declared that some of the practices of high frequency trading firms were "fundamentally unfair — and potentially illegal — situations that give elite groups of traders early access to market-moving information at the expense of the rest of the market."  In April of 2014, New York Attorney

General Schneiderman subpoenaed a number of high-frequency trading (HFT) firms for information about their "special relationships" with exchanges and dark pools. Dark pools are private exchanges in which investors can trade stocks anonymously. The HFT firms that Schneiderman targeted are Tower, Chopper Trading, and Jump Trading.

### c. Defendants' Manipulation of the KOSPI 200 Night Market in 2012

31.     In 2012, Defendants utilized their algorithmic flash trading abilities to artificially and illegally manipulate prices of the KOSPI 200 Futures during Night Market trading on the CME for their own profit.  Specifically, four traders associated with Tower traded a total of 3,828,127 KOSPI 200 Futures contracts in the period between January and December 2012 on the CME during Night Market trading.  This means that Tower traded approximately 53.8% of *all* KOSPI 200 Futures trades made on the CME during Night Market trading for 2012.[13]

32.     In that period, Tower Research Capital's traders created hundreds and hundreds of ***fictitious*** buys and sells to artificially manipulate the price of the KOSPI 200 futures contracts they were trading on the CME Globex.  Here is how the illegal scheme worked.

---

[13] As Tower was responsible for more than half of KOSPI 200 Futures trades made on the CME Night Market for 2012 and the Plaintiffs collectively made over 1,000 trades on the CME Night Market in 2012, there is approximately a 99.999999999999% chance that, for at least one of those transactions, Tower and at least one of the Plaintiffs were direct counterparties with each other.  To put it another way, since Tower made over 50% of the trades on the market and Plaintiffs made over 1,000 trades, there is an approximately 1/2 or 50% chance that each trade made by a Plaintiff did not have Tower as a counterparty.  As Plaintiffs made over 1,000 trades, the chance that ***none*** of those trades had Tower as a counterparty is an infinitesimal .0000000000000001%.  (Statistical binomial probability, where something either "comes up" or does not, with a fixed probability in repeated trials, is calculated in this formula: $b(x; n, P) = \{ n! / [ x! (n - x)! ] \} * Px * (1 - P)^{n - x}$, where $x$ is number of success (at least 1 in this case), P is probability of success on an individual trial (.5 in this case) and $n$ is the number of trials (1000 in this case).  M.G. Bulmer, *Principles of Statistics* 84 (Dover Publications, Inc. 1979).  As trading on the CME Globex is completely anonymous, however, information on Tower's counterparties is solely within the possession of the CME which will not produce such information absent a subpoena.

Tower entered large-volume KOSPI 200 buy or sell orders on CME Globex that it had no intention of fulfilling legitimately.  Tower either immediately canceled these large-volume orders or traded those large volume contracts with itself using its algorithms and flash trading process to fill its own orders before those contracts could be matched by other traders.  These strategies allowed Tower to create a false impression regarding the number of contracts available in the market, along with illusory price and volume information, and thereby manipulate the price of KOSPI 200 futures on the CME Globex.  Tower's strategy – which it utilized hundreds of times – moved the KOSPI 200 price on the CME Globex in a direction favorable to Tower and allowed it to either purchase contracts at prices lower, or sell contracts at prices higher, than were available in the market before Tower entered its fictitious large-volume buy or sell orders.

33.     Tower then immediately repeated this strategy in the opposite direction – allowing it to immediately obtain a riskless profit by buying futures contracts at a lower price than it just paid for them or by selling futures contracts at a higher price than it had just paid for them.

34.     As part of its scheme to manipulate trading in KOSPI 200 contracts, Tower designed its trading programs to place several layers of "quote orders" on the opposite side of the market from its trade orders to create a fictitious illusion of market interest.  Tower's quote orders were eithers orders to buy contracts at a price higher than the prevailing offer, or orders to sell contracts at a price lower than the prevailing bid.  Tower engineered its algorithms so that these above or below market quote orders were automatically cancelled within a fraction of a second.  Tower did this because it did not intend for the quote orders to be filled when it

entered them, but instead intended to trick other participating traders into reacting to the false price, and volume information it created with its fraudulent and misleading quote orders.

35.     While Tower's use technology may be cutting edge, its use of false and fictitious buy or sell orders to manipulate the price of futures is actually a longstanding illegal practice often times referred to as "spoofing" which is designed to manipulate the price of a futures contract so that it does not reflect the price that would naturally be generated as a result of real supply and demand.   During the 2012 time period, Tower utilized these spoofing practice hundreds of times, illegally earning approximately US $14.1 million (₩14.1 billion KRW)  in profits.

