17-648
*Choi v. Tower Research Capital LLC*

N.Y.S.D. Case #
14-cv-9912(KMW)

# In the
# United States Court of Appeals
# For the Second Circuit

_____

August Term, 2017

Argued: September 20, 2017
Decided: March 29, 2018

No. 17-648-cv

**USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: March 29, 2018**

Myun-Uk Choi, Jin-Ho Jung, Sung-Hun Jung, Sung-Hee Lee,
Kyung-Sub Lee, individually and on behalf of all others similarly
situated,
*Plaintiffs-Appellants,*

*v.*

Tower Research Capital LLC, Mark Gorton,
*Defendants-Appellees.*

_____

Appeal from the United States District Court
for the Southern District of New York.
No. 14-cv-09912 – Kimba M. Wood, *Judge.*

_____

Before: Walker, Pooler, and Lohier, *Circuit Judges*.

_____

Plaintiffs, five Korean citizens, transacted on a "night market"
of Korea Exchange ("KRX") futures contracts. The KRX is a

CERTIFIED COPY ISSUED ON 03/29/2018

derivatives and securities exchange headquartered in Busan, South Korea.  On the KRX night market, traders enter orders in Korea when the KRX is closed for business, whereupon their orders are quickly matched with a counterparty by an electronic trading platform ("CME Globex") located in Aurora, Illinois.  The trades are then cleared and settled on the KRX when it opens for business the following morning.

Plaintiffs allege that Defendants Tower Research Capital LLC, a New York based high-frequency trading firm, and its founder, Mark Gorton, injured them and others by engaging in manipulative "spoofing" transactions on the KRX night market in violation of the Commodity Exchange Act ("CEA"), 7 U.S.C. §§ 1 *et seq.*, and New York law.  The district court dismissed the action principally on the ground that the CEA does not apply extraterritorially as would be required for it to reach Defendants' alleged conduct.  Because we conclude Plaintiffs' allegations make it plausible that the trades at issue were "domestic transactions" under our precedent, we do not agree that application of the CEA to Defendants' alleged conduct would be an impermissible extraterritorial application of the act.  We also disagree with the district court's conclusion that Plaintiffs failed to state a claim for unjust enrichment.  Accordingly, we VACATE and REMAND for further proceedings.

_____

MICHAEL EISENKRAFT, Cohen Milstein Sellers & Toll PLLC, New York, NY (J. Douglas Richards, Richard Speirs, Cohen Milstein Sellers & Toll PLLC, New York, NY; Times Wang, Cohen Milstein Sellers & Toll PLLC, Washington, DC, *on the brief*), *for Plaintiffs-Appellants*.

NOAH A. LEVINE, Wilmer Cutler Pickering Hale and Dorr LLP, New York, NY (Matthew T. Martens, Albinas J. Prizgintas, Wilmer Cutler Pickering Hale and Dorr LLP, Washington DC, *on the brief*), *for Defendants-Appellees*.

_____

JOHN M. WALKER, JR., *Circuit Judge*:

Plaintiffs, five Korean citizens, transacted on a "night market" of Korea Exchange ("KRX") futures contracts. The KRX is a derivatives and securities exchange headquartered in Busan, South Korea. On the KRX night market, traders enter orders in Korea, when the KRX is closed for business, whereupon their orders are quickly matched with a counterparty by an electronic trading platform ("CME Globex") located in Aurora, Illinois. The trades are then cleared and settled on the KRX when it opens for business the following morning.

Plaintiffs allege that Defendants Tower Research Capital LLC ("Tower"), a New York based high-frequency trading firm, and its founder, Mark Gorton, injured them and others by engaging in

manipulative "spoofing" transactions on the KRX night market in violation of the Commodity Exchange Act ("CEA"), 7 U.S.C. §§ 1 *et seq.*, and New York law.  The district court dismissed the action principally on the ground that the CEA does not apply extraterritorially as would be required for it to reach Defendants' alleged conduct.  Because we conclude Plaintiffs' allegations make it plausible that the trades at issue were "domestic transactions" under our precedent, we do not agree that application of the CEA to Defendants' alleged conduct would be an impermissible extraterritorial application of the act.  We also disagree with the district court's conclusion that Plaintiffs failed to state a claim for unjust enrichment under New York law.  Accordingly, we VACATE and REMAND for further proceedings.