### d.  Defendants' Manipulation of the KOSPI 200 Night Market in 2012 is Revealed on May 28, 2014

36.     On May 28, 2014, Tower's manipulation of the KOSPI 200 Night Market in 2012 was revealed by the Financial Services Commission ("FSC") – a Korean regulator akin to the SEC.   On that date, the FSC revealed, in a press release, that it voted to "refer to the prosecutor's office an algorithmic trading specialty company with its traders under the suspicion of participating in unlawful trades" as well as the company itself.[14]  The FSC went on to reveal that:

> From January to December, 2012, the traders of a U.S. based algorithmic trading specialty company accessed the KOSPI 200 Overnight Futures Market and traded with the use of the proprietary algorithmic trading technique, which manipulated prices to build their buy and sell positions by creating automatically and repeatedly fictitious trades or making appeared liquidating, resulting in unlawful profit of ₩14.1 billion KRW (about USD $14.1 M).[15]

---

[14] Translated from Korean (http://www.fss.or.kr/fss/kr/promo/bodobbs_view.jsp?seqno=17872&no=10671&s_title=&s_kind=&page=35).

[15] Translated FSC Press Release from Korean.

The press release also provided additional details of the scheme, including a graphic illustrating its workings (reproduced and translated below).

**<u>Details</u>**



<in several seconds and minutes >

37.     Multiple news articles in Korea followed, providing additional information about the scheme, including that the anonymous American algorithmic trading company was, in fact, Tower.

38.     For instance, on February 29, 2014, an article appearing in Asia Economics reported that Tower and its counsel stated at an FSC proceeding that "Tower did self-trade through algorithm trading due to Korean Exchange's blocking system failure, which should block Tower's self-trade systemically", where Korean Exchange responded that "Tower should have blocked its own self-trading structure or it should registered self-trading prevention with

Exchanges as are other overseas Exchanges." [16]  In other words, Tower and its counsel admitted that it actually self-traded through its algorithm trading system.

39.    On April 27, 2014, an article appearing in Hankuk Economy [17] provided additional detail concerning Tower's fraudulent transactions.  Specifically, Tower schemed to set bids to buy 2 ticks higher than the at-then price index -- making the index price appear to increase.  If the other participants buy those 2 ticks higher prices, then Tower changes to the opposing position and sells its already bought at-then price index, where Tower gained 2 ticks price gaps from the other participants.  For example, if KOSPI 200 Futures price index is about to increase from 260.00 to 260.05, Tower set its mass bids to buy at 260.15, which is 2 ticks higher than 260.05. If the market reacts to Tower's fictitious mass price increase, Tower changed its position from long to short and it sells its already bought 260.05 at 260.15 to the other participants.

40.    Other news articles also reported Tower's illegal manipulation of KOSPI200 contracts on CME Globex as follows[18]:

### < CBS No Cut news dated on May 29, 2014>

"According to Financial Supervisory Service ("FSS")'s announcement on May 28, 2014, it charges to Korean Prosecution Office United States Trading company, (anonymous "A"), and its

---

[16] http://www.asiae.co.kr/news/view.htm?idxno=2014022011042267629 (Translated from Korean)

[17] In Korean (http://www.hankyung.com/news/app/newsview.php?aid=2014042752871).

[18] All translated from the Korean.

(CBS No Cut News: http://www.nocutnews.co.kr/news/4032854 / Kyunghyang News: http://bizn.khan.co.kr/khan_art_view.html?artid=201403240600025&code=920301&med=khan / Kyunghyang News: http://bizn.khan.co.kr/khan_art_view.html?artid=201404172138075&code=920301&med=khan / MK News: http://news.mk.co.kr/newsRead.php?year=2014&no=604679)

associated 4 traders for unjust enrichment by unfair manipulating KOSPI 200 Futures Night Session market…..Also, according to FSS, they got unjust enrichment amount to ₩14.1 billion KRW (Approx. $14.1 million USD) through algorithmic trading method at 4 kinds of KOSPI 200 Futures 3,828,127 contracts……they developed algorithm method and by way of 'wash sale' and 'liquidating the stocks from the market' to increase the price and so on……FSS said that it is the first case in history as algorithmic method derivatives market manipulation case in S. Korea. And it said that the "A" company is on the probe of US authority for its unfair transaction, too";