## BACKGROUND[1]

The KOSPI 200, a stock index akin to the S&P 500 or the Dow Jones, consists of the weighted averaged of two hundred Korean stocks traded on the KRX.  The KRX also includes a KOSPI 200 futures contract in its daytime trading, which allows traders to speculate on the value of the KOSPI 200 index at various future dates.  To facilitate after-hours trading of KOSPI 200 futures, the KRX contracted with CME Group, the product of a merger of the Chicago Mercantile

---

[1] These facts derive from the amended complaint, and we accept them as true.  *See Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007).

Exchange ("CME") and the Chicago Board of Trade, to establish an overnight market for futures trading. Pursuant to that agreement, futures contracts on KRX's "night market" are listed and traded on "CME Globex, an electronic CME platform located in Aurora, Illinois." Amended Complaint ("AC") ¶ 18. CME Globex "is the same platform which CME [Group] utilizes to trade derivatives [of a wholly domestic character] based on U.S. Treasury bonds, the S&P 500, the NASDAQ 100, the Dow Jones Industrial Average, grains, livestock, weather and real estate." AC ¶ 18. In 2012, the year relevant to this action, approximately 7,000,000 trades of futures contracts took place on the KRX night market. AC ¶ 20 n.8.

A KRX night market trade begins with the placement of a "limit order" on the KRX system in Korea. Within seconds, the trader's order is matched with an anonymous counterparty on CME Globex "using the multiple price a[u]ction method through which successful bidders are required to pay for the allotted quantity of securities at the respect price/yield at which they have bid." AC ¶ 21 (internal quotation marks omitted). Following matching, "settlement of all trades occurs the day after on the KRX." AC ¶ 22.

In 1998, Gorton founded Tower, a high-frequency trading firm. "High frequency trading firms use computers to create and operate algorithms and, by using those algorithms and technology, execute trades faster than anyone else—making pennies on millions and

millions of trades executed in milliseconds." AC ¶ 27. In 2012, Tower aggressively brought its algorithm and technology to bear on the KRX night market, executing nearly 4,000,000 trades of futures contracts, approximately 53.8% of all KRX night market trades that year. AC ¶ 31.

Plaintiffs allege that a significant number of these trades were manipulative, in that Defendants "utilized their algorithmic flash trading abilities to artificially and illegally manipulate prices of the KOSPI 200 Futures during Night Market trading on the CME for their own profit." AC ¶ 31. Specifically, Plaintiffs allege that Tower's traders "created hundreds and hundreds of *fictitious* buys and sells to artificially manipulate the price of the KOSPI 200 futures contracts they were trading on the CME Globex." AC ¶ 32.

The alleged scheme—which Plaintiffs describe as "spoofing"—operated as follows. Tower's traders would enter large volume buy or sell orders on the KRX night market and then would use Tower's high-frequency technology to immediately cancel their orders or ensure that they themselves were the counterparties on the trades. They would do so because the intent was not to execute the trades but to create a false impression about supply and demand and thereby drive the market price either up or down. Once that was accomplished, the traders would sell contracts at the artificially inflated price or buy contracts at the artificially deflated price,

eventually reaping substantial profits either way. In 2012, Plaintiffs allege, Tower's traders used this spoofing practice hundreds of times, earning more than $14,000,000 in illicit profits. AC ¶ 35.

Plaintiffs, for their part, executed more than 1,000 KRX night market trades in 2012. AC ¶ 24. Given the anonymity of CME Globex, Plaintiffs cannot at the moment identify with precision whether they were a counterparty on any of the allegedly manipulative Tower trades, but they allege it to be a near statistical certainty that at least one Tower trader was a direct counterparty with at least one Plaintiff in a KRX night market trade in 2012. AC ¶ 31 n.13. In any event, Plaintiffs allege that they traded at artificial prices during and due to Defendants' spoofing waves.

In May 2014, a Korean government regulator, the Financial Services Commission ("FSC"), uncovered Defendants' scheme and referred Tower to Korean prosecutors. FSC publicly stated that "traders of a U.S. based algorithmic trading specialty company accessed the KOSPI 200 Overnight Futures Market and traded with the use of the [sic] proprietary algorithmic trading technique, which manipulated prices to build their buy and sell positions by creating automatically and repeatedly fictitious trades." AC ¶ 36. Several media outlets also reported on the scheme and identified Tower as the responsible entity. AC ¶¶ 37–40.

In December 2014, Plaintiffs filed a class complaint on behalf of themselves and other individuals or entities that were allegedly harmed by Defendants' spoofing scheme when they traded in futures on the KRX night market in 2012. Plaintiffs alleged that Defendants' conduct violated several sections of the CEA and New York's prohibition on unjust enrichment.