### < Kyunghyang news dated on March 24, 2014>

"According to anonymous high ranking officer of FSS, one of US investment company earned unjust enrichment over ₩10 billion KRW ($10 million USD) by manipulating the market through automatic trading program at Night Session Futures market……US company, "A", entered at CME linked KOSPI 200 Futures market by automated algorithmic trading method and got over ₩10 billion KRW ($10 million USD) during 2012 through 2013…. "A" company used the programmed method that it offers to sell and re-take.  It got short term profit by using hundreds of transactions at mili-second, by which it gave distorted information to the public individual investors and sold its stocks……it is intentional distortion of market information and which is regarded as unfair trading, which incurred damage to the investors";

### <Kyunghyang news dated on April 17, 2014>

"A" company got illicit profit by unfair trading through algorithm method at Night Session Futures market……."A" company got over ₩10 billion KRW  during 2012~2013 at CME linked KOSPI 200 Futures market…..";

### <MK news dated on April 17, 2014>

"Financial Services Commission decided to report the suspicion of Tower Research's illegal profit by manipulation of the KOSPI 200 Future Market to the Public Prosecutor's Office. Foreign HFT trading company is apprehended for its unfair trading of domestic futures commodity and put on prosecution for the first time in history.  That company said that it just transacted automatically set trading structure and thus there was no intention, also, there is no illegal programming method against Korean Act.  That company has its head-quarter at New York, USA and, Mark Gorton, who used to a former trader of Credit Suisse founded that company on 1998 as an algorithm specialty trading company.  That company transacted over 40% of whole futures of CME KOSPI 200."

### CLASS ACTION ALLEGATIONS

41.     Plaintiffs bring this action as a class action pursuant to Federal  Rule of Civil Procedure 23(a) and (b)(3) on behalf of the following class:

All persons, corporations and other legal entities who transacted in KOSPI 200 Futures Contracts on the Overnight Futures Market via CME Globex between January 1, 2012 to December 31, 2012, inclusive, and were damaged by Defendants manipulation of the price of KOSPI 200 Futures Contracts.

Excluded from the Class are Defendant Gorton and his family, Defendant Tower , and the officers and directors of Defendant Tower at all relevant times; members of their immediate families and any entity in which Defendants have or had a controlling interest.[19]

42.     The members of the Class are so numerous that joinder of all members is impracticable.  Throughout the Class Period, KOSPI 200 Futures Contracts were actively traded with an average volume on the Night Market of $3.584 billion (₩3.584 trillion KRW) during the Class Period and an aggregate volume of approximately $881.693 billion (₩881.693 trillion KRW) for the Class Period.  While the exact number of Class members is unknown to Plaintiffs at this time and can only be ascertained through appropriate discovery, Plaintiffs believe that there are thousands of geographically dispersed members in the proposed Class. Members of the Class may be identified from records maintained by CME Globex and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used  in commodities and securities class actions.

43.     Plaintiffs' claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law complained of herein.

44.     Plaintiffs will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class action and securities litigation.

---

[19] Plaintiffs reserve the right to modify the class definition at certification or otherwise.

45.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

(a)     whether Defendants' manipulation of KOSPI 200 Futures constituted a manipulative or unlawful act;

(b)     the scope and duration of Defendants' manipulation of the price of KOSPI 200 Futures;

(c)     whether such manipulation caused prices of KOSPI 200 Futures to be artificial;

and

(d)     whether injury or the extent of such artificiality may be established by common, Class-wide means.

46.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.   There will be no difficulty in the management of this action as a class action.

## FIRST CLAIM FOR RELIEF

**Manipulation of KOSPI 200 Futures
in Violation of the Commodity Exchange Act
(7 U.S.C. § 1, *et seq.*)**

47.     Plaintiffs repeat and re-allege each and every allegation contained above as if fully set forth herein.

48.     The CME has been designated by the CFTC as a contract market pursuant to Section 5 of the CEA, 7 U.S.C. § 7.  CME is an organized, centralized market that provides a forum for KOSPI 200 Futures contracts and other derivative products.  Globex is a CME trading platform located in Aurora, Illinois.

49.     *Intent*.  Defendants deliberately, through their use of fictitious buy and sell orders and other spoofing techniques, intentionally manipulated and artificially inflated and deflated the price of the KOSPI 200 Futures contracts traded on the CME Globex during the Night Market in 2012.

50.     *Artificial Price*.  During the Class Period, KOSPI 200 Futures contract prices on the CME Globex did not result from the legitimate market information, supply factors, and demand factors.  On the contrary, KOSPI 200 Futures contract prices on the CME Globex Night Market during the Class Period were artificially inflated or deflated by the fictitious trades and other spoofing activities undertaken by Defendants.

51.     *Causation*.  By engaging in fictitious sales and other spoofing techniques, Defendants manipulated the price of KOSPI 200 Futures contracts traded on the CME Globex during the Class Period and thereby caused damages to Plaintiffs and Class Members who purchased or sold at these artificially inflated and deflated prices.