Defendants moved to dismiss and the district court (Kimba M. Wood, J.) granted the motion. Relying on *Morrison v. National Australia Bank Ltd.*, 561 U.S. 247 (2010), the district court concluded that application of the CEA to Defendants' conduct would be an impermissible extraterritorial application of the act. *Myun-Uk Choi v. Tower Research Capital LLC*, 165 F. Supp. 3d 42 (S.D.N.Y. 2016). The district court reasoned that, under *Morrison*, Defendants' alleged conduct was within the territorial reach of the CEA only if the contracts at issue were (i) purchased or sold in the United States or (ii) listed on a domestic exchange. *Id.* at 48. The district court determined that the contracts were not purchased or sold in the United States because the orders needed to "first be placed through the KRX trading system [in Korea]," and because any trades matched on CME Globex in Illinois were final only when settled the following morning in Busan. *Id.* at 49. The district court then concluded that although *CME* might be a "domestic exchange," Plaintiffs did not sufficiently plead that the same was true for *CME Globex*. *Id.* at 49–50.

Finally, the district court dismissed Plaintiffs' unjust enrichment claim on the ground that Plaintiffs did not allege "any direct dealing or actual, substantive relationship with the Defendants." *Id.* at 51.

Plaintiffs amended their complaint to add allegations about the domesticity of KRX night market transactions, the nature of CME Globex, and the likelihood that they were counterparties with Defendants during the relevant period.

Defendants filed another motion to dismiss, which the district court again granted. *Myun-Uk Choi v. Tower Research Capital LLC*, 232 F. Supp. 3d 337 (S.D.N.Y. 2017).[2] The district court concluded that Plaintiffs still failed to sufficiently allege that CME Globex is a "domestic exchange" under *Morrison* because it is not structured like other exchanges, is not registered as an exchange with the Commodity Futures Trading Commission, and is not subject to the rules of a registered exchange. *Id.* at 341–42. The district court also held that the amended allegations did not plausibly show that trades on the KRX night market were "domestic transactions" because, in its

---

[2] The district court's first decision rejected Defendants' argument that Plaintiffs' allegations are subject to Fed. R. Civ. P. 9(b)'s heightened pleading standard. 165 F. Supp. 3d at 46–48. Although Defendants raised the argument again in their subsequent motion to dismiss, the district court did not address it or Defendants' argument that, apart from *Morrison*, Plaintiffs failed to state a CEA claim. Defendants do not press either of these arguments on appeal and we do not address them. Nor do we address whether the specific allegations in the complaint constitute "spoofing" in violation of the CEA.

view, KRX rules suggest that transactions become final only when they settle on the KRX, not when they match on CME Globex. *Id.* at 342. Finally, the district court again dismissed Plaintiffs' unjust enrichment claim on the ground that Plaintiffs needed "definitive evidence of a direct relationship," yet they "failed to prove that buyers and sellers were direct counterparties under KRX rules." *Id.* at 343. Plaintiffs appealed.

## DISCUSSION

"We review de novo the dismissal of a complaint for failure to state a claim upon which relief can be granted." *Reich v. Lopez*, 858 F.3d 55, 59 (2d Cir. 2017). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 570).

Plaintiffs contend that the district court erred in dismissing their CEA and unjust enrichment claims. Because we conclude Plaintiffs sufficiently alleged that applying the CEA to Defendants' conduct would not be an extraterritorial application of the act, and that Plaintiffs' losses were sufficiently related to Defendants' gains for purposes of their unjust enrichment claim, we agree.

### I. Commodity Exchange Act

"The CEA is a remedial statute that serves the crucial purpose of protecting the innocent individual investor—who may know little

about the intricacies and complexities of the commodities market—from being misled or deceived." *Loginovskaya v. Batratchenko*, 764 F.3d 266, 270 (2d Cir. 2014) (internal quotation marks omitted). As relevant to Plaintiffs' amended complaint, the CEA proscribes the use of "any manipulative or deceptive device or contrivance" in connection with a futures contract and prohibits the manipulation of the price of a futures contract. 7 U.S.C. § 9(1), (3).

Defendants' argument is that, under *Morrison*, KRX night market trades occur outside of the United States and are therefore beyond the CEA's reach.