52.     **Ability to Influence Prices**.  Due to their algorithmic trading process, powerful computers, and ability to make huge trades at incredibly high speed, Defendants had the ability to, and did, influence the price of KOSPI 200 Futures contracts traded on the CME Globex during the Class Period.

53.     By their intentional misconduct, Defendants violated each Sections 6(c), 6(d), 9(a) and 22(a) of the CEA, 7 U.S.C. §§ 9, 13b, 13(a) and 25(a) during the Class Period.

54.     Thereby, Defendants proximately caused Plaintiffs and members of the Class injury for which each is entitled to recover the actual damages resulting from the manipulation and other violations of the CEA.

## SECOND CLAIM FOR RELIEF

**Vicarious Liability for Manipulation of KOSPI 200 Futures
in Violation of the Commodity Exchange Act
(7 U.S.C. § 2)**

55.     Plaintiffs repeat and re-allege each and every allegation contained above as if fully set forth herein.

56.     Each Defendant is liable under Section 2(a)(1) of the CEA, 7 U.S.C. § 2(a)(1), for the manipulative acts of their agents, representatives, and/or other persons acting for them.

## THIRD CLAIM FOR RELIEF

**Aiding and Abetting and Control Person Liability for Manipulation
in Violation of the Commodity Exchange Act
(7 U.S.C. § 25)**

57.     Plaintiffs repeat and re-allege each and every allegation contained above as if fully set forth herein.

58.     To any extent that Defendant Gorton is not liable under the First Claim, then Defendant Gorton is liable under this Claim as Defendant Gorton possessed knowledge of Tower's intent to violate the CEA by manipulating, intended to further that violation; and acted in furtherance of Tower's intention through his control of Tower, his direction of Tower's traders, and his control and direction of Tower's algorithmic trading.

59.     Plaintiffs and the Class are each entitled to actual damages for the violations of the CEA alleged herein.

## FOURTH CLAIM FOR RELIEF

**Restitution/Disgorgement/Unjust Enrichment Under the Common Law**

60.     Plaintiffs repeat and re-allege each and every allegation contained above as if fully set forth herein;

61.     It would be inequitable for Defendants to be allowed to retain the benefits which Defendants obtained from their illegal manipulative acts and other unlawful conduct described herein, at the expense of Plaintiffs and members of the Class.

62.     Plaintiffs and members of the Class are entitled to the establishment of a constructive trust impressed upon the benefits to Defendants from their unjust enrichment and inequitable conduct.

63.     Alternatively or additionally, each Defendant should pay restitution of its own unjust enrichment to Plaintiffs and members of the Class.

## PRAYER FOR RELIEF

WHEREFORE,  Plaintiffs pray for relief and judgment, as follows:

A.      For an order determining that this action is a proper class action, certifying Plaintiffs as class representatives under Rule 23 of the Federal Rules of Civil Procedure, and Plaintiffs' counsel as Class Counsel;

B.      For a judgment awarding Plaintiffs and the Class damages against Defendants for their violations of the CEA, together with prejudgment interest at the maximum rate allowable by law;

C.      For a judgment awarding Plaintiffs and the Class any and all sums of Defendants' unjust enrichment;

D.     For an order impressing a constructive trust temporarily, preliminarily, permanently or otherwise on Defendants' unjust enrichment, including the portions thereof that were obtained at the expense of Plaintiffs and the Class;

E.     For an award to Plaintiffs and the Class of their costs of suit, including reasonable attorneys' and experts' fees and expenses; and

F.     For such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiffs hereby demand a trial by jury.

Dated:  March 25, 2016                    Respectfully submitted,

**COHEN MILSTEIN SELLERS & TOLL PLLC**

J. Douglas Richards (JDR-6038)
Michael Eisenkraft (ME-6974)
Richard Speirs (RS-8872)
88 Pine St., 14th Floor
New York, NY  10005
Telephone: (212) 838-7797
Facsimile: (212) 838-7745

Daniel S. Sommers
1100 New York Avenue, N.W.
West Tower, Suite 500
Washington, DC  20005-3964
Telephone: (202) 408-4600
Facsimile: (202) 408-4699

- and -

YoungKi Rhee
**WE THE PEOPLE LAW GROUP**
15F The Salvation Army Building
476 Chungjeongro 3-Ka
Seodaemun-Ku, Seoul 120-837, Korea
Tel: (822) 2285-0062
Fax: (822) 2285-0071
Email: ykrhee@wethepeople.co.kr

*Counsel for Plaintiffs and the Proposed Class*