In *Morrison*, the Supreme Court set out to define the territorial reach of § 10(b) of the Securities Exchange Act, 15 U.S.C. § 78j(b). After discussing the presumption against extraterritoriality, 561 U.S. at 255, the Court concluded that, given its text, § 10(b) (and Rule 10b-5, promulgated thereunder) has only a domestic reach, and therefore applies only to one of two types of transactions: (i) "transactions in securities listed on domestic exchanges;" and (ii) "domestic transactions in other securities," *id.* at 267.

*Morrison* said nothing about the CEA, and we have only once, in *Loginovskaya*, addressed *Morrison*'s effect on that act. There, we concluded that *Morrison*'s "domestic transactions" test applies to the CEA, but, because the plaintiff in *Loginovskaya* did not purchase commodities on an exchange, we had no occasion to address the

"domestic exchange" prong.  *See Loginovskaya*, 764 F.3d at 272–75.  In concluding that *Morrison*'s "domestic transactions" test applies to the CEA, we adopted a rule established in the § 10(b) case of *Absolute Activist Value Master Fund Ltd. v. Ficeto*, 677 F.3d 60 (2d Cir. 2012). *Loginovskaya*, 764 F.3d at 274.  In *Absolute Activist*, we concluded that a transaction involving securities is a "domestic transaction" under *Morrison* if "irrevocable liability is incurred or title passes within the United States."  677 F.3d at 67.  "[I]rrevocable liability" attaches "when the parties to the transaction are committed to one another," or, "in the classic contractual sense, there was a meeting of the minds of the parties."  *Id.* at 68 (internal quotation marks omitted); *see also Vacold LLC v. Cerami*, 545 F.3d 114, 121–22 (2d Cir. 2008) (citing *Radiation Dynamics, Inc. v. Goldmuntz*, 464 F.2d 876, 890–91 (2d Cir. 1972)).

Consequently, plausible allegations that parties to a transaction subject to the CEA incurred irrevocable liability in the United States suffice to overcome a motion to dismiss CEA claims on territoriality grounds.  We believe in this case that Plaintiffs' allegations make it plausible that parties trading on the KRX night market incur irrevocable liability in the United States.  This being a sufficient basis to resolve the extraterritoriality question at this stage, there is no need for us to address whether the CEA has a territorial reach on the basis that the CME Globex is a "domestic exchange."

In *Loginovskaya*, we took pains to heed *Morrison*'s mandate that an extraterritorial analysis assess "the particular statutory provision" at issue. *Loginovskaya*, 764 F.3d at 271 (citing *Morrison*, 561 U.S. at 266–67); *see also Morrison*, 561 U.S. at 261 n.5. We have never concluded however, as the district court and the parties seemed to assume, that *Morrison*'s "domestic exchange" prong applies to the CEA either to broaden or to narrow its extraterritorial reach. The section of the CEA relevant to a territoriality analysis, *see Loginovskaya*, 764 F.3d at 272–73, does not contain the language similar to the language in § 10(b) that led *Morrison* to craft the "domestic exchange" prong: the "purchase or sale of any security registered *on a national securities exchange*." 15 U.S.C. § 78j(b) (emphasis added). Rather, the CEA speaks only of "registered entit[ies]." 7 U.S.C. § 25(a)(1)(D)(i).

\*   \*   \*

We quickly dispatch Defendants' contention that, under *Morrison*, the CEA cannot apply to a commodity traded on a foreign exchange. Leaving aside whether *Morrison*'s discussion of exchanges is applicable to the CEA, *Morrison* itself refutes Defendants' argument. *Morrison* clearly provided that the "domestic transaction" prong is an independent and sufficient basis for application of the Securities Exchange Act to purportedly foreign conduct. *Morrison* summarized the standard in the disjunctive: "[W]hether the purchase or sale is made in the United States, *or* involves a security listed on a

domestic exchange." 561 U.S. at 269–70 (emphasis added). In applying this standard, *Morrison* assessed the domestic nature of a transaction of securities that were listed on an Australian exchange, *see id.* at 273, which would have been an unnecessary endeavor under Defendants' view. Similarly, when we applied *Morrison* in *City of Pontiac Policemen's & Firemen's Retirement System v. UBS AG*, 752 F.3d 173 (2d Cir. 2014), we specifically assessed, for trades made on foreign exchanges, whether irrevocable liability attached. *Id.* at 181–82. Plainly the reasoning of *Morrison* does not preclude the application of the CEA to trades made on a foreign exchange when irrevocable liability is incurred in the United States. We therefore turn to whether Plaintiffs sufficiently alleged that the parties incurred irrevocable liability for KRX night market trades in the United States.

The parties do not dispute that the trades at issue were "matched" in the United States on CME Globex and were "cleared and settled" in Korea. The issue is therefore whether the allegations make it plausible that the parties incurred "irrevocable liability" upon matching. Plaintiffs' amended complaint alleges not only that KRX night market trades bind the parties on matching, it also alleges that the express view of CME Group is that "matches [on CME Globex] are essentially binding contracts" and "[m]embers are required to honor all bids or offers which have not been withdrawn from the market." AC ¶¶ 21–22. Nothing in the amended complaint or

1   elsewhere suggests that a trading party may unilaterally revoke
2   acceptance following matching on CME Globex.  It follows from these
3   allegations that, in the "classic contractual sense," *Absolute Activist*,
4   677 F.3d at 68, parties incur irrevocable liability on KRX night market
5   trades at the moment of matching.

6   Defendants' arguments to the contrary are unavailing.
7   Defendants contend that irrevocable liability attaches only at
8   settlement on the KRX the morning after matching on CME Globex.
9   For this contention, they rely on the KRX rules, which, they assert,
10  "provide that KOSPI 200 futures trades become irrevocable *only* after
11  clearing and settlement."  Br. of Appellees at 47 (emphasis added).
12  We are not convinced.  The KRX rules on which Defendants rely state,
13  in Defendants' words, that "executions may be cancel[l]ed or restated
14  after matching due to errors by the exchange or by a market
15  participant."  Br. of Appellees at 47.  Whether the exchange can cancel
16  or modify trades due to errors, by the exchange or by a market
17  participant, however, says nothing about whether either trading
18  party is free to revoke its error-free acceptance of a trade after
19  matching.  Stated differently, that the exchange has the power to
20  rectify errors in the parties' contracts does not render those contracts
21  "revocable" in any meaningful sense.

22  Defendants next point to a KRX website that, they assert,
23  provides that "'assumption of liability' occurs only during the

clearing process," Br. of Appellee at 48 (alteration omitted), implying, in Defendants' view, that clearing is the first point at which any liability attaches. Defendants expressed a similar view at oral argument, where counsel contended that liability does not attach *at all* between the buyer and seller of the futures contract, but, rather, between each and the KRX. This view evinces a fundamental misunderstanding of Plaintiffs' allegations and exchange trading generally. Although liability might ultimately attach between the buyer/seller and the KRX upon clearing, that does not mean liability does not *also* attach between the buyer and seller at matching prior to clearing. The mechanics of the transaction support both: (i) the buyer and seller enter a binding irrevocable agreement through matching on CME Globex; and then, subsequently, (ii) through the KRX's clearing process, the buyer and seller each transfer that liability from each other to the exchange. Before this subsequent transfer of liability takes place in Korea the next morning, trading counterparties are bound to each other, and not to the exchange. This is analogous to the traditional practice, prior to the advent of remote algorithmic high-speed trading, in which buyers and sellers of commodities futures would "reach[] an agreement on the floor of the exchange" and then subsequently submit their trade to a clearinghouse for clearing and settling. *Leist v. Simplot*, 638 F.2d 283, 287 (2d Cir. 1980); *see also Ryder Energy Distribution Corp. v. Merrill Lynch Commodities*

*Inc.*, 748 F.2d 774, 776 (2d Cir. 1984). Just as the meeting of the minds previously occurred on the exchange floor, Plaintiffs plausibly allege that there is a similar meeting of the minds when the minds of the KRX night market parties meet on CME Globex.

The KRX rules themselves acknowledge a pre-existing liability between trading counterparties prior to the exchange's assumption of liability. Specifically, the rules provide that after the KRX verifies a trade, "the Exchange shall *assume the liability that the member has to the member* who is the counterparty of [the] trade and the relevant member bears the liability that the Exchange assumed for it." App'x 441 (emphasis added). This is consistent with the alleged view of CME Group, which indicates in several sources identified in Plaintiffs' amended complaint that matching on CME Globex creates irrevocable liability (which later is *assumed* by the exchange).

At the least, Plaintiffs' allegations make it plausible that the parties incurred irrevocable liability for their KRX night market trades on CME Globex in Illinois, which is all that is required at this stage of the litigation. Plaintiffs' CEA claims should not have been dismissed on extraterritoriality grounds.

**II.    Unjust Enrichment**

Plaintiffs brought a claim for unjust enrichment, a New York common law quasi-contract cause of action requiring the plaintiff to establish: "(1) that the defendant benefitted; (2) at the plaintiff's

expense; and (3) that equity and good conscience require restitution." *Kaye v. Grossman*, 202 F.3d 611, 616 (2d Cir. 2000).[3] The district court dismissed the claim, concluding that Plaintiffs failed to prove a required "direct relationship" between themselves and the Defendants to support their claim. *Myun-uk Choi*, 232 F. Supp. 3d at 343. We disagree.

Contrary to the district court's view, a New York unjust enrichment claim requires no "direct relationship" between plaintiff and defendant. In *Cox v. Microsoft Corp.*, the Appellate Division sustained an unjust enrichment claim brought against Microsoft by "indirect purchasers of Microsoft's software products," *i.e.*, plaintiffs who had no direct relationship with Microsoft. 8 A.D.3d 39, 40–41 (1st Dep't 2004). The court stated "'[i]t does not matter whether the benefit is directly or indirectly conveyed.'" *Id.* at 47 (quoting *Mfrs. Hanover Tr. Co. v. Chem. Bank*, 160 A.D.2d 113, 117–18 (1st Dep't 1990)); *see also Grund v. Del. Charter Guarantee & Tr. Co.*, 788 F. Supp. 2d 226, 251 (S.D.N.Y. 2011) ("Unjust enrichment does not require a direct relationship between the parties.").

Rather, the requirement of a connection between plaintiff and defendant is a modest one: "[A] claim will not be supported if the

---

[3] Applying New York's conflict of laws principles, the district court concluded that, because there is no conflict between New York and Illinois law, New York law applies. *See Myun-Uk Choi*, 165 F. Supp. 3d at 50. Neither party contests this finding on appeal.

connection between the parties is too attenuated." *Mandarin Trading Ltd. v. Wildenstein*, 16 N.Y.3d 173, 182 (2011) (concluding a relationship was too attenuated where there was a complete "lack of allegations that would indicate a relationship between the parties, or at least an awareness by [defendant] of [plaintiff's] existence").

Plaintiffs' allegations easily establish a connection sufficient for the unjust enrichment claim to proceed. Plaintiffs alleged it to be a near statistical certainty that they directly traded with Defendants on the KRX night market during the relevant period, in which Defendants continually manipulated the market on which the trades occurred. AC ¶ 31 n.13. Moreover, even if none of Plaintiffs' trades were executed directly with Defendants, that would not necessarily defeat Plaintiffs' claim at this stage because Plaintiffs plausibly allege that Defendants' spoofing strategy artificially moved market prices in a way that directly harmed Plaintiffs while benefitting Defendants. If Plaintiffs bought higher or sold lower than they would have absent Defendants' manipulation, Defendants would have caused Plaintiffs harm and enriched themselves at Plaintiffs' expense and "under such circumstances that in equity and good conscience [they] ought not to retain [the funds]." *Simonds v. Simonds*, 45 N.Y.2d 233, 242 (1978) (internal quotation marks omitted). In our view, the connection between the parties in that situation would not be "too attenuated."

Consequently, we vacate the district court's dismissal of Plaintiffs' unjust enrichment claim.[4]

## CONCLUSION

For the reasons stated above, we VACATE the judgment of the district court and REMAND for further proceedings.

A True Copy
Catherine O'Hagan Wolfe, Clerk
United States Court of Appeals, Second Circuit

---

[4] Defendants also assert that Plaintiffs' unjust enrichment claim must be dismissed as duplicative of Plaintiffs' CEA claims. Br. of Appellees at 55–56. Defendants did not raise this argument in their motion to dismiss the amended complaint and it is therefore waived. *See Medforms, Inc. v. Healthcare Mgmt. Sols., Inc.*, 290 F.3d 98, 109 (2d Cir. 2002). In any event, it appears to us that the elements of an unjust enrichment claim are distinct from the elements of a CEA manipulation claim. *Compare Mobarak v. Mowad*, 117 A.D.3d 998, 1001 (2d Dep't 2014), *with In re Amaranth Nat. Gas Commodities Litig.*, 730 F.3d 170, 173 (2d Cir. 2013). For example, Plaintiffs' CEA claim requires a showing that it was Defendants' intent to create artificial market prices, *see In re Amaranth*, 730 F.3d at 173, an element Plaintiffs need not establish for their unjust enrichment claim, *see Mobarak*, 117 A.D.3d at 1001